**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES FIDELITY & GUARANTY COMPANY, | 1:99-CV-5583 OWW SMS |
| Plaintiff, | ORDER RE: MULTIPLE MOTIONS (DOCS. 220, 221, 223 & 229) AND SETTING SCHEDULING CONFERENCE |
| v. | |
| LEE INVESTMENTS LLC, d.b.a. THE ISLAND, and DIANA CONLEY. | |
| Defendants. | |
| LEE INVESTMENTS LLC, | |
| Plaintiff, | |
| v. | |
| AMERICAN SPECIALTY INSURANCE SERVICES INC, AMERICAN SPECIALTY RISK MANAGEMENT SERVICES, LLC, UNITED STATES FIDELITY & GUARANTY COMPANY, | |
| Counter-Defendants. | |

## I.  INTRODUCTION

This is a workers compensation insurance coverage dispute. Defendant Lee Investments LLC ("Lee") owns and operates a water park called "The Island" in Fresno.  Lee, through its insurance broker AON Risk Services of Central California, Inc. ("Aon"), purchased a workers compensation insurance policy (the "Policy")

1

1   from U.S. Fidelity & Guaranty Co. ("USF&G") for the relevant

2   period of time.  USF&G operated through its agent American

3   Specialty Insurance Company ("American Specialty").   This case

4   has evolved into a three-way dispute between (1) USF&G and

5   American Specialty, (2) Lee, and (3) Aon.

6         Before the court for decision are the following motions:

7         (1)   USF&G's motion to supplement and/or amend the complaint

8               to add alter ego allegations; and to amend the

9               scheduling order to allow limited discovery on these

10              new allegations.  (Doc. 220.)

11        (2)   Lee's motion to file a second amended and supplemental

12              counterclaim against USF&G for negligence, fraud,

13              negligent misrepresentation, indemnity conspiracy to

14              defraud, declaratory relief, breach of contract,

15              tortious breach of the implied covenant of good faith

16              and fair dealing and abuse of process.  (Doc. 223.)

17        (3)   Aon's motion to amend its answer to Lee's third-party

18              complaint to assert counterclaims for negligence,

19              negligent misrepresentation and fraud.  (Doc. 229.)

20        (4)   Aon's motion to amend its answer to USF&G's and

21              American's third-party complaint to assert

22              counterclaims for comparative equitable indemnity and

23              contribution.  (Doc. 229.)

24        (5)   USF&G's motion to re-set dispositive motion deadline to

25              allow the filing of a second round of summary judgment

26              motions.  (Doc. 221.)

27

28

**2**

1

## II.   <u>FACTUAL BACKGROUND</u>

2      In late 1997 or early 1998, Lee contracted with Rexford

3 Development Company for the development of The Island.  Rexford

4 subcontracted Whitewater West Industries ("Whitewater") to

5 construct certain water slides at The Island.

6      Lee and Rexford are alleged to be alter egos of one another

7 under the mutual control of Richard Ehrlich.  During depositions

8 conducted in 2001, Lisa Erlich-Chupak testified that her father,

9 Richard Erlich, owned most of Lee, as well as Rexford Development

10 Corporation and Rexford Properties, two entities involved in

11 development of The Island.

12      In early 1998, Aon sought workers compensation insurance for

13 The Island through American Specialty, an agent with experience

14 in the water park industry.  Initially, Lee selected a workers'

15 compensation policy underwritten by Industrial Indemnity

16 ("Industrial").  Industrial issued its policy in April 1998.

17 Soon thereafter, Industrial conducted an audit of The Island,

18 which revealed that Lee had casual laborers as well as

19 subcontractors performing construction-related tasks at The

20 Island.  On July 13, 1998, Industrial sent Lee a notice

21 cancelling its policy, citing a "change in your business or

22 opertaion that materially increases the hazard or frequency or

23 severity of loss."  American Specialty assured Aon that it would

24 find replacement coverage for the Island.

25      Soon thereafter, American Specialty located a workers'

26 compensation policy (the "Policy") from USF&G, for which American

27 Specialty acted as a managing general agent.  On August 11, 1998,

28 just prior to the issuance of the Policy, American Specialty sent

**3**

1  a letter to Aon, as Lee's agent, that stated in pertinent part:

2
3          Please help me prove to our underwriter the following:

4          1. Island employees will not be performing tasks
           outside of their designated classifications as water
           park employees.  2.  Construction has ceased at The
5          Island and all construction laborers working for
           Rexford Development Corporation have moved to a
6          different job site.  Therefore, workers' compensation
           claims arising from construction will not be reported
7          under Lee Investments' workers compensation policy.

8  (Doc. 229, Aon's motion, Ex. 1.)

9      Aon communicated these concerns to Lisa Ehrlich, Lee's

10 General Counsel, who confirmed that Lee would no longer use its

11 employees to perform construction tasks at The Island.  Ms.

12 Ehrlich asked Aon to draft a letter that was later placed on Lee

13 letterhead and sent to American Specialty.  This letter, dated

14 August 12, 1998, states:

15         This is to confirm that The Island is operating as a
           water park.  Our opening date was August 6, 1998.  Our
16         operation will no longer employ construction laborers.
           Any construction work will be performed by independent
17         contractors.  We will obtain and forward certificates
           of insurance on any contractors hired.  The Island will
18         provide appropriate training for the water park
           employees.  Their duties will be restricted to park
19         activities.

20 (Doc 229, Ex. 1-B.)  The letter was signed and mailed by Christy

21 Plat of Lee.  Ms. Platt testified that she orally reviewed the

22 contents of the letter with Ms. Ehrlich and "read it to her to

23 make sure that it included what Lisa wanted" before signing it

24 ans sending it to American Specialty.

25     On the same day, August 12, 1998, Ms. Ehrlich sent a letter

26 to Whitewater complaining of the costs of "maintaining a labor

27 force to erect [Whitewater's] materials" and indicating that Lee

28 would "rent the appropriate equipment and provide ample labor for

                                    **4**

a two week period," once the remaining materials arrived at the site.  (Doc. 229, Ex. 1-C.)

On August 26, 1998, Aon sent a letter to Ms. Platt of Lee, enclosing the USF&G binder for workers' compensation benefits. The letter noted that the "coverage with [USF&G] has been issued on the premise that there will be no construction laborers employed by Lee Investments LLC."  (Doc. 229, Ex. 1-D.)

In January 1999, Lee undertook to complete construction of the Red Wave water slide, utilizing its own employees, without Whitewater supervision.  (*See* Doc. 194, Order on Cross Mots. for Sum. J., at 49.)   The construction was supervised by a Lee employee.  To assist with the construction work, Lee hired two employees who had previously performed construction work for Lee and also used current employee Diana Conley.  On February 22, 1999, Diana Conley was helping to guide slide sections into place as they were lifted by slingstraps.  During the process, a bar fell and hit Ms. Conley, who sustained serious injuries.

In March 1999, Conley filed a claim for benefits under the Policy.  As required, USF&G reported the injury to California's Worker Compensation Insurance Rating Bureau (WCIRB).

On April 26, 1999, USF&G filed this lawsuit against Lee and Conley,[1] seeking rescission of the Policy and reimbursement for sums paid under the Policy.  By that time, USF&G had advanced more than $600,000 in benefits to Conley.

