IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES FIDELITY & GUARANTY COMPANY, | ) ) | No. CV-F-99-5583 OWW/SMS |
| | ) ) ) | MEMORANDUM DECISION DENYING LEE INVESTMENTS LLC'S MOTION FOR JUDGMENT PURSUANT TO |
| Plaintiff, | ) ) | RULE 50(b), FEDERAL RULES OF CIVIL PROCEDURE (Doc. 703) |
| vs. | ) ) ) | |
| LEE INVESTMENTS, LLC dba THE ISLAND, et al., | ) ) ) | |
| Defendant. | ) ) ) | |
| _____ | ) | |

Lee Investments LLC (hereafter Lee) moves pursuant to Rule 50(b), Federal Rules of Civil Procedure, for judgment as a matter of law on the ground that no reasonable jury would have a legally sufficient evidentiary basis to find for United States Fidelity & Guaranty Company (hereafter USF&G) and Aon Risk Services Inc. of Central California Risk Services (hereafter Aon) in that:

> 1. As a condition or exception limiting coverage, Mr. Sackett's August 11, 1998 letter (Exh. 833) was required to be, but was not, as a matter of law, clear, plain and conspicuous;

> 2. As a matter of law in this case, it was

1

an element of USF&G's claim for rescission
that Lee have been provided with, completed,
signed and returned, an application for the
workers' compensation policy issued by USF&G;

3.  As a matter of law, USF&G and Aon failed
to show that Lee's employees engaged in
activities that were outside of a water park
workers' compensation classification code;
and

4.  As a matter of law, Lee did not make a
misrepresentation to Aon, Lee did not intend
to induce any reliance by Aon on a
misrepresentation, and no reliance of Aon was
a substantial factor in causing harm to Aon.

A.  Governing Standards.

The standards governing a motion for judgment as a matter of

law pursuant to Rule 50, Federal Rules of Civil Procedure, are

reiterated in *Gibson v. City of Cranston*, 37 F.3d 731, 735 (9th

Cir.1994):

When confronted with a motion for judgment as
a matter of law, whether at the end of the
plaintiff's case or at the close of all the
evidence, a trial court must scrutinize the
proof and the inferences reasonably to be
drawn therefrom in the light most amiable to
the nonmovant ... In the process, the court
may not consider the credibility of
witnesses, resolve conflicts in testimony, or
evaluate the weight of evidence ... A
judgment as a matter of law may be granted
only if the evidence, viewed from the
perspective most favorable to the nonmovant,
is so one-sided that the movant is plainly
entitled to judgment, for reasonable minds
could not differ in the outcome ....

Further, a party cannot raise arguments in a post-trial motion

for judgment as a matter of law that it did not raise in its pre-

verdict motion.  *Freund v. Nycomed Amersham*, 347 F.3d 752, 761

2

1    (9th Cir.2003).

2        B. **Was the Sackett's August 11, 1998 letter (Exh. 833) A**

3    **Condition or Exception Limiting Coverage, and Required To Be As a**

4    **Matter of Law, Clear, Plain and Conspicuous?**

5        Lee asserts that the August 11, 1998 letter "stated what

6    USF&G claims was a condition to coverage that Lee's employees (a)

7    stay within their designated classification as water park

8    employees and (b) that claims arising from 'construction' not be

9    reported under the workers' compensation policy", and contends:

> USF&G and ASI never made clear to Lee what
> was and was not included within the
> designated classification for water park
> employees, nor did USF&G and ASI inform Lee
> that they were interpreting 'construction' in
> a layperson's terms instead of in the sense
> that would require a construction
> classification code under the Uniform
> Statistical Reporting Plan.  Dr. Levine
> established that 'designated classification'
> and 'construction' in this context would be
> understood by persons in the insurance
> industry in their technical sense, but USF&G
> claimed that any activity that a layperson
> could call construction was impermissible.
> This was never clarified for Lee, which, like
> Mr. Lemasters, understood it was not unusual
> for water park maintenance employees to erect
> water slides as part of park operations.

20   Lee asserts that, because USF&G and American Specialty were not

21   clear, plain and conspicuous in their statement of condition or

22   exception to the policy, that condition or exception cannot be

23   enforced.  Lee cites *Thompson v. Occidental Life Insurance Co.*, 9

24   Cal.3d 904, 912 (1973):

> [A]n insurance company is not precluded from
> imposing conditions precedent to the
> effectiveness of insurance coverage despite

3

1        the advance payment of premium.  However, any
such condition must be stated in conspicuous,

2        unambiguous and unequivocal language which an
ordinary layman can understand.

3

4  Lee also cites *E.M.M.I., Inc. v. Zurich American Ins. Co.*, 32

5  Cal.4th 465, 471 (2004):

6        As we have declared time and again, 'any
exception to the performance of the basic

7        underlying obligation must be so stated as
clearly to apprise the insured of its

8        effect.'  Thus, 'the burden rests upon the
insurer to phrase exceptions and exclusions

9        in clear and unmistakable language.'  The
exclusionary clause 'must be conspicuous,

10       plain and clear.'  This rule applies with
particular force when the coverage portion of

11       the insurance policy would lead an insured to
reasonably expect coverage for the claim

12       purportedly excluded.

13     Lee's contention assumes that the August 11, 1998 letter

14  imposed a condition or restriction on coverage.  It did neither.

15     As USF&G responds, Lee's contention that the August 11, 1998

16  letter constituted a condition modifying the terms of an

17  integrated policy is "completely unfounded as a matter of law"

18  and fact.  The August 11, 1998 letter was not part of the

19  insurance policy, did not address any term or provision of the

20  insurance policy, and did not constitute a condition or exclusion

21  to the policy itself.  The cases upon which Lee relies discuss

22  rules for the interpretation of an insurance policy that is in

23  force, and not, as here, written representations made by the

24  applicant before the written and fully integrated policy contract

25  was issued or came into effect.  As USF&G contends:

26        Sackett's August 11, 1998 letter ... clearly

was not part of the policy.  Rather, it constituted only a request by the insurer in the course of the policy application process for confirmation that Lee would not use its employees to perform construction work.  That inquiry was made to allow USF&G and American Specialty to determine whether they would be willing to issue the policy in the first place.

Furthermore, Lee, over the objections of USF&G, requested and obtained Jury Instruction No. 29:

If you find that USF&G imposed any condition to its issuance of the workers' compensation policy to Lee, you should determine if any language of such condition is uncertain or ambiguous.  If you find that the language of any condition to the issuance of the workers' compensation policy is uncertain or ambiguous, you should consider the language it its narrowest sense.