Lee filed a counterclaim and then a first amended

---

[1]    USF&G later stipulated to the dismissal of Conley as a defendant after she agreed to be bound by any orders, judgments, or settlements resulting from this litigation.

counterclaim against USF&G, American Specialty, American

Specialty Risk Management Services LLC ("ASRM").  Lee also filed

a third-party complaint against Aon raising similar allegations.

In August 2000, Lee dismissed Aon without prejudice after Lee and

Aon entered into a tolling agreement.  However, in May 2001,

USF&G filed a third-party complaint against Aon seeking indemnity

and contribution.  In September 2001, Lee filed a third-party

complaint against Aon.

### A.   Summary of Prior Order on Cross-Motions for Summary Judgment.

Cross motions for summary judgment were filed on May 24,

2002.  District court Judge Robert E. Coyle heard oral arguments

in August 2002.  No decision was issued until July 2004, at which

time the district court denied Lee's motion for summary judgment

and denied in part and granted in part USF&G, American Specialty

& ASRM's cross-motion.  (Doc. 194.)  The key findings of the

decision are as follows.

With respect to USF&G and American Specialty's motion for

summary judgment:

(1)  Summary adjudication was granted to USF&G on all but one of

the elements of its rescission claim.  Specifically, there

was a triable issue of fact as to whether the

representations by Lee concerning construction activity by

its personnel were misrepresentations.  (Doc. 194, 66-74)

Summary adjudication was granted to USF&G on several other

issues relevant to rescission:  the representations made by

Lee are material (*Id*. at 74-79); USF&G is entitled to

restitution from Lee if it prevails on its claim for

rescission; and, at the time of the motion, USF&G had advanced $623,320.26 on behalf of Conley (*Id*. 79-81).

(2)  American Specialty moved for summary judgment on Lee's counterclaim for negligence.  American Specialty argued that it owed no duty to Lee because it was not Lee's agent, but Lee maintained that American Specialty held itself out as an expert in this form of insurance.  Summary judgment was denied because it could not be determined a matter of law that American Speciality owed no duty to Lee.  (*Id*. at 81-87.)

(3)  USF&G/American Specialty moved for summary judgment on Lee's counterclaims for Fraud and Negligent Misrepresentation on the ground that Lee had not established that any misrepresentations were made by American Specialty.  The motion was denied because the facts underlying the alleged misrepresentations are disputed. (*Id*. at 87-88.)

(4)  USF&G/American Specialty moved for judgment on Lee's counterclaim for conspiracy to defraud on the ground that such a cause of action does not exist under California Law.  This assertion was rejected and the motion denied.  (*Id*. at 88-89.)

(5)  USF&G/American moved for judgment on Lee's counterclaim for equitable indemnity on the ground that this claim would be moot if USF&G prevails on its rescission claim.  The district court declined to eliminate the claim on this ground at the summary judgment stage. (*Id*. at 89-90)

**7**

(6)   Finally USF&G moved for judgment on Lee's counterclaim for breach of oral contract.  While acknowledging that Lee's evidence in support of such a claim was weak, the motion was denied because there were disputed questions of fact.  (*Id*. at 90.)

With respect to Lee's cross-motion:

(1)   Lee's contention that USF&G unlawfully failed to limit or restrict the Policy by use of an approved endorsement (i.e., one that would have excluded coverage for construction work) was rejected.  Specifically, this argument was deemed "not relevant" because, assuming the truth of USF&G's claim that "Lee represented to [USF&G] in applying for the policy that its business was a water park and that its operation no longer employed construction workers,...there would be no basis or reason for [USF&G] to issue the [] endorsement....because [USF&G] would not have expected construction workers to be employed by Lee." (Doc. 194 at 54.)

(2)   Lee's contention that USF&G had waived its right to rescind because it failed to investigate under California Insurance Code § 336 was also rejected.  Section 336 provides: "the right to information of material facts may be waived...by neglect to make inquiries as to such facts, where they are distinctly implied in other facts of which information is communicated."  The record before the court was "disputed and raises genuine issues of material fact concerning the notice received by [USF&G] that would have triggered a duty

**8**

1    to conduct further investigation before issuing the workers'

2    compensation policy or would have triggered a basis for

3    Fidelity to terminate the policy prior to Conley's injury."

4    (*Id*. at 63.)

5  (3)  Finally, Lee's motion for judgment that USF&G intentionally

6        waived its right to rescind by virtue of accepting premium

7        payments was also rejected.  (*Id*. at 65-66.)

8

9        **B.    Recent Activity in this Case.**

10       After the initial summary judgment decision issued, a trial

11  on the remaining issues was reset for June 1, 2005.  To

12  accommodate counsel's schedules and allow for the completion of

13  expert discovery, the trial was again continued until February

14  28, 2006.

15       In late November 2005, Lee informed counsel for USF&G that

16  it would be filing for bankruptcy within two weeks.  In December,

17  Lee asserted that its largest unpaid obligation was under a lease

18  of the water park held by Rexford properties.  Based on Lee's

19  assertion that it might file for bankruptcy, the trial was again

20  continued to March 28, 2006.  After several telephone

21  conferences, Lee determined that it would not be filing for

22  bankruptcy.

23       On December 19, 2005, the case was transferred from Judge

24  Coyle to the undersigned district judge.  In mid-January, the

25  parties again attempted to reach a settlement, but the deadline

26  set by the magistrate judge for settlement passed.  A status

27  conference was held on February 10, 2006, at which time the

28  parties expressed interest in amending the pleadings.  A schedule

**9**

1   for the filing of motions to amend was set at that hearing.

2      In the period since the decision on the cross motions for

3   summary judgment, the amount advanced by USF&G on behalf of

4   Conley has risen to over $850,000.

5

6      **III.   STANDARD APPLICABLE TO MOTIONS TO AMEND/SUPPLEMENT**

7      Motions to amend or supplement pleadings are governed by

8   Federal Rule of Civil Procedure 15 (a) or (d), respectively:

9           (a) Amendments. A party may amend the party's pleading
10          once as a matter of course at any time before a
            responsive pleading is served or, if the pleading is
            one to which no responsive pleading is permitted and
11          the action has not been placed upon the trial calendar,
            the party may so amend it at any time within 20 days
12          after it is served. Otherwise a party may amend the
            party's pleading only by leave of court or by written
13          consent of the adverse party; and leave shall be freely
            given when justice so requires. A party shall plead in
14          response to an amended pleading within the time
            remaining for response to the original pleading or
15          within 10 days after service of the amended pleading,
            whichever period may be the longer, unless the court
16          otherwise orders.

17                            ***
            (d) Supplemental Pleadings. Upon motion of a party the
18          court may, upon reasonable notice and upon such terms
            as are just, permit the party to serve a supplemental
19          pleading setting forth transactions or occurrences or
            events which have happened since the date of the
20          pleading sought to be supplemented. Permission may be
            granted even though the original pleading is defective
21          in its statement of a claim for relief or defense. If
            the court deems it advisable that the adverse party
22          plead to the supplemental pleading, it shall so order,
            specifying the time therefor.
23

24      Leave to amend should be "freely given," "[i]n the absence

25   of any apparent or declared reason - such as <u>undue delay</u>, <u>bad</u>

26   <u>faith</u> or <u>dilatory motive</u> on the part of the movant, repeated

27   failure to cure deficiencies by amendments previously allowed,

28   <u>undue prejudice</u> to the opposing party by virtue of allowance of

**10**

1  the amendment, <u>futility of amendment</u>, etc." *Foman v. Davis*, 371

2  U.S. 178, 182 (1962)(emphasis added).

3      Similarly, the Ninth Circuit has entrusted application Rule

4  15(d) to the district court's broad discretion.