(Doc. 661, p. 30).  Therefore, Lee's issue of policy condition or exclusion was presented to and the jury fully considered Lee's argument that USF&G was imposing a condition in the workers' compensation policy, that such condition had to be certain and unambiguous and, if so, should be interpreted in its narrowest sense.  The jury unequivocally rejected Lee's theory of the case and version of conflicting facts.

Lee's assertion that Jury Instruction No. 29, given at trial, is of "no moment" because the issue of whether the condition was clear, plain and conspicuous is a question of law, is without merit.  The case upon which Lee relies, *20th Century Ins. Co. v. Liberty Mut. Ins. Co.*, 965 F.2d 747, 753 (9th Cir.1992), does not so hold.  Further, because Lee requested and obtained Jury Instruction No. 29, the doctrine of invited error

5

precludes Lee's motion on this ground.  *See Deland v. Old Republic Life Insurance Company,* 758 F.2d 1331, 1336-1337 (9th Cir.1985).

The jury resolved every one of the multitude of disputed facts against Lee, finding Lee had been deceitful and had acted with fraudulent intent in inducing USF&G to issue the worker's compensation insurance policy.  Lee's motion for judgment on this ground is DENIED.

C. <u>As a Matter of Law, Was USF&G Required to Provide Lee With A Completed, Signed and Returned, Application For the Workers' Compensation Policy Issued by USF&G?</u>

Lee argues that, as a matter of law, an application for the workers' compensation policy was required in this case as an element of the claim for rescission.  This claim has been fully analyzed and rejected in Lee's accompanying motion to vacate the Partial Judgment.

Lee relies on the testimony during its cross-examination of Stanley Sheehan:

> Q.  In the course of doing underwriting, American Specialty reviewed applications; is that correct?
>
> A.  Yes, American Specialty reviews applications as a part of underwriting.
>
> Q.  And as a matter of policy and procedures, did you request a signed application?
>
> A.  A signed application is requested as part of the procedure.
>
> Q.  And that was true in 1998; correct?

1          A.   Yes.   That was true in 1998.

2    (Testimony of Sheehan, Feb. 7, 2007, 16:20-17:4).

3          Lee argues that this testimony establishes that an

4    application for insurance by USF&G is an element of a claim for

5    rescission.   Lee cites CACI Instruction 2308, "Rescission for

6    Misrepresentation or Concealment in Insurance Application -

7    Essential Factual Elements", as including in the elements of the

8    claim the following:

9               1.   That [*name of insured*] submitted an
                application for insurance with [*name of
10              insurer*];

11              2.   That in the application for insurance
                [*name of insured*] [intentionally] [failed to
12              state/represented] that [*insert omission or
                alleged misrepresentation*] ....

13

14   Lee contends that Lee never submitted an application for

15   insurance with USF&G.   Rather, Lee asserts:

16              American Specialty pieced together
                information from various outdated and
17              incomplete sources to write the policy,
                including an unsigned application for
18              insurance with Industrial Indemnity.  The
                original application was in substantial
19              conflict with other information American
                Specialty had within its Lee file, including,
20              without limitation, another supplemental
                application submitted by Dibudio & DeFendis
21              which clearly indicated Lee's intent to
                construct and erect new slides with its
22              employees.  USF&G now seeks to rescind based
                on Lee's alleged misrepresentations regarding
23              the nature and scope of Lee's employees work
                as it relates to assembling an unfinished
24              water slide.

25   Lee contends:

26              Evidence was introduced at trial that the

                              7

1
2
3
4
5

> formality of the application puts the
> applicant on notice that the information
> provided will be used to determine whether to
> issue a policy.  Here, the application, and
> the protections inherent to the applicant
> therein, were missing.  This missing
> instruction on the element of an application
> clearly prejudiced Lee and lead to an
> unfavorable result.

6   Lee's position is based on reference to incomplete testimony

7 and is incorrect as a matter of California law.  The provisions

8 of California law governing the right to rescission under the

9 California Insurance Code and case law impose no "requirement" of

10 an application.  *See Mitchell v. United National Ins. Co.*, 127

11 Cal.App.4th 457, 467-469 (2005):

12
13
14
15
16
17

> United National based its right to rescind
> the policy on Insurance Code sections 331 and
> 359.  Insurance Code section 331 states:
> 'Concealment, whether intentional or
> unintentional, entitles the injured party to
> rescind insurance.'  Insurance Code section
> 359 similarly provides: 'If a representation
> is false in a material point, whether
> affirmative or promissory, the injured party
> is entitled to rescind the contract from the
> time the representation becomes false.'

18
19
20
21
22
23
24
25
26

> Insurance Code sections 331 and 359 are part
> of a larger statutory framework that imposes
> 'heavy burdens of disclosure' 'upon both
> parties to a contract of insurance, and any
> material misrepresentation or the failure,
> whether intentional or unintentional, to
> provide requested information permits
> rescission of the policy by the injured
> party.'  (*Imperial Casualty & Indemnity Co.
> v. Sogomonian* (1988) 198 Cal.App.3d 169, 179-
> 180 ... Insurance Code section 332, for
> example, requires each party to an insurance
> contract to disclose, 'in good faith, all
> facts within his knowledge which are or which
> he believes to be material to the contract
> ...' The disclosure obligations imposed by
> these statutes are directed specifically at

8

1
2
3
4
5
6
7

the formation of the insurance contract.
Insurance Code section 334 states:
'Materiality is to be determined not by the
event, but solely by the probable and
reasonable influence of the facts upon the
party to whom communication is due, in
forming his estimate of the disadvantages of
the *proposed contract*, or in making his
inquiries.'  (Ins. Code, § 334, italics
added.)  Insurance Code section 356 provides:
"The completion of the contract of insurance
is the time to which a misrepresentation must
be presumed to refer.'

8
9
10
11
12
13
14

Requiring full disclosure at the inception of
the insurance contract and granting a
statutory right to rescind based on
concealment or material misrepresentation at
that time safeguard the parties' freedom to
contract.  '[An insurance company] has the
unquestioned right to select those whom it
will insure and to rely upon him who would be
insured for such information as it desires as
a basis for its determination to the end that
a wise discrimination may be exercised in
selecting its risks.' ....

15   None of these Insurance Code provisions require a written or

16   formal "application" before a contract of insurance may be

17   rescinded because of misrepresentation or concealment.

18       Moreover, Sheehan's selectively quoted testimony that a

19   signed application is requested by American Specialty during the

20   underwriting process is irrelevant, because Sheehan also

21   testified an unsigned application is often accepted.  Hugh Awtrey

22   testified that signed applications are usually not required as

23   part of the underwriting process:

24
25

Q.  Let's go down to the bottom of the page,
please.  This application was not signed; is
that correct?

26

A.  That is correct.

9

1          ...