5          Rule 15(d) is intended to give district courts broad
           discretion in allowing supplemental pleadings. The rule
6          is a tool of judicial economy and convenience. Its use
           is therefore favored. As Judge Haynsworth observed more
7          than two decades ago:

8
           Rule 15(d) of the Federal Rules of Civil Procedure
9          provides for...supplemental pleading. It is a
           useful device, enabling a court to award complete
10         relief, or more nearly complete relief, in one
           action, and to avoid the cost, delay and waste of
11         separate actions which must be separately tried
           and prosecuted. So useful they are and of such
12         service in the efficient administration of justice
           that they ought to be allowed as of course, unless
13         some particular reason for disallowing them
           appears, though the court has the unquestioned
14         right to impose terms upon their allowance when
           fairness appears to require them.
15
           ....The clear weight of authority, however, in both the
16         cases and the commentary, permits the bringing of new
           claims in a supplemental complaint to promote the
17         economical and speedy disposition of the
           controversy....
18
   *Keith v. Volpe*, 858 F.2d 467, 473 (9th Cir. 1988)(internal
19
   citations omitted).
20
        Accordingly, if amendment/ supplementation serves the
21
   interests of judicial economy, it should be freely given unless,
22
   (a) the moving party exhibits undue delay, bad faith or dilatory
23
   motive, the opposing party would suffer undue prejudice, or (c)
24
   amendment would be futile.
25
   //
26
   //
27
   //
28

                                  **11**

### IV.   DISCUSSION

**A.**   **USF&G's motion to supplement and/or amend the complaint to add alter ego allegations; and to amend the scheduling order to allow limited discovery on these new allegations.**

In November 2005, USF&G learned that Lee was considering filing for bankruptcy.  Soon thereafter, in December 2005, USF&G learned that Lee's alleged insolvency and undercapitalization was due, at least in, part to a purported multi-million dollar unpaid lease obligation to one of the Rexford entities.

USF&G allege that both Lee and the Rexford entitles are owned and controlled by Richard Erlich.  Based upon this information, USF&G now moves to amend the complaint to add alter ego allegations.  USF&G also seeks to reopen discovery to obtain documentation to support its alter ego claim.  Specifically, USF&G seeks documents concerning the financial status of Lee, Rexford Properties and Rexford Development Corporation.  USF&G asserts that this discovery can be quickly conducted and completed.  (Doc. 220 at 8.)

If amendment/ supplementation serves the interests of judicial economy, it should be freely given unless, (a) the moving party exhibits undue delay, bad faith or dilatory motive, (b) the opposing party would suffer undue prejudice, or (c) amendment would be futile.

### 1.   Futility.

To establish an alter ego claim, plaintiff must establish that "(1) there is such a unity of interest and ownership between the corporation and the individual or organization controlling it that their separate personalities no longer exist, and (2)

1  failure to disregard the corporate entity would sanction a fraud
2  or promote injustice." *Robbins v. Blecher,* 52 Cal. App. 4th 886,
3  892 (1997).

4       Here, Lisa Erlich-Chupack testified that Richard Erlich
5  owned all or a majority of Lee, Rexford Development Corporation,
6  and Rexford Properties. (*See* Smyth Decl., Ex. 3.) Richard
7  Miller, the accountant for the various entities, testified that
8  Lee did not have its own bank account at the time the Policy was
9  purchased and that Rexford Development paid all of the premiums
10 for the policy. (*Id.* at Ex. 4.) In light of these and other
11 facts, Lee's recent threat of bankruptcy based in part on its
12 indebtedness to one of the Rexford entities suggests that Lee is
13 manipulating its assets and liabilities to render itself judgment
14 proof. USF&G's alter ego claim does not appear to be futile.

15            **2.  Prejudice**.

16      USF&G asserts that there would be no actual prejudice to Lee
17 because USF&G could always seek to bind the alter egos after
18 judgment. The Ninth Circuit has held that Federal Rule of Civil
19 Procedure 69(a) empowers federal courts to rely on state law to
20 add judgment debtors. *See Cigna Property* and Cas. Ins. Co. v.
21 Polaris Pictures Corp., 159 F.3d 412, 421 (9th Cir. 1998).
22 California Code of Civil Procedure § 187 gives a court the
23 authority to use "all the means necessary" to carry its
24 jurisdiction into effect. This includes the power to amend a
25 judgment to add judgment debtors if (1) "the new party [is] the
26 alter ego of the old party;" and (2) "the new party [] controlled
27 the litigation, thereby having had the opportunity to litigate,
28 in order to satisfy due process concerns." *In Re Levander*, 180

**13**

1  F.3d, 1114, 1121 (9th Cir. 1999), *citing Tripplet v. Farmers*

2  *Ins., Exch.*, 24 Cal. App. 4th 1415, 1421 (1994).

3      Lee responds that the proposed amendment would demand

4  "significantly more discovery" which would impose an "unfair

5  burden on Lee."  (Doc. 240, at 2.)  Lee cites a number of cases

6  to support its assertion that "it is well established that

7  putting Lee through the time and expense of continued litigation

8  on a new theory, with the possibility of new evidence," would

9  cause undue prejudice.  *See Ascon Properties, Inc. v. Mobile Oil*

10  Co, 866 F.2d 1149, 1161 (9th Cir. 1989), *MV Am. Queen v. San*

11  *Diego Marine Construction Corp*, 708 F.2d 1483, 1492 (9th Cir.

12  1983).  USF&G correctly rejoins that in *Ascon* and *MV American*

13  *Queen*, the Ninth Circuit relied on multiple factors to reach the

14  conclusion that prejudice would result, mentioning the burden of

15  further discovery as only part of the totality of the

16  circumstances.  A supplemental alter ego allegation would require

17  a modest amount of additional discovery.  Although it is not a

18  dispositive factor, the delay and expense of such discovery does

19  weigh against trying the alter ego allegation alongside the

20  existing claims.

21          **3.   Delay.**

22      Lee objects that USF&G has unreasonably delayed filing this

23  claim because it was "on notice" of the relationship between Lee,

24  Ehrlich, and the Rexford entities.  It is undisputed that USF&G

25  knew of the interconnections since the depositions of Lisa

26  Ehrlich, Richard Ehrlich, and Richard Miller (the accountant) in

27  2001.  In addition, Lee points out that USF&G was on notice since

28  the initiation of this lawsuit that Conley suffered a serious

**14**

injury that would expose the insured and/or USF&G to significant
liability.  Lee asserts that USF&G should have known, therefore,
that a judgment of such size against Lee would endanger Lee's
financial stability.

Lee's objections are misplaced.  Although USF&G may have
known of the ties between Lee and the Rexford entities, USF&G had
no reason to consider filing of an alter ego claim until it
became apparent that Lee might be shifting its assets to the
Rexford entities to protect itself against a potential adverse
judgment in this case.