2          THE COURT: Is there some reason for that?

3          THE WITNESS: Unless companies require
           signatures, we generally don't have
4          signatures of apps.  If they come back at the
           time of binding, sometimes I will come back
5          and say before we bind coverage, we will need
           a signature, but otherwise, policies are done
6          over the phone and we submit it and it's
           written without a signature.

7

8          There are certain types of policies where I
           might come back and say we need a signature.
9          Workers' Compensation, there is generally
           never signatures on applications.

10  (Testimony of Awtrey, Feb. 8, 2007, 170:7-20).  Bennett Bibel

11  also testified that an underwriter can use any form of

12  documentation it chooses in making an underwriting decision:

13         Q.  Do some workers' comp insurers make
           determinations whether to issue policies to
14         particular applicants based solely on this
           standard Acord application?

15
           A.  I would have to say that's the norm.  The
16         normal circumstance.  In most circumstances,
           the Acord application, which was developed by
17         the insurance industry, answers or asks the
           questions that an underwriter needs to write.

18
           Q.  Okay.  Is there some guideline as to what
19         an underwriter has to have in order to write
           - to decide to write a workers' compensation
20         insurance policy?

21         A.  At the risk of being facetious, he needs
           a contract to have the pen in order to be
22         able to have the authority to write.
           Underwriting is an art as well as a science.
23         And underwriters have wide latitude in the
           process of accepting or declining a given
24         risk.  And an underwriter on a given day may
           ask for something, another day he may not ask
25         for it.  It depends on how much he knows
           about the nature of a particular risk and who
26         is submitting it.

                                    10

(Testimony of Bibel, Feb. 17, 2007, 38:4-21).

As USF&G argues, Lee's contention that it was prejudiced because the "formality" of the application would have placed Lee on notice that the information provided would be used to determine whether to issue the policy is contradicted by the reality of Lee's relationship with its broker, Aon, and workers' comp insurance industry practice:

> As a matter of fact, Lee's broker, Aon, obviously was aware that the information it was providing to American Specialty in the August 12, 1998 letter, which it drafted, would be utilized to determine whether to issue the policy.

Lee replies that USF&G previously cited *Cohen v. Penn Mut. Life Ins. Co.*, 48 Cal.2d 720, 726 (1957), for the proposition that the fact the insurer asked specific questions on the application makes the answers material as a matter of law. Lee asserts that it previously argued that, without a corresponding request for certain information on the application, the information is presumed immaterial, citing *Reserve Ins. Co. v. Apps,* 85 Cal.App.3d 228, 231 (1978) and *Ashely v. American Mut. Liab. Ins. Co.*, 167 F.Supp. 125, 132 (N.D.Cal. 1958). Lee argues the application itself is such an important and necessary document that it may be used to prove or disprove the element of materiality. Lee claims the issue of an application and the presence of it was key to show the absence of fraud and the lack of a misrepresentation:

> As set forth in the cases above, the

11

application gives notice to the applicant that the information sought is important. Along with this, is the assumption that the applicant will see and review the application, see the questions asked, review the questions with either the insurer or the applicant's broker, and thus be informed of what the insurer wants to know and also to know that the information is sought for the purposes of an underwriting determination. All of these factors are the reasons for the importance, and necessity of an application. This is supported by the CACI instruction ... which lists an application as the first element of a claim for rescission.

At trial, USF&G failed to establish the existence of an application.  This is not surprising because USF&G was unable to meet this element.  In the present case, two separate applications were filled out on Lee's behalf prior to the cancellation of the original policy issued by Industrial Indemnity.  Neither were signed by Lee.  The most recent application, and not surprisingly, the one not completed by Aon, clearly answered the question regarding whether the employees were building or erecting slides in the affirmative!  The unequivocal testimony at trial was that this application was in the Lee file at ASI when the USF&G policy was issued.  ASI testified that it reviewed the file in determining whether to issue the USF&G policy. Accordingly, it was uncontroverted that on this earlier application Lee informed ASI that it intended to perform acts that USF&G would later construe as construction.

Moreover, Lee was not provided another 'fresh' application despite the change in circumstances and experience of Lee in operating the park.  Lee knew what remained to be completed (the red slide) and that it intended, as long as Bruce Calomiris was a part of the operation, that Lee would maintain all the slides and might assemble the red slide if it was completed.  On the other hand, Lee did not know the contents of the August 11, 1998 letter.  Thus, Lee did not have sufficient notice of information

12

1    which should have been in the application.

2 Lee contends that the Partial Judgment must be vacated, altered

3 and/or amended for failure to decide an essential issue in the

4 case.

5    Lee's position is inaccurate.  A contract of insurance was

6 issued to Lee by USF&G at the instance of Aon, as Lee's insurance

7 broker, through American Specialty.  This transaction follows

8 industry practice whereby the insured's broker seeks workers'

9 comp coverage for the insured that may or may not be accompanied

10 by a signed, completed application for the policy.  Lee's

11 position would negate any ability of USF&G to rescind that policy

12 merely because an application was not completed and signed by

13 Lee.  The course of dealing between Lee and Aon and industry

14 practice explains fully how the USF&G insurance policy came into

15 force after the Industrial Indemnity policy was cancelled.  In

16 accordance with industrial practice, Lee's broker "shopped" the

17 risk and located an insurer willing to issue a workers' comp

18 policy based on Aon's presentation of "the case" for Lee.  Lee's

19 arguments concerning the importance of the application pertain to

20 materiality, which were made by Lee to the jury on the issue of

21 liability.  There was no failure of proof on an essential issue

22 nor any instructional error regarding a completed application for

23 the policy.

24    For all the reasons stated above, Lee's motion for judgment

25 as a matter of law on this ground is DENIED.

26    D.   Whether USF&G and Aon Failed to Show that Lee's

13

**Employees Engaged in Activities Outside of a Water Park Workers'**

**Compensation Classification Code?**

Lee asserts that USF&G reported Ms. Conley's accident to the Workers' Compensation Insurance Rating Bureau (WCIRB) as occurring under classification code 9016, as was made clear by Master Stat Report Facsimile (Ex. 675). Lee contends that there was no evidence that Ms. Conley's injury was ever classified by USF&G or the WCIRB as occurring under any other classification code:

> This admission by USF&G proves that Ms. Conley was working within water-park [sic] classifications in accordance with Mr. Sackett's August 11, 1998 letter to Hildebrand (Exh. 833) and Ms. Platt's August 12 letter (Exh. 374).
>
> Clearly, Lee's August 12 letter which USF&G claims serves as the basis for Lee's misrepresentation notified USF&G that Lee employees' 'duties would be limited to park operations.' (Exh. 374.) Classifications 9016 and 9180 were the only code classifications that were pertinent to the water park operations in issue. Accordingly, the great weight of the evidence, and indeed the only evidence, was that Ms. Conley was injured in the course of her employment with Lee while conducting tasks that were clearly 'park operations.'