### 4.   Bad faith.

Lee asserts that this motion to supplement "reeks of bad
faith" in light of USF&G's recent withdrawal of Lee's defense.
But, apart from Lee's conclusory allegation that USF&G's is only
filing this alter ego motion to "squeeze the new parties for
settlement while it has a chance and before judgment is entered,"
the record does not support a finding of bad faith here.  USF&G's
alter ego claim appears to be well-founded and may be a necessary
step in any effort by USF&G to collect on a potential judgment in
this case.

### 5.   Judicial Economy.

USF&G asserts that the interests of judicial economy will be
served by resolving this alter ego claim alongside the other
claims in one proceeding.  But, examining in detail the business
relationship between Lee and the Rexford entities would
significantly complicate a trial on the rescission issue that
would otherwise focus on a discrete set of interactions between
Lee, its insurers, and the insurance brokers.  Adding the alter

**15**

ego claims would not serve the interests of judicial economy, particularly given the fact that California law would permit USF&G to amend any judgment in its favor to add alter ego judgment debtors.

USF&G's motion to amend to add alter ego claims is **GRANTED, but these claims will be severed and tried separately**, along with the bad faith and equitable indemnity claims, after jury trial on the rescission issue.  A schedule for further discovery on this issue will be set after resolution of the rescission issue.

      **B.**    <u>**Lee's motion to file a second amended and supplemental counterclaim against USF&G for negligence, fraud, negligent misrepresentation, indemnity conspiracy to defraud, declaratory relief, breach of contract, tortious breach of the implied covenant of good faith and fair dealing and abuse of process**</u>.  **(Doc. 223.)**

      **1.**    **Additional Relevant Facts.**

In March 1999, Conley filed a claim before the California Workers' Compensation Appeals Board (WCAB), naming Lee, and GAB Robins (the third party administrator of the Policy) as defendants.  In April 1999,  USF&G filed its action in this court, seeking a declaration that the Policy is void and that USF&G is entitled to rescind the policy ("the Rescission action").  On June 29, 1999, Conley filed a declaration of readiness to proceed with the WCAB action.  On the same day, USF&G filed an objection to the jurisdiction of the WCAB over the rescission question.  The WCAB denied USF&G's objection and apparently continues to assert jurisdiction over the claim for rescission.

On July 7, 1999, Conley filed a motion to dismiss in this court, asserting that jurisdiction belonged in the WCAB and that

dismissal was appropriate on various abstention grounds.  Even though Lee had already answered the federal court complaint, it joined Conley's motion to dismiss on July 14, 1999.  Judge Coyle denied the motion to dismiss, reasoning that the WCAB did not have exclusive jurisdiction over the rescission issue and that abstention was not required or appropriate.  (Doc. 21, filed Oct. 28, 1999.)

On November 16, 1999, Conley requested reconsideration from the district court.  Lee did not join this motion for reconsideration and instead sought leave to file a counterclaim.  Conley's motion for reconsideration was denied.  (Doc. 57, filed Aug. 17, 2000.)  The order denying the motion for reconsideration noted that Lee's counterclaims for breach of fiduciary duty, fraud, conspiracy to defraud, and negligent misrepresentation against USF&G, American Specialty, and AON, arise out of the same facts as the rescission claim and would therefore bring those facts before the district court.  While any decision by the WCAB on the recession issue would bind the parties to the WCAB dispute (USF&G, Lee, and Conley), it would not bind the other counterdefendants in the federal action (i.e., American Specialty and AON) which are not parties to the WCAB action.  This provided an independent basis for allowing the rescission claim and the related counterclaims to proceed in federal court.  (*Id.* at 19.)

On April 18, 2000, Lee made a demand for the appointment of independent defense counsel in the WCAB proceeding.  USF&G agreed to do so in a letter dated April 26, 2000.  That letter stated that nothing contained therein constituted a waiver of any claims, rights, causes of action, rights of action, defenses,

**17**

positions and/or remedies possessed by USF&G, all of which were
expressly reserved.  (Doc. 245, Ex. 5.)  Lee selected Dowling,
Aaron & Keeler ("DAK") as its counsel.  The parties dispute
whether bills from DAK, which were forwarded directly to American
Specialty, referenced only the WCAB case (as USF&G's contends) or
both the WCAB case and the federal case (as Lee contends).

    USF&G concedes that it paid invoices from DAK for time spent
in connection with the WCAB and with depositions which were
simultaneously noticed in both the WCAB and the federal court
matter.

    USF&G heard nothing further from Lee until April 29, 2005,
when Lee sent a letter to Mr. Lowell Gratigny of American
Specialty, requesting payment of bills referencing "The Island"
and "Lee Investments."  Critically, Mr. Gratigny has
responsibility over the <u>federal court litigation</u> and has no
involvement with the workers' compensation case.  Mr. Gratigny
responded to Lee that he had no record in his file that a "cumis"
counsel had been requested by Lee.

    On January 10, 2006, Lee sent a letter to USF&G specifically
requesting payment of attorneys fees incurred in <u>this</u> case.  By
letter dated January 26, 2006, USF&G denied any duty to defend
Lee in this action.

    Lee now seeks to amend its complaint to assert two new
claims against USF&G.  Lee's proposed amendment alleges that
USF&G committed the tort of abuse of process by improperly
bringing this declaratory relief action for rescission in federal
court for various improper purposes.  Lee also proposes to add a
new claim that alleges various forms of insurance bad faith
against USF&G, including bad faith failure to defend.

**18**

**2.   Lee's Proposed Abuse of Process Claim is Futile.**

Lee alleges that USF&G has filed and maintained this Rescission action in "patent violation of California law that prohibits an insurer from seeking declaratory relief that will prejudice Lee in its defense of the WCAB proceeding."  (Doc. 222 at ¶77.)  Specifically Lee asserts, among other things, that:

> (1) USF&G has used the Rescission Action as a means to deny Lee a defense of the rescission issue on which lee is entitled; (2) USF&G has used orders and will use evidence, findings and orders in the Rescission Action against Lee in the WCAB proceedings; (3) USF&G has threatened Lee with and intends through the Rescission Action to subject Lee to penalties as an uninsured employer and to a civil action by Conley; and (4) USF&G has and intends to use the Rescission Action to threaten Lee with those potential penalties and Conley's potential civil action in an effort to effect a settlement in an unfavorable manner.

(*Id.*)

The elements of an abuse of process claim are: (1) "an ulterior motive;" and (2) "a willful act in the use of process not proper in the regular conduct of the proceedings."  *Drum* v. *Bleau, Fox & Assoc.*, 107 Cal. App. 4th 1009, 1020 (2003). The ulterior motive element can be inferred from proof of a willful improper act, so the critical question is whether Plaintiffs have established a "willful act in the use of process not proper in the regular conduct of the proceedings."  *Id.*  Put another way, to abuse process, a defendant must use court process for a purpose not intended, such as to obtain a collateral advantage.

At the heart of Lee's proposed abuse of process claim is the allegation that USF&G has filed and maintained this rescission action in "patent violation of California law that prohibits an insurer from seeking declaratory relief that will prejudice Lee

1   in its defense of the WCAB proceeding." (Doc. 222 at ¶77.) This

2   is an overstatement of the reach of California law on this

3   subject.