USF&G rejoins that Ms. Conley's classification in the Master Stat Report Facsimile is not an admission by USF&G.

First, USF&G correctly observes there was no evidence at trial as to who made the report to the WCIRB or whether the source of the information for the report was anything other than the report of injury filed by Lee.

14

1    Second, USF&G maintains that the insurer was required to

2    report injuries to the WCIRB using only the classification codes

3    set forth in the policy.  USF&G refers to the trial testimony of

4    Lee's workers' compensation expert, Dr. Arthur J. Levine:

5            Q.  It says under No. C, 'Report the standard
             classification code to which the claim has
6            been assigned.  No claims can be assigned any
             standard classifications, unless payroll or
7            other appropriate exposure also has been
             reported for the standard classification.'
8
             So you have to - if you are going to make a
9            report on the Unit Stat Report, it has to be
             for a classification that's in the existing
10           policy; is that right?

11           A.  Yes, unless the insurance company tells
             the Bureau that they think the classification
12           should be added or changed.

13           ...

14           THE COURT: At the time of an injury, the
             insurer reports to the Board under the
15           classifications that are in the policy.  And
             unless there is a change to those
16           classifications in the policy by endorsement
             or some other means, then those are the
17           classifications used for reporting?

18           THE WITNESS: Right.  It's a control
             mechanism.  The Bureau does not - if
19           something is going on in a classification
             that isn't in the policy, the Bureau needs to
20           know about it.  They can't just have
             insurance companies assigning claims to
21           classes that aren't on there.

22   (Testimony of Levine, Feb. 14, 2007, 56:11-20, 57:24-58:8).

23       From this, USF&G contends when Ms. Conley was injured, her

24   injury was reported to the WCIRB under the classifications

25   actually contained in the USF&G policy, as an amusement park

26   maintenance worker, classification 9016:

1
2
3

> The injury was reported as required by law,
> and the manner in which it was reported was
> not an admission that construction
> classifications come within the scope of an
> amusement park operations employee.

4   USF&G contends that by the time the classification was

5 reported, USF&G had filed its action for rescission.  It was

6 clear that USF&G contended that the work performed by Ms. Conley

7 was a construction activity not covered by the policy.  Even if

8 the Master Stat Report Facsimile was an admission, there was

9 contrary evidence that USF&G did not accept or make such an

10 admission, which the jury could and did consider by expressly

11 finding that there was no waiver or estoppel by USF&G based on

12 all the evidence.

13   Lee replies that USF&G misleads the Court concerning its

14 admission because "USF&G fails to remind the Court that the only

15 expert testimony concerning the Master Unit Stat Report was that

16 the purpose was to accurately report injuries."  Lee contends

17 that further testimony by Dr. Levine established that although

18 the reporting party must initially report under an existing

19 classification, the reporting party has a continuing duty to

20 revise the classifications and amend the Master Unit Stat Report

21 so that it accurately reported the classification under which the

22 injury occurred:

23
> Q.  Now, by custom and practice in the
> insurance industry, is the carrier's
> assignment of the 9016 classification code to
> an accident on this Master Unit Statistical
> Facsimile relied on as accurate?

24
25

26
> MR. SMYTH: Objection, no foundation.

1        THE COURT: Lay the foundation.  Sustained.

2        ...

3        Q.  Dr. Levine, do you know what use is made
         of the reported classification code for the
4        injuries that employees suffer on the job?

5        A.  Yes, I do.

6        ...

7        Q.  What use is made?

8        A.  The two uses I just mentioned.  The first
         is rate-making by the Rating Bureau, and the
9        second is Experience Modification
         Determination by the Rating Bureau for the
10       individual employer.

11       Q.  And to your knowledge, by custom and
         practice, is an insurance company required to
12       report accurately what classification code
         applies?
13
         A.  Yes.  If they don't, then it contaminates
14       or subverts the whole rating basis as well as
         gives the employer a potential advantage or
15       disadvantage in their Experience Modification
         competing with other competitors in the
16       industry.

17       ...

18       The Rating Bureau is, first and foremost, a
         rating organization, and it takes tremendous
19       pains and is extremely concerned about the,
         let's call it 'purity', or accuracy, of its
20       database.

21       In many of the meetings I attend, the
         president of the Rating Bureau comments that
22       a proposed rule change or a particular
         procedure will have an impact or won't have
23       an impact on the credibility and accuracy of
         the database.
24
         There is probably nothing that they are more
25       concerned about than making sure that this
         information is properly reported and
26       accumulated because is it's not right, then

                              17

> they are not giving the right results to the
> Insurance Commissioner, and their own
> members, the insurance companies, are using
> data that's skewed.
>
> So both for their own self-interest and for
> their role for the Insurance Commissioner,
> they want to get it right.

(Testimony of Levine, Feb. 14, 2007, 35:8-37:10)

Relying on this testimony, Lee asserts that "this" was ultimately USF&G's responsibility and that the reporting occurred after the rescission action was filed "only makes the admission more egregious [and] does not ... excuse USF&G from its admission.

Third, USF&G contends, whether Ms. Conley's work could be covered by a construction code classification is irrelevant:

> USF&G asserted in argument and during the
> case that the issue was whether Lee's
> employees, not just Ms. Conley, would be
> performing *construction work,* as that term
> was normally interpreted using common
> language.  The jury could and did reject
> Lee's hypertechnical interpretation of the
> August 12 letter as referring only to work
> requiring a separate classification under a
> construction code.  More importantly, none of
> the parties who participated in the drafting
> of the August 12, 1998 letter, Hugh Awtrey
> and Christy Platt, testified to any
> understanding of a 'special meaning' of
> construction work different than its common
> meaning.  Finally, as testified by Bennett
> Bibel, even if construction work were such
> performed [sic] normally by a water park
> employee, it still had to be separately
> classified under the WCIRB if it constituted
> new *construction*.  Testimony of Bennett
> Bibel, February 13, 2007 at 63:13-22 ... It
> was clear and undisputed that the water slide
> on which Conley was injured was a completely
> new slide under original construction.