4       A federal district court hearing a declaratory relief action

5   for rescission has the discretion to either stay or dismiss the

6   declaratory relief claim if proceeding might prejudice the

7   insured in the underlying compensation action. *See Brillhart v.*

8   *Excess Ins. Co*, 316 U.S. 491 (1942). A district court should

9   exercise its discretion to either stay or dismiss in order to

10  "avoid needless determination of state law issues...discourage

11  litigants from filing declaratory actions as a means of forum

12  shopping...[and] avoid duplicative litigation." *Gov't Employees*

13  *Ins. Co. V. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998). Among

14  other circumstances to be considered in the exercise of this

15  discretion, the Ninth Circuit suggests weighing the following

16  factors:

17          whether the declaratory action will settle all aspects
            of the controversy; whether the declaratory action will
18          serve a useful purpose in clarifying the legal
            relations at issue; whether the declaratory action is
19          being sought merely for the purposes of procedural
            fencing or to obtain a 'res judicata' advantage; or
20          whether the use of a declaratory action will result in
            entanglement between the federal and state court
21          systems. In addition, the district court might also
            consider the convenience of the parties, and the
22          availability and relative convenience of other
            remedies.

23

24  *Id*. at 1225 n.5.

25      The Ninth Circuit's concern over whether the party bringing

26  the declaratory relief action might obtain a "res judicata

27  advantage" is similar to concerns raised by the California

28  Supreme Court in *Montrose Chemical Corp. v. Superior Court*, 6

**20**

Cal. 4th 287, 301 (1993)(*Montrose I*).   In *Montrose I*, in which an
insurer sought a declaration that it had no duty to defend, the
court cautioned against "the risk of inconsistent factual
determinations that could prejudice the insured," and advised
that "a stay of the declaratory relief action pending resolution
of the third party suit is appropriate when the coverage question
turns on facts to be litigated in the underlying action."   *Id*. at
303.   In particular, *Montrose I* emphasized the importance of
avoiding prejudice to the insured in the underlying litigation.

> For example, when the third party seeks damages on
> account of the insured's negligence, and the insurer
> seeks to avoid providing a defense by arguing that its
> insured harmed the third party by intentional conduct,
> the potential that the insurer's proof will <u>prejudice
> its insured in the underlying litigation</u> is obvious.
> This is the classic situation in which the declaratory
> relief action should be stayed. By contrast, when the
> coverage question is logically unrelated to the issues
> of consequence in the underlying case, the declaratory
> relief action may properly proceed to judgment.

*Id*. (emphasis added).   But, the kind of prejudice that merits a
stay only arises under certain circumstances.

> When the courts talk about prejudice to the insured
> from concurrent litigation of the declaratory relief
> and third party actions, they are saying, in effect,
> that the insurer must not be permitted to join forces
> with the plaintiffs in the underlying actions as a
> means to defeat coverage. <u>Another sort of prejudice
> occurs when the insured is compelled to fight a
> two-front war, doing battle with the plaintiffs in the
> third party litigation while at the same time devoting
> its money and its human resources to litigating
> coverage issues with its carriers</u>. And, of course,
> there is the collateral estoppel issue. If the
> declaratory relief action is tried before the
> underlying litigation is concluded, the insured may be
> collaterally estopped from relitigating any adverse
> factual findings in the third party action,
> notwithstanding that any fact found in the insured's
> favor could not be used to its advantage.

*Montrose Chem. Corp v. Superior Court*, 25 Cal. App. 4th 902, 910

21

1    (*Montrose II*) (1994)(emphasis added).

2        A cursory review of the facts in this case shows that Lee is

3    being asked to fight a "two-front war," however, the record does

4    not indicate that the WCAB proceeding is currently placing

5    demands upon Lee or Lee's counsel, particularly given the fact

6    that USF&G continues to cover Lee's defense costs associated with

7    Conley's compensation claims before the WCAB.  Moreover, language

8    from *Montrose II* suggests that the two-front war factor is not

9    dispositive, as a court is also instructed to give consideration

10   "to the burden on insurance carriers that must continue to pay

11   defense costs and fees until the underlying actions are

12   resolved."  *Montrose II*, 25 Cal. App. 4th at 910.

13       Critically, even if there was a potential for "two-front

14   war" prejudice here, a court is vested with discretion to either

15   stay or dismiss a declaratory relief action where prejudice may

16   result.  *See Scottsdale v. MV Transp.*, 36 Cal. 4th 643, 662 (Cal.

17   2005).  The very fact that a court may <u>choose</u> to stay rather than

18   dismiss a declaratory judgment action even in the face of

19   prejudice, suggests that the mere <u>filing</u> by USF&G of a separate

20   declaratory relief action does not constitute abuse of process,

21   which requires the "use [of] court process for a purpose not

22   intended...."  *Drum*, 107 Cal. App. 4th at 1020.

23       Lee responds that its abuse of process claim is not based

24   merely on the filing or maintenance of this lawsuit.

25   Specifically, the complaint alleges that USF&G unlawfully abused

26   the court process by:

27   //

28   //

**22**

(1) the taking of multiple depositions, many of
exceeding length; (2) opposing dismissal of the
Rescission Action after the WCAB had already ruled it
had jurisdiction; (3) inducing and forcing Conley not
to pursue coverage in the WCAB proceedings; (4) forcing
Lee to defend the rescission issue in federal court so
that it could try to deny Lee a defense; (5) using the
counterclaim Lee was compelled to file to protect its
rights as alleged evidence that the rescission issue
was allegedly properly before the federal court; and
(6) using the federal action as additional leverage to
try to extort from Lee a settlement.

Lee is correct that the term "process" as used in an abuse of

process claim "has been interpreted broadly to encompass the

entire range of procedures incident to litigation." *Barquis v.*

*Merchants Collection Assn.*, 7 Cal. 3d 94, 104 n.4 (1972).

However, many of the alleged "abuses" are closely tied to Lee's

allegation that the filing of the rescission action in federal

court was an unlawful abuse of process.  As discussed, USF&G's

prosecution of its rescission action in federal court cannot form

the basis of an abuse of process claim as it is a proper use of a

judicial forum to obtain a decision on whether an insurance

contract was procured by fraud.  Accordingly, for the purpose of

abuse of process, it not improper for USF&G to "oppose[]

dismissal of the Rescission Action after the WCAB had already

ruled it had jurisdiction," to "force Lee to defend the

rescission issue in federal court," to use "the counterclaim Lee

was compelled to file...as alleged evidence that the rescission

issue was ...properly before the federal court," or to use "the

federal action as additional leverage to try to extort from Lee a

settlement."

Lee also alleges that USF&G used the discovery process

unlawfully.  However, as the *Barquis* court notes, even abusive

23

1   use of a court process does not necessarily support an abuse of

2   process claim if there is an adequate legal remedy.  7 Cal. 3d at

3   106 (noting that there was no adequate legal remedy for abusive

4   and intentional filing of actions in an inconvenient forum where

5   doing so required low income adverse parties to engage counsel to

6   advise them of their venue rights).  The taking of multiple

7   depositions, "many of exceeding length," might constitute a

8   discovery violation, but there are ample means under the federal

9   and California discovery rules by which Lee could have objected

10  to and perhaps have prevented any abusive discovery from taking

11  place.  Moreover, there is no indication that Lee was at all

12  harmed by any discovery misconduct.  Rather, the record indicates

13  that USF&G covered Lee's defense costs associated with

14  depositions that were simultaneously noticed in both the WCAB and

15  the federal court matter.