18

Lee contends that the testimony of Lee's workers' compensation expert, Arthur Levine, confirms that Ms. Conley was performing water park operations when she was injured.  Lee asserts that Dr. Levine "is one of the preeminent experts on California Workers' Compensation Insurance, arguably one of the most knowledgeable outside the actual workers' compensation administration", that he has authored a book and taught classes on workers' compensation and liability insurance, and has served as the attorney for the Public Members of the Governing Committee on the Workers' Compensation Insurance Rating Bureau.  Lee asserts:

> Dr. Levine testified that work performed by Ms. Conley during the time of her injury, and any construction-related activity performed by Ms. Conley or Mr. Calomiris after the park opened for business was considered to be part of park operations and as such, it was covered under the water park classification codes 9016 or 9180.  This evidence was unrebutted by other expert testimony.  This evidence cannot be disregarded absent contradicting expert testimony.  Dr. Levine's opinion was supported by Lee's water park expert Kent Lemasters who testified that it was not unusual for water parks to use their own employees to erect new slides, depending on the skills of park personnel and other issues.
>
> As set forth above, the key communications, all indicate that American Specialty would agree to insure Lee's employees performing 'their designated classification as water park employees,' and Lee agreed that its employees 'would be restricted to park operations.'  Taken together, and in light of Dr. Levine's uncontroverted testimony, it is clear that Ms. Conley (and Mr. Calomiris and the remaining Lee employees assembling the

> Red Wave Slide in February 1999) was
> performing within park operations and
> performing a task that is within a designated
> water park classification code.
>
> Thus, even though classification codes are
> technically only used to calculate premiums,
> the clear weight of the evidence was that
> they were used by the parties in this case to
> designate and describe USF&G's claimed
> underwriting limitation and Lee's expected
> and anticipated scope of work by its
> employees.  The clear weight of the evidence
> was that water park operations included
> erecting water slides, Lee's employees would
> perform those tasks, Lee expected to be
> insured for those tasks, and USF&G and
> American Specialty should have expected to
> insure those tasks.  Accordingly, the clear
> weight of the evidence is that there was no
> misrepresentation concerning the nature and
> scope of Lee employees' work and that Ms.
> Conley was performing a task contemplated and
> accepted by USF&G.

Both USF&G and Aon oppose this conclusory opinion and refer
to the disputed evidence.  Both assert that Lee's contention
ignores all of the evidence at trial and all of the relevant
legal issues.  USF&G contends:

> First, Lee ignores the clear and explicit
> language in its August 12, 1998 letter that
> Lee would no longer employ construction
> laborers and that any construction work would
> be performed by independent contractors.
> Although Lee would like to rephrase the
> language of that letter to state that Lee's
> employees would only perform construction
> work requiring a separate classification
> under the Uniform Statistical Reporting Plan
> of the WCIRB, the letter clearly did not so
> state.  In determining the falsity of Lee's
> representations and its intentional
> concealment of its plans to use its own
> employees to finish construction of the water
> park slide, whether or not its employees fell
> within a workers [sic] compensation
> classification is irrelevant.  Any alleged

20

testimony by Levine that Conley's work fell within a water park operations classification thus also was irrelevant. Lee's contention that the clear weight of the evidence established the classification codes were used by the parties to designate USF&G's claimed underwriting limitation as to the expected and anticipated scope of work by its employees ... is absurd. No one, not even Ms. Ehrlich, testified to that effect.

Second, Lee's representation that it would not perform construction work with its own employees was not limited to Conley. During trial, Bruce Calomiris testified that he utilized a ten-ton crane and reach forklifts to assemble the water park slide. Conley herself testified that she performed work, including bolting together portions of the slide while other workers were on manlifts 30 to 40 feet in the air, which clearly constitute construction.

Third, as even Lee admits ..., 'classification codes are technically only used to calculate premiums, ...' ... It thus was irrelevant as to whether the work of any construction worker, including Conley, fell within an amusement park classification. Lee represented that it would not use its own employees to perform construction work. It did not reference workers [sic] compensation classifications. In any event, USF&G's expert, Bennett Bibel, testified that under the WCIRB, *new construction* must always be separately classified ... Even Levine testified that new construction had to be separately classified.

Finally, Levine in fact did not testify specifically that Conley was performing work that fell within a water park classification. However, he did provide his preposterous and unbelievable testimony that while construction of a six-story building constituted 'construction,' construction of a six-story water slide did not and that while construction of a temporary structure over a college graduation ceremony was considered assembly and not construction, even though the USRP had a *construction* classification

21

1          for tent erection.  The weight of the
        evidence was that Levine's testimony was
2          preposterous and unbelievable.

3

    Aon argues that Lee's contention that Ms. Conley was
4
performing work within the scope of water park operations is
5
irrelevant:
6
        [T]here was evidence that (1) all of the
7          parties understood American Specialty's
        concern to be any type of construction work
8          performed by Lee's employees, and (2) Lee
        understood the August 12, 1998 letter to mean
9          that Lee's employees would not perform such
        work.
10
Aon refers to the trial testimony of Christy Platt:
11
        Q. ... If you look to the last sentence of
12         the letter, and it says ..., 'The coverage
        with [USF&G] has been issued on the premise
13         that there will be no construction laborers
        employed by [Lee].'
14
        Now, that was your understanding as well?
15
        A.  Correct.
16
        Q.  So in your dealings with Mr. Awtrey and
17         Aon around the time of the August 12th letter
        ... you understood that Mr. Awtrey was
18         relaying to you ... the new insurance
        company's concerns about water park employees
19         doing construction, correct?

20         A.  Yes.

21         Q.  Okay.  And you understood that the August
        12th letter was intended to address those
22         concerns, correct?

23         A.  Correct.

24         Q.  And you discussed the insurance company's
        concerns with Lisa Ehrlich, correct?
25
        A.  I'm sure I did.
26

1  (Testimony of Platt, Feb. 14, 2007, 16:3-21).  Aon also refers to

2  the trial testimony of Cathy Hacker:

3          Q.  And do you recall what Stan said about
            potentially issuing a USF&G policy to
4          American Specialty to The Island for Workers'
            Compensation insurance?

5
            A.  My recollection is that he would consider
6          writing it only on the condition that we had
            verification that Splash Island employees no
7          longer would perform any construction work.

8  (Testimony of Hacker, Feb. 2, 2007, 55:16-21)

9  Aon contends that since the jury reasonably could conclude as a

10  matter of fact, that Ms. Conley was performing construction work,

11  the jury's verdict was not against the clear weight of the

12  evidence.