16       Finally, it is not clear what is meant by Lee's final abuse

17  of process allegation -- that USF&G "induc[ed] and forc[ed]

18  Conley not to pursue coverage in the WCAB proceedings.  Nor is it

19  clear how this would have harmed Lee.

20       The motion to amend to add an abuse of process claim is

21  **DENIED.**

22  //

23  //

24  //

25  //

26  //

27  //

28  //

**24**

***3.    Lee's Bad Faith Claim.***

      a.   <u>Summary of the Claim</u>.

Lee's proposed Ninth Claim alleges that USF&G breached the covenant of good faith and fair dealing and acted in bad faith by:

(1)    refusing to defend Lee on the rescission issue before the WCAB;

(2)    intentionally manipulating court and administrative processes so that Lee and Conley would be forced to litigate the rescission issue in the federal court forum rather than before the WCAB;

(3)    intentionally manipulating court and administrative processes against the interest of Lee so that USF&G could contend that it did not owe a duty to defend the issue of rescission;

(4)    failing to defend Lee at all before the WCAB or in the Rescission Action until Lee demanded a defense;

(5)    deliberately withdrawing the defense of Lee in the Rescission Action at a time when Lee faced extraordinary defense expenses for expert discovery and trial;

(6)    failing to conduct Lee's defense of the WCAB proceedings so as to protect Lee from Conley's potential claims for penalties and from Conley's potential contention that Conley can bring a civil action against Lee for greater damages than Conley would receive from the WCAB;

(7)    failing timely and fully to communicate with Lee and retaining Giesler in the WCAB proceedings who purported to represent Lee in those proceedings, but who in fact has not communicated at all with Lee and has not represented Lee at all in those proceedings;

(8)    attempting to undermine and render Lee defenseless against USF&G's claimed right of rescission in both the WCAB and federal court proceedings;

(9)    forcing Lee to the brink of bankruptcy;

(10)   failing to investigate on behalf of Lee the potential exposure of third parties who may have contributed to Conley's accident; and

1    (11) on information and belief, failing to notify the
          Uninsured Employer's Benefit Trust Fund of the
2          rescission issue in the WCAB proceedings so that
          the Fund could intervene to protect its and Lee's
3          interests.

4   (Doc. 222, at ¶73.)  Notably, all of the above-mentioned

5   allegedly unlawful conduct concerns events that occurred after

6   Ms. Conley was injured.

7                    **4.   Judicial Economy/Prejudice Issues.**

8        As was the case with USF&G's proposed alter ego claim,

9   expanding the scope of the litigation to include the laundry list

10  of allegations related to USF&G's litigation-related conduct

11  would significantly complicate a trial on the rescission-coverage

12  issue.  For the most part, where appropriate, these claims can

13  most effectively be addressed after the rescission issue is

14  resolved without prejudicing Lee.  Lee argues that it will be

15  severely prejudiced if it is forced to incur the expense of

16  litigating the rescission issue in federal court.  USF&G suggests

17  that the bad faith failure to defend claim can be resolved on the

18  ground of futility.

19               **5.   Futility of the Bad Faith Failure to Defend Claim.**

20        "An insurer must defend its insured against claims that

21  create a potential for indemnity under the policy....The duty to

22  defend is broader than the duty to indemnify, and it may apply

23  even in an action where no damages are ultimately awarded."

24  *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643, 65 (2005).

25  The *Scottsdale* court described in detail the scope of the duty to

26  defend:

27  //

28  //

                                    **26**

Determination of the duty to defend depends, in the first instance, on a comparison between the allegations of the complaint and the terms of the policy. But the duty also exists where extrinsic facts known to the insurer suggest that the claim may be covered. Moreover, that the precise causes of action pled by the third-party complaint may fall outside policy coverage does not excuse the duty to defend where, under the facts alleged, reasonably inferable, or otherwise known, the complaint could fairly be amended to state a covered liability.

The defense duty arises upon tender of a potentially covered claim and lasts until the underlying lawsuit is concluded, or until it has been shown that there is no potential for coverage. When the duty, having arisen, is extinguished by a showing that no claim can in fact be covered, it is extinguished only prospectively and not retroactively.

On the other hand, in an action wherein none of the claims is even potentially covered because it does not even possibly embrace any triggering harm of the specified sort within the policy period caused by an included occurrence, the insurer does not have a duty to defend.  This freedom is implied in the policy's language.  It rests on the fact that the insurer has not been paid premiums by the insured for such a defense.  The duty to defend is contractual.  The insurer has not contracted to pay defense costs for claims that are not even potentially covered.

From these premises, the following may be stated: If any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage. On the other hand, if, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise in the first instance.

*Id.* at 466.

Procedurally, if an insurer believes that a complaint does not present a potential for indemnity, the insurer may either (1) deny defense at the outset and risk being sued later for bad faith denial of insurance benefits, or may (2) assume the defense under a reservation of the right to seek recovery of the defense

27

costs if it is later determined that there is no potential for
any coverage.  *Id*. at 660.

　　USF&G maintains that Lee's proposed claim for bad faith
breach of the duty to defend is futile because Lee has no right
to a defense in the federal case.  The operative Policy
provisions are undisputed.  The Policy covers "bodily injury by
accident or bodily injury by disease."  (Policy at 1, Part 1 ¶A.)
It is also undisputed that the Policy was issued "on the premise
that there will be no construction laborers employed by Lee...."
(Doc. 229, Ex. 1-D).  Under the Policy, USF&G retains "the right
and duty to defend at our expense, any claim, proceeding or suit
against you for benefits payable by this insurance," but
disclaims that it has "no duty to defend a claim, proceeding, or
suit that is not covered by this insurance."  (Policy at 1, Part
1, ¶C.)  USF&G maintains that the rescission action does is not a
"claim, proceeding or suit against you for benefits payable by
this insurance."

　　In support of its futility argument, USF&G cites, among
other cases, *Horsemen's Benevolent & Protective Assn v. Insurance
Co. of North Am.,* 222 Cal. App. 3d 816, 820-22 (1990).  In that
case, Horsemen's (an association providing services to horse
owners) purchased an insurance policy on behalf of its members
that contained an explicit exclusion for "bodily injury to any
person [sustained] while exercising or training any horse."
Three of Horsemen's members were later named as defendants in a
personal injury lawsuit arising out of a racing accident.  The
three members then filed cross-claims against Horsemen's,
alleging fraud and misrepresentation as to the nature of the

**28**

1  policy coverage.  Horsemen's tendered the expense of its own

2  defense to the insurer.  The *Horsemen's* court held that no

3  defense was owed to Horsemen's because the evidence "conclusively

4  demonstrate[d] the [] liability policy for personal injury or

5  property damage did not provide coverage for the defense or

6  indemnity of the cross-complaints against Horsemen's:

7
8
9
10

> The three cross-complaints against Horsemen's were
> premised on allegations of fraud or intentional and
> negligent misrepresentation concerning the racing and
> training exclusion in the Bellefonte policy. The
> cross-complainants did not allege liability on the part
> of Horsemen's for any personal injury or property
> damage suffered by them.

11  *Id.* at 820.

12     Here, USF&G alleges that to induce issuance of the policy,

13  Lee misrepresented the nature of the activities in which its

14  employees would be engaged.  As in *Horsemen's,* the federal court

15  claims do not concern liability on the part of the insured for

16  covered occurrences of "bodily injury by accident or bodily

17  injury by disease."  Rather, the claims here concern the

18  applicability of the policy's construction activities exclusion.