13      Lee replies that the August 11 and August 12, 1998, post-

14  policy-insurance letters make clear that USF&G intended to cover

15  any work done by Lee employees if properly classified within

16  water park classification and that Lee clearly informed American

17  Specialty that it intended its workers to perform normal water

18  park operations.   Lee refers to the August 11, 1998 letter (Ex.

19  833):

20          Attached is a copy of The Island's workers'
            compensation loss runs.  Bill, I think we
21          have a problem.  The loss runs seem to
            evidence an interchange of labor between the
22          water park employees and the construction
            employees.  Please review the type of losses
23          that have occurred and help us understand how
            this fits with our understanding of the
24          client/employee relationship.  We would have
            anticipated training losses rather than
25          construction losses.

26          After seeing the loss runs, we are concerned.

                                    23

The loss runs seem to support Industrial
Indemnity auditors' position.  Please help me
to prove to our underwriter the following:

1.  *Island employees will not be performing
tasks outside of their designated
classification as water park employees;*

2.  Construction has ceased at The Island and
all construction laborers working for Rexford
Development Corporation have moved to a
different job site.  Therefore, workers'
compensation claims arising from construction
will not be reported under Lee Investments
workers' compensation policy. [Emphasis
added]

Lee again contends that neither Kent LeMasters' testimony or Dr.

Levine's testimony has been rebutted.  Lee refers to Dr. Levine's

trial testimony:

Q. ... Dr. Levine, I would like you to assume
that in response to the underwriter's inquiry
on the previous hypothetical that I gave to
you, the prospective insured responded using
the term or phrase 'construction laborers,'
and stated that the prospective insured would
not employ construction laborers.

In 1998, would that phrase have been
generally understood in the insurance
industry to have had a specialized meaning?

...

A.  Yes.

Q.  Dr. Levine, I would ask you to assume the
same facts, except the prospective insured
has stated that the prospective insured will
not to do [sic], 'construction.'  In 1998,
would that term have generally been
understood in the insurance industry to have
had a specialized meaning?

A.  Yes.

Q.  Now, I want you to further assume that
the prospective insured stated that the

24

1    insured would limit its activities to 'park
     operations.'  In 1998, would such phraseology
2    generally have been understood in the
     insurance industry to have had a specialized
3    meaning?

4    ...

5    THE WITNESS: When you said 'park operations,'
     you are talking about a water park?
6
     ...
7
     Q.  Any kind of park for hypothetical
8    purposes, an amusement park,

9    ...

10   THE WITNESS: I mean as opposed to a public
     park with grass in it?
11
     MR. JAMISON: Right.
12
     ...
13
     THE WITNESS: Yes.  That would have a - that
14   would be understood in the insurance industry
     to have a particular meaning.
15
     ...
16
     Q.  And what meaning would it have?
17
     A.  Well, once again, it would mean
18   operations that are performed by a contractor
     or by a construction company that was
19   classified or for some other reason had to be
     classified under one of the several dozen of
20   specific construction codes or - I'm using
     'code' and 'classification' interchangeably.
21
     Q.  Okay.  And earlier in this series of
22   hypotheticals, I asked you about the phrase,
     quote, 'construction laborers,' and you
23   indicated that it would have been generally
     understood in the insurance industry to have
24   a specialized meaning.  What would that
     meaning have been?
25
     A.  I would distinguish it from, say,
26   maintenance workers, repair workers, general

                          25

1       grounds workers.  All of those kinds of
        people can do what might be considered in a
2       lay sense or generic sense construction work,
        but that's not what it means in the Workers'
3       Comp industry.  And maybe an example of that,
        let's talk about a water park.
4
        If the - one of the sections of a slide at
5       the top, I don't know how high the things
        are, 70 feet or whatever they are, were to
6       break and need to be welded.  You could have
        a park maintenance employee go up or operate
7       a crane or whatever was required, and
        disassemble this thing and load this heavy
8       pipe to the ground and weld it and then
        reverse the process.  That might sound like a
9       construction activity if you just generally
        talked about construction.
10
        But very clearly, it's a repair activity and
11      'repair',' it doesn't matter how heavy duty
        it is, if it's repair, then in the Workers'
12      Comp rules, the classification language and
        so on, that's included in whatever the basic
13      nonconstruction classification is.

14      So construction laborers, to me, doesn't mean
        people who are doing maintenance repair and
15      other kinds of activities that are in the
        regular classification. It means people that
16      are doing specifically construction
        classification things, usually contractors,
17      employees those do those sorts of things
        [sic].
18
        ...
19
        Q.  In other words, you have to look at the
20      fact that it's being used in a Workers'
        Compensation insurance context; is that
21      right?

22      A.  Yes.

23
(Testimony of Levine, Feb. 14, 2007, 45:9-49:80).  Lee contends
24
that because Dr. Levine's testimony establishes that, in the
25
context of Workers' Compensation insurance, the terms
26

                                26

"construction" and "construction laborer" do not refer to incidental construction work that may be performed by a maintenance employee, Ms. Conley's work on the red slide in February 1999 was normal park operations and would be covered and expected within water park classifications 9180 or 9016.

All these arguments center on factual disputes over the parties' intent in contracting, most especially Lee's credibility, in responding to the underwriter's questions and requirements.  The jury was free to reject Dr. Levine's testimony which the jury could have found was not coherent, or so biased or arbitrary as to be of no help to the trier of fact.  The testimony established that there were no discussions about code classifications when the policy was sought for Lee by Aon, especially not in relation to USF&G's "no construction" by Lee's employees requirement.  The secret intent of Lee to refer solely to "construction" activities as defined by specialized complex workers' comp classification codes, which even the experts do not fully understand, nor could Dr. Levine cogently or comprehensibly explain, is not supported by the evidence.  There was a total absence of evidence and failure of proof by Lee that before the policy was bound and issued that Lee and Aon ever discussed such classification codes with ASI or USF&G so as to vary the common meaning of construction or to expand coverage to such unintended construction activities.  This dispute was factual, not assisted by Levine's legal conclusions and the jury rejected Lee's evidence based on credibility findings adverse to Lee.

1     Lee's motion for judgment on this ground is DENIED.

2     **E.   Whether, As a Matter of law, Lee Made a**

3 **Misrepresentation to Aon, Lee Intended to Induce Any Reliance by**

4 **Aon on a Misrepresentation, and Whether A Reliance of Aon Was a**

5 **Substantial Factor in Causing Harm to Aon?**

6     Lee maintains there was no legally sufficient evidence for a

7 reasonable jury to find Lee liable for attorneys' fees to Aon for

8 commission of a "tort of another."  Lee asserts Christy Platt's

9 August 12, 1998 letter and all of Lisa Ehrlich's statements to

10 Hugh Awtrey in response to his questions on August 12, 1998 were

11 intended to be transmitted to American Specialty.  Lee argues:

12             Lee did not intend to induce any reliance on
              the part of Aon on any representations by Lee
13             and Aon did not in fact rely on any such
              representations.  Instead, Aon on [August 12,
14             1998] was, with the exception noted below,
              only delivering communications between Lee
15             and American Specialty.  Since Aon was not
              the intended recipient of any alleged
16             misrepresentations and did not itself rely on
              any such representations, there could be no
17             claim for a misrepresentation to Aon or other
              breach of duty by Lee.