19  *Horsemen's* suggests that there is no duty to defend under these

20  circumstances.

21     In response, Lee first suggests that USF&G failed to follow

22  proper procedure before denying Lee a defense in the federal

23  case.  Specifically, Lee asserts that USF&G agreed to provide Lee

24  with independent counsel regarding "all issues before the Workers

25  Compensation Appeals Board," but that "despite recognizing its

26  obligation to provide Lee with independent counsel, USF&G now

27  refuses to provide Lee with such counsel for the defense of the

28  rescission action" in federal court.  (Doc. 252 at 2.)  But, Lee

**29**

confuses the duty to provide the insured independent counsel in
the underlying compensation dispute with a "duty" to provide
counsel in a coverage action to rescind the insurance policy
based upon a misrepresentation allegedly made by the insured.
Lee cites no authority which supports the existence of this
latter duty under the facts and circumstances of this case.[2]

Lee also repeatedly argues that by bringing this declaratory
relief action USF&G tortiously breached the covenant of good
faith and fair dealing.  This argument is misplaced for the same
reason that the abuse of process claim is futile.  The law sets
up a system under which the declaratory judgment/rescission court
may examine the potential for causing prejudice to the insured in
the underlying workers compensation action.  Lee points to cases
in which bad faith claims were allowed to proceed under somewhat
related circumstances, but these cases are distinguishable.  For
example, in *Dalrymple v. United Services Automobile Association*,
40 Cal. App. 4th 497, 515 (1995), the court found it to be

> at least arguable that pursuing a declaratory relief
> action regarding coverage could be done for reasons
> indicating bad faith...(e.g., if there were no proper
> cause to dispute coverage, *and* if more than erroneous
> interpretation of a policy (e.g., a willfully misguided
> one) were concerned.

(emphasis in the original).  It cannot be argued here that there

---

[2] The cases cited by Lee are not on point.  For example,
in *Diamond Woodworks, Inc. v. Argonaut Insurance Co.*, 109 Cal.
App. 4th 1020 (2003), an insurance company was found to have
acted "reprehensibly" when, despite the existence of caselaw
suggesting the insured was entitled to a defense, the insurer
continued to deny provision of a defense to the insured.  Here,
Lee has been unable to point to a single case that clearly
imposes a duty upon an insurer to provide a defense to the
insured in a rescission action.

1  was "no proper cause to dispute coverage," nor is it alleged that
2  USF&G made "a willfully misguided" interpretation of the policy
3  in concluding that the misrepresentation claim was not covered by
4  the policy's defense provisions.

5      Lee's bad faith failure to defend claim appears to be futile
6  as currently pled.  Absent any stronger showing of merit on this
7  issue, it is not appropriate to try that claim prior to or
8  alongside the rescission-coverage issue.  However, as
9  appropriate, Lee may pursue its bad faith failure to defend claim
10 and may seek reimbursement of its defense costs after resolution
11 of the rescission claims.[3]

12     Accordingly, Lee's motion to amend to assert claims for bad
13 faith and/or breach of the covenant of good faith and fair
14 dealing is **GRANTED, but these claims will be severed and tried
15 separately,** along with the alter ego and equitable indemnity
16 claims, after jury trial on the rescission issue is completed.

17     **C.   Aon's motion to amend its answer to Lee's third-party
            complaint to assert counterclaims for negligence,
18          negligent misrepresentation and fraud**.   (Doc. 229.)

19
20     Aon now seeks leave to amend its answer to Lee's third party
   Complaint to assert claims for negligence, negligent
21 misrepresentation, and fraud.  Specifically, Aon seeks to recover
22 a portion of its attorneys' fees and costs incurred in this
23 matter under the "tort of another" doctrine.  USF&G filed a
24

25
   _____

26     [3]   As a separate ground for its bad faith breach claim,
   Lee also argues that USF&G failed to provide Lee a proper defense
27 in the WCAB proceeding.  There is no pressing need to resolve
   these allegations at this time.  They too may be raised after the
28 rescission claims are resolved.

statement of non-opposition to this motion.  (Doc 243.)  Lee
objects to amendment on the ground that the proposed counterclaim
would be futile.  The question is whether the complaint, read in
the light most favorable to the plaintiff states a valid claim.
*See Miller v. Rykoff-Sexton Inc.*, 845 F.2d 209 (9th Cir. 1988).

Under the tort of another doctrine:

> A person who through the tort of another has been
> required to act in the protection of his interests by
> bringing or defending an action against a third person
> is entitled to recover compensation for the reasonably
> necessary loss of time, attorney's fees, and other
> expenditures thereby suffered or incurred.

*Prentice v. N. Am. Title Guaranty Corp.*, 59 Cal. 2d 618 (1963).

Both parties rely upon a recent case out of the Northern
District, *Burger v. Kuimelis*, 325 F. Supp. 2d 1026 (N.D. Cal.
2004).  In *Burger*, a broker alleged that the insured's wrongful
conduct caused the broker to become "an unwitting tool in [the
insured's] criminal scheme to defraud," and that the insureds
"knew they were placing [the broker] at risk of an
[administrative] investigation."  *Id*. at 1036.  The broker sought
to recover the expenses he incurred defending himself against the
administrative investigation, even though the broker pled guilty
to a related charge.  *Id*. at 1037.  The district court in *Burger*
found that the broker's allegations were sufficient to state a
fraud action under the tort of another doctrine.

The allegations here are similar to those in *Burger*.  Here,
Aon asserts that Lee defrauded Aon by falsely representing that
it would no longer use its employees to perform construction
work.  Aon further contends that it was "entirely foreseeable
that Aon would become embroiled in any dispute over the accuracy

32

1   of the representations in that letter." (Doc. 229 at 8.)

2       Lee unpersuasively cites *Umet Trust v. Santa Monica Medical*

3   *Investment Co.*, 140 Cal. App. 3d 864, 869-870 (1983) for the

4   proposition that a party can only recover attorneys fees under

5   exceptional circumstances. *Umet* does not support Lee's case.

6   The *Umet* court specifically held that such exceptional

7   circumstances exist when "a person who through the 'tort of

8   another' has been required to act in the protection of his

9   interests." *Id*. at 869.

10      Lee also maintains that Aon's negligence claim is futile

11  because Lee owed no duty to Aon.  But, "the duty not to mislead

12  is a duty that runs from [a client] to [its broker.]" *Burger*,

13  325 F. Supp. 2d at 1044.

14      Lee next argues that Aon's fraud claim must fail on several

15  grounds.  First, Lee incorrectly argues that Aon must <u>allege</u> (a)

16  that Lee made a representation to Aon with the intent to induce

17  Aon to rely on the truth of the representation (b) that Aon's

18  reliance was justified, and (c) that Aon suffered damages.  In

19  support of this objection, Lee cites California Civil Jury

20  Instructions 1900 (Intentional misrepresentation) and 1903

21  (negligent misrepresentation).  Even if these jury instructions

22  were binding authority, which they are not, they address the

23  ultimate burden of proof at trial, not the pleading standard

24  applicable in the context of a futility objection.

25      Second, Lee argues that Aon cannot possibly prove reliance

26  because the alleged misrepresentations were made in a letter that

27  was sent by Lee to American/USF&G and was not intended for Aon.