18

19 Lee relies on Aon's action on August 12, 1998, when Aon itself

20 drafted for Lee the language regarding Lee's nonperformance of

21 construction activities to be transmitted for Lee by Aon, to ASI.

22 Lee contends this was on Aon's sole initiative and that Aon, in

23 Mr. Awtrey's and Ms. Moore's August 27, 1998 letter (Ex. 841),

24 for its own benefit, took it upon itself to advise Lee that the

25 policy had been issued on the premise that no construction

26 laborers would be employed by Lee.  Lee asserts that Aon's own

conduct, and not any breach of duty by Lee to Aon, resulted in Aon being sued by USF&G and American Specialty for indemnity and resulted in Aon's counterclaim against USF&G and American Specialty for indemnity.  Lee asserts that Aon cannot recover for the "tort of another" where Lee breached no duty owed to Aon or Aon's own conduct necessitated its involvement in litigation, citing *Burger v. Kuimelis,* 325 F.Supp.2d 1026, 1041-1043 (N.D.Cal.2004).

"[A] person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorneys fees and other expenditures thereby suffered." *Prentice v. North American Title Guaranty Corp.*, 59 Cal.2d 618, 620 (1963).

Aon responds that Lee presents a one-sided view of the evidence that ignores substantial trial testimony to the contrary.  Aon asserts that the jury reasonably concluded that Lee intentionally made misrepresentations to Aon during Lee's effort to obtain a follow-on workers' comp insurance policy through USF&G, and that those misrepresentations caused Aon to be sued by USF&G for indemnity based on alleged fault of Aon which was attributable to Lee's tortious conduct.  Aon contends there was substantial evidence that American Specialty and USF&G sought confirmation that Lee would perform no further construction work nor employ construction workers at Island Water Park.  Lee knew Aon was relying on those representations in drafting the letter

1  to American Specialty and Lee intended Aon, American Specialty,

2  and USF&G, to rely on the truth of the representations.   Aon

3  refers to Aon's cross-examination of Lisa Ehrlich:

4          Q.   He [Hugh Awtrey] may have told you that
             whatever work - the insurance company wanted
5          to know that whatever work was going to be
             done was going to be done by subcontractors
6          and that Lee would obtain certificates of
             insurance?

7

8          A.   Yes.

          Q.   He told you that?
9
          A.   That they wanted a letter regarding that
10         work that was done would be done by
             subcontractors and that certificates of
11         insurance would be obtained.

12              ...

13         Q.   Whatever work was going to be done was
             going to be done by subcontractors?
14
          A.   Let me see if I can remember.  We talked
15         about - we talked about the status of
             operations, and then he told me that they
16         wanted a letter.  I know we talked about the
             construction laborers, and then we did talk
17         about, yes, construction work, and that it
             would be done by subcontractors, and
18         certificates of insurance would be issued.

19              ...

20         Q.   Okay.  And in fact, this letter was
             prepared and sent to Christy Platt by Mr.
21         Awtrey, as far as you know, right?

22         A.   It was prepared by Mr. Awtrey and she
             signed it and sent it back to him, I believe.
23
          Q.   Again, I think you testified that you
24         talked to Christy Platt and told her that Mr.
             Awtrey would be proposing some language for a
25         letter, right?

26         A.   That is correct, that is what he said,

                              30

1          that he might want to do that.

2          Q.  And that as long as the language in the
           letter was consistent with your discussion
3          with Mr. Awtrey and with Ms. Platt, that Ms.
           Platt could go ahead and sign that letter?
4
           A.  That is correct.
5

6   (Trial testimony of L. Ehrlich, Feb. 9, 2007, 7:10-18; 7:22-8:4;

7   8:14-9:1).  Aon also refers to Aon's cross-examination of Christy

8   Platt:

9          Q.  Okay.  And you were clarifying that issue
           for Hugh, correct?  If I could rephrase.
10
           In other words, if the concern at the time of
11         the cancellation of the Industrial Indemnity
           policy was that there were some employees
12         doing construction that were employed by the
           water park, you were helping Hugh and Joanne
13         understand that maybe those employees were in
           fact under Rexford or some other company?
14
           A.  Correct.
15
           ...
16
           Q. ... Do you recall that Mr. Awtrey was
17         seeking your assistance in helping the second
           insurance company, USF&G, feel more
18         comfortable about issuing an insurance policy
           in light of these construction concerns?
19
           A.  As it relates to who was doing that work.
20
           Q.  Right.
21
           A.  I believe that to be true, yes.
22

23  (Trial testimony of Platt, Feb. 14, 2007, 5:17-25; 6:17-23).

24      Lee's admissions support the jury's findings that Lee knew

25  the prospective second insurer, USF&G, required affirmative

26  representations by Lee that Lee would not perform construction

                                    31

activities and would not utilize construction workers, who would be subcontracted and insurance certificates provided.  Aon further contends that Aon did not "take it on itself" to write the letter to American Specialty.  Instead, Aon was acting prudently as Lee's broker in responding to American Specialty's requirement that Lee provide a letter containing these representations before issuing the policy.  Lee was well aware of this requirement, as evidenced by the testimony set forth above, and the trial testimony of Cathy Hacker:

> Q.  And do you recall what Stan said about potentially issuing a USF&G policy to American Specialty to The Island for Workers' Compensation insurance?
>
> A.  My recollection is that they would consider writing it only on the condition that we had verification that Splash Island employees no longer would perform any construction work.
>
> ...
>
> Q.  Now, in the meeting, was there any discussion about whether the response to any inquiry by Aon had to come from the insured, the policy holder or prospective policy holder?
>
> A.  Yes, we were requiring that we receive a written response from the insured.
>
> ...
>
> Q.  Okay.  Was there anything in that letter, as you read it, that states, 'American Specialty is requesting a written response'?
>
> A.  Yes.
>
> Q.  And where is that?