28  However, Aon's proposed amendment specifically alleges that Lee

**33**

1   made representations directly to Aon and that Aon relied on these
2   representations.

3        Finally, Lee argues that Aon cannot state a claim under the
4   tort of another doctrine because Aon at least partially caused
5   its own involvement in the litigation through fraudulent acts of
6   its own that Lee plans to prove at trial.  Lee argues that, under
7   such circumstances, the tort of another doctrine is legally
8   unavailable.  But, the fact that Lee has alleged wrongdoing on
9   the part of Aon does not render Aon's claim invalid at the
10  pleading stage.  For example, in *Burger*, the broker incurred some
11  attorneys fees as a result of his own misconduct.  However, even
12  though "it might be difficult to determine what damages are
13  attributable to [the client's] alleged misconduct...such is a
14  matter better considered later."  325 F. Supp. at 1037.

15       Aon's proposed "tort of another" claims are not futile.  No
16  party offers any further objection to Aon's amendment.
17  Permitting the addition of Aon's proposed claims would not
18  require additional discovery, nor would it demand the
19  presentation of additional witnesses or evidence at trial.  Aon's
20  motion to amend to assert claims of negligence, negligent
21  misrepresentation, and fraud under the "tort of another" doctrine
22  is **GRANTED.**  It may be appropriate to try this claim with the
23  rescission-coverage issue.  This timing issue will be addressed
24  at the up-coming scheduling conference.
25  //
26  //
27  //
28  //

**34**

**D.** **Aon's motion to amend its answer to USF&G's and American's third-party complaint to assert counterclaims for comparative equitable indemnity and contribution.** **(Doc. 229.)**

USF&G has asserted claims of indemnity and contribution against Aon in a third party complaint.  Aon now seeks leave to amend its answer to USF&G's third party complaint to assert claims for comparative equitable indemnity, contribution and declaratory relief.  Aon argues that amendment should be permitted because its proposed claims are essentially the same as the claims already asserted by USF&G.

USF&G filed a conditional non-opposition to Aon's motion. USF&G and American Specialty assert that they "do not oppose Aon's motion to assert a counterclaim against them if the Court grants the motion of USF&G to amend its complaint to add allegations of alter ego." (Doc. 244.)  However, USF&G and American Specialty "would oppose the motion of Aon if the Court were to deny USF&G's motion...." (*Id.*)  USF&G offers no legal or factual argument in its conditional opposition.

Again, because these proposed claims will not require additional discovery, witnesses or evidence at trial, the interests of judicial economy would not be hindered by permitting amendment.  Aon's motion to amend to assert counterclaims for comparative equitable indemnity and contribution is **GRANTED.** However, as the availability of equitable indemnity and contribution will turn on the outcome of the rescission-coverage issue, these claims will be severed and tried separately after the rescission-coverage trial is completed.

35

1

2

**E.   USF&G's motion to re-set dispositive motion deadline to allow the filing of a second round of summary judgment motions.   (Doc. 221.)**

3    USF&G also moves to amend the scheduling order to allow the

4  filing of a second round of summary judgment motions.[4] USF&G

5  argues that consideration of a renewed motion is appropriate here

6  because it has new facts which may eliminate some of the issues

7  in dispute. *See Advanced Semiconductor Materials America Inc.,*

8  *v. Applied Materials Inc.*, 922 F. Supp. 1439 (N.D. Cal. 1996);

9  *Courtaulds Aerospace Inc. v. Huffman*, 826 F. Supp. 345 (E.D. Cal.

10 1993). USF&G also asserts that newly decided cases have

11 clarified the applicable law. Specifically, *Mitchell v. United*

12 *National Ins. Co*, 127 Cal. App. 4th 457 (2005) held that an

13 unintentional failure to disclose material facts in an

14 application provided a basis for rescission even though there

15 were other facts giving rise to a duty on the part of the insurer

16 to investigate other alleged misrepresentations.

17    USF&G also asserts that the July 30, 2004 order on cross

18 motions for summary judgment disposed of all but one element of

19 USF&G's rescission claim (whether Lee's representations to Aon

20 constituted misrepresentations) and all but part of one of Lee's

21 affirmative defenses (whether USF&G waived its right to

22 rescission under California Insurance Code § 336 by failing to

23 make inquiries as to material facts where distinctly implied by

24 other facts). Lee objects to USF&G's characterization of the

25

26    [4]    Lee complains that the latest scheduling order only
permits the parties to bring motions to extend the existing
27 pleadings and does not permit the filing of new dispositive
motions.   This is a non-sequitur, as USF&G is now moving to
28 amend the schedule.

**36**

1  remaining issues in the case, asserting that Judge Coyle merely

2  denied Lee's motion for summary judgment on the issue of whether

3  USF&G waived its right to rescission under California Insurance

4  Code § 336.   Lee objects that USF&G is trying to "bootstrap a

5  denial of Lee's motion for summary judgment into a ruling

6  granting summary judgment to USF&G."   In addition, Lee suggests

7  that it will advance other waiver theories at trial.

8       Summary judgment is one mechanism for resolving such

9  disputes, but under the circumstances, where a trial on the

10 merits has been delayed for many years, it is more efficient to

11 take up these issues as motions in limine.   The motion to amend

12 the scheduling order to permit the filing of new dispositive

13 motions is **DENIED**.   A schedule for the future progress of the

14 case will be set during the next scheduling conference.

15

16                      **V.   CONCLUSION**

17       For the reasons set forth above,

18 (1)   USF&G's motion to supplement and/or amend the complaint

19        to add alter ego allegations; and to amend the

20        scheduling order to allow limited discovery on these

21        new allegations, (Doc. 220), is **GRANTED,** but these

22        claims will be severed.   Any discovery and/or trial on

23        these claims will proceed after the trial on the

24        coverage (rescission) claims.

25 (2)   Lee's motion to file a second amended and supplemental

26        counterclaim against USF&G (Doc. 223) is **DENIED** with

27        respect to the abuse of process allegation as futile.

28

**37**

(3)   Lee's motion to file a second amended and supplemental
counterclaim against USF&G (Doc. 223), is **GRANTED** with
respect to the bad faith allegations, but all bad faith
claims will be severed and tried separately after trial
on the rescission issue.

(3)   Aon's motion to amend its answer to Lee's third-party
complaint to assert counterclaims for negligence,
negligent misrepresentation and fraud under the tort of
another doctrine, (Doc. 229), is **GRANTED.**

(4)   Aon's motion to amend its answer to USF&G's and
American's third-party complaint to assert
counterclaims for comparative equitable indemnity and
contribution, (Doc. 229), is **GRANTED** but these claims
will be severed and tried separately after trial on the
rescission issue.

(5)   USF&G's motion to re-set the dispositive motion
deadline to allow the filing of a second round of
summary judgment motions, (Doc. 221), is **DENIED.**


A scheduling conference will be held on September 1, 2006,
at 8:45 a.m., to:

(a)   Set a schedule for further proceedings, including
motions in limine, and a trial date; and

(b)   determine whether Aon's tort of another allegations
will proceed to trial with the rescission-coverage
issues.

**SO ORDERED**

**Dated: July 18, 2006                    /s/ OLIVER W. WANGER**

_____
**          Oliver W. Wanger**
**UNITED STATES DISTRICT JUDGE**