1

2

3

4

      **A.   The second paragraph, the second - third
sentence, says, 'Please help me prove to our
underwriter the following: Number 1, Island
employees will not be performing tasks
outside of their designated classification as
water park employees.'**

5

6

7

      **So a proof would mean a response.**

      **Q.   All right.  So you understood the
sentence, 'Please help me to prove to our
underwriter,' to be a request for a written
response; is that correct?**

8

9

10

      **A.   A response, which, since we like to have
things in writing in the insurance world so
that we have documentation, but it
specifically does not say 'written proof.'**

11

12

13

14

15

16

17

**(Trial testimony of Hacker, Feb. 2, 2007, 55:16-21, 71:17-21,
108:5-21).   The factual circumstances could not be clearer.   Aon
was endeavoring, as Lee's broker, to satisfy the underwriter's
concerns about Lee's employees' work activities to enable the
policy to be issued to Lee.   The jury found against Lee on its
theories that Aon breached any duty of care or made any
misrepresentations.**

18

19

20

21

22

23

24

25

26

    **Aon describes Lee's reliance on *Burger v. Kuimelis, supra*,
to contend that Lee breached no duty to Aon as misplaced, because
Kumeilis held:   "[t]he duty not to mislead is a duty that runs
from counterdefendants [insureds] to Kumeilis [broker]."   *Burger,
supra*, 325 F.Supp.2d at 1044.   Aon responds that Lee's argument
that Aon's own conduct in drafting the letter necessitated its
involvement in this litigation ignores the fact that Aon was
acting for Lee and Lee provided misinformation to Aon:**

      **Accordingly, just as the insureds in <u>Burger</u>**

33

lied to their broker to induce him to prepare
a document used to defraud HUD, Lee provided
misinformation to Aon knowing that the August
12 letter would be used to secure an
insurance policy through USF&G/American
Specialty.

In its reply, Lee alters its position.  Lee now argues:

Dr. Levine's testimony was unrebutted that
insurance industry personnel would be
expected to understand 'construction,' as
used in the terminology between the parties,
not to include construction activities that
were a part of water park maintenance within
the meaning of water park classification
codes 9016 and 9180, and to include only
'construction' activities that were outside
of a water park classification and that would
require a workers' compensation construction
classification code.  Ms. Platt testified by
deposition to her understanding of the
terminology as referring to 'ground-up'
construction of the park.  Mr. Awtrey was
both in the insurance industry and had worked
for years at Clovis Lakes, later known as
Wild Waters Adventures, where park employees
built slides.  Mr. Awtrey admitted that he
never discussed construction of water slide
[sic] with Lee.  (2/8/07 Awtrey testimony at
126:13-128:4.)  There was no evidence that
Mr. Awtrey, Cathy Hacker or anyone else in
the insurance industry conveyed to Lee that
they interpreted 'construction' differently
than Dr. Levine testified they would have
been expected to interpret it.

Lee (and Aon ...)  could reasonably (and did
by Dr. Levine's and Ms. Platt's deposition
testimony) have understood that completion of
the red slide was not 'construction' within
the meaning of Mr. Sackett's August 11, 1998
letter and Ms. Platt's August 12, 1998 letter
(and Mr. Awtrey's and Ms. Moore [sic] August
27, 1998 letter to Lee), but instead would be
considered activity within a water park
classification.  There was no
misrepresentation if the completion of the
red slide was such activity.  Uncontradicted
expert evidence from Mr. Lemasters
established that it was not unusual for water

34

parks to do slide erection with their own
maintenance employees and Dr. Levine's
testimony that such work would fall within a
water park classification was uncontradicted.
USF&G's citation to the testimony of both Mr.
Bibel and Dr. Levine that 'new construction'
would be separately classified begged the
question about how to classify the completion
of the red slide.  Aon cites no testimony
indicating that any expert other than Dr.
Levine answered this question.

Furthermore, by the time USF&G filed its
Master Unit Statistical Report designation of
the Conley accident as falling within
classification code 9016, USF&G has already
filed its rescission action.  Dr. Levine
testified that USF&G could and should have
sought to change how it designated the
accident, but never did.  Accordingly,
USF&G's Master Unit Statistical Report was
contrary to its contention in its rescission
action and stands, along with Dr. Levine's
testimony, as unrebutted evidence that
Conley's accident arose from activity within
a water park classification.

Accordingly, there was no evidence to support
that Lee made a misrepresentation to Aon,
that Lee intended to induce Aon to rely on a
misrepresentation, or that Aon actually
relied on a misrepresentation.  Furthermore,
if Aon had relied on Ms. Platt's August 12,
1998 letter to mean that Lee could not
complete the red slide, that reliance, as a
matter of law and uncontradicted evidence,
would have been unjustified.

All of this ignores uncontradicted testimony that neither

Aon, American Specialty, or Lee at the time of the letters,

discussed or considered the technical meaning of workers'

compensation classification codes.  No hypertechnical or logic-

defying meanings for the term "construction" were considered or

used in the parties' communications about the "no construction

activities" representations by Lee.  Lee fully advanced and

argued to the jury its claim that Aon breached the duty of care
as Lee's workers' comp insurance broker by not knowing or fully
explaining the meaning of construction so as to have Lee's
construction activities covered under the USF&G policy.  The jury
rejected Lee's broker malpractice - negligence theory in its
entirety, as well as Lee's claim that Aon misrepresented,
intentionally, or negligently, the meaning of the terms
"construction" or "construction activities" in connection with
the USF&G policy.

There was substantial evidence to support that as principal
in its insurance broker relationship with Aon, Lee owed Aon
duties of candor and cooperation.  The evidence is that Lee
misrepresented its intent and the performance of construction
activities at the Island site in July-August 1998 and thereafter,
supported the jury's finding that Lee breached these duties to
Aon.  But for Lee's tortious misrepresentations to Aon and
American Specialty, USF&G, a third party, would not have issued
the policy and would not have sued Aon for indemnity arising from
Lee's misrepresentations to USF&G and Lee's breach of duty to
Aon.  This evidence supports the tort of another claim.

Lee's motion for judgment on the tort of another claim is
DENIED, subject to allocation of recoverable fees for tort of
another where the direct claims and defense between the Lee
parties and Aon do not implicate USF&G's indemnity case.

### CONCLUSION

36

1    For the reasons stated above:

2        1.   Lee's motion for judgment pursuant to Fed. R. Civ. Proc.

3    Rule 50(b) is DENIED.

4        2.   Counsel for USF&G and Aon shall prepare and lodge a form

5    of order that reflects the specific rulings on each issue

6    addressed by this decision within five (5) days following the

7    date of service of this decision by the Court's Clerk.

8        IT IS SO ORDERED.

9    Dated:    March 14, 2008                    /s/ Oliver W. Wanger
                                         UNITED STATES DISTRICT JUDGE