1

2

3

4

5

6                  IN THE UNITED STATES DISTRICT COURT FOR THE

7                      EASTERN DISTRICT OF CALIFORNIA

8

9   UNITED STATES FIDELITY &          )      No. CV-F-99-5583 OWW/SMS
    GUARANTY COMPANY,                  )
10                                     )      MEMORANDUM DECISION GRANTING
                                       )      IN PART AND DENYING IN PART
11                                     )      LEE INVESTMENTS LLC'S MOTION
                                       )      TO VACATE PARTIAL JUDGMENT
12                   Plaintiff,        )      ON JURY VERDICT UPON
                                       )      MULTIPLE CLAIMS INVOLVING
13          vs.                        )      MULTIPLE PARTIES OR TO ALTER
                                       )      OR AMEND PARTIAL JUDGMENT
14                                     )      PURSUANT TO RULES 59(e) and
    LEE INVESTMENTS LLC dba THE        )      60(a) & (b), FEDERAL RULES
15  ISLAND,                            )      OF CIVIL PROCEDURE (Doc.
                                       )      704)
16                                     )
                                       )
17                   Defendant.        )
                                       )
18  _____)

19

20          Lee Investments LLC (hereafter Lee) moves for an Order

21  vacating the "Partial Judgment on Jury's Verdicts Upon Multiple

22  Claims Involving Multiple Parties" (hereafter Partial Judgment),

23  (Doc. 681), entered on March 1, 2007 in favor of United States

24  Fidelity & Guaranty Company (hereafter USF&G), American Specialty

25  Insurance Services, Inc. (hereafter American Specialty or ASI),

26  and Aon Risk Services Inc. of Central California Risk Services

                                   1

1    (hereafter Aon).

2        The Partial Judgment states:

3            This case was tried before a jury commencing
             January 29, 2007, and concluded upon the
4            return, by the jury, of its verdicts on
             February 26, 2007.  The case involves more
5            than one claim for relief, including counter-
             claims and third-party claims and involved
6            multiple parties.  The parties have reserved,
             by written stipulation and order: USF&G's
7            alter ego claims against Richard K. Ehrlich,
             an individual, et al., the determination of
8            the amount of attorneys' fees and interest
             claimed by USF&G; and the claim of Aon Risk
9            Services Inc. of Central California Insurance
             Services ('Aon') for relief based on the tort
10           of another.  All other claims of the parties
             were adjudicated by the jury, including
11           USF&G's claim for rescission based on fraud;
             all claims of Lee Investments LLC, dba The
12           Island, a California limited liability
             company.  Any claims as to Diane Conley have
13           been determined by the parties' stipulation.

14           Due to the prior delay in, complexity and
             contentiousness of this litigation, to avoid
15           uncertainty and inconsistent verdicts, there
             is no just reason for delay and partial
16           judgment should now therefore be entered.

17           Based on the jury's written verdicts returned
             in open court February 26, 2007, the
18           following verdicts were rendered:

19           A.  The jury's verdicts finding in favor of
             USF&G on its claim for rescission finding
20           fraud and intentional concealment; finding
             against Lee on all Lee's defenses of
21           statutory waiver, common law waiver,
             estoppel, unreasonable delay, wrongful
22           conduct, and awarding USF&G restitution
             damages in the amount of $875,034.99.

23
             B.  On Lee's claims against USF&G, American
24           Specialty and Aon, finding in favor of USF&G,
             American Specialty, and Aon and against Lee
25           on all Lee's claims for fraud/intentional
             misrepresentation; concealment; conspiracy;
26           negligent misrepresentation; and negligence.

                              2

Finding against Lee and in favor of Aon on Lee's claim for breach of an oral contract against Aon.  Finding in favor of USF&G, American Specialty and Aon and against Lee on all their defenses to Lee's claims based on fraud of Lee; negligent misrepresentation by Lee; estoppel against Lee; wrongful conduct by Lee; common law waiver against Lee; as to Aon against Lee due to Lee's intentional tort as superseding cause; as to Aon, no unreasonable delay by Lee; and in favor of Aon and against Lee on Aon's defense of assumption of risk.

C.  On all Aon's claims against Lee, finding in favor of Aon and against Lee on Aon's claims for intentional misrepresentation, negligent misrepresentation and that Lee was 100% comparatively at fault; in favor of Aon's claim of negligence against Lee; that Aon was not negligent.  Finding in favor of Aon and against Lee on all Lee's affirmative defenses to Aon's claims, including fraud, negligent misrepresentation, estoppel, no wrongful conduct by Aon; no common law waiver by Aon, no unreasonable delay by Aon.

Accordingly, on each of these claims and defenses, JUDGMENT IS ENTERED AS FOLLOWS:

1.  In favor of USF&G and against Lee for rescission and USF&G shall recover from Lee restitutionary damages of $875,034.99;

2.  Against Lee on all Lee's defenses to USF&G'S claims for rescission;

3.  Against Lee on all its claims and in favor of USF&G, American Specialty and Aon against Lee and in favor of USF&G, American Specialty and Aon on all their affirmative defenses to Lee's claims;

4.  In favor of Aon on all its claims and against Lee; and against Lee in favor of Aon on all on [sic] Lee's affirmative defenses to Aon's claims; and

5.  USF&G, American Specialty and Aon shall recover costs of suit.

3

1          Lee moves pursuant to Rules 59(e) and 60(a) and (b),

2    Federal Rules of Civil Procedure, asserting as grounds:

3               1. The Partial Judgment is void in that the
                California Workers' Compensation Appeals
4               Board (WCAB) has and had exclusive
                jurisdiction;

5
                2.   The Court committed clear error and its
6               decisions have been manifestly unjust in
                denying Lee judgment as a matter of law on
7               USF&G'S original and amended complaint for
                rescission in that:

8
                    a.   This Court does not have
9                   jurisdiction and the complaint
                    fails to state a claim upon which
10                  relief can be granted;

11                  b.   California law does not permit
                    a workers' compensation insurer to
12                  impose a condition or expectation
                    on a workers' compensation policy
13                  except by endorsement to the policy
                    and then the insurer may only
14                  terminate the policy in accordance
                    with its cancellation provisions;

15
                    c.   As a condition or exception to
16                  Lee's workers' compensation policy,
                    Matthew Sackett's August 11, 1998
17                  facsimile to William Hildebrand was
                    required to be, but was not, clear
18                  plain and conspicuous;

19                  d.   Christy Platt's August 12, 1998
                    letter to Matthew Sackett was not
20                  admissible under the parol evidence
                    rule because it was related to and
21                  contradicted Lee's workers'
                    compensation policy;

22
                    e.   An application was required as
23                  a matter of law;

24                  f.   USF&G was bound as a matter of
                    law by its report of Diana Conley's
25                  accident as being within
                    Classification Code 9016 and there
26                  was no evidence that any of Lee's

                              4

employees' activities fell outside
a water park classification code.

3.   The Court committed clear error and its
decisions have been manifestly unjust in
denying Lee judgment as a matter of law on
the counterclaim of Aon for the reasons set
forth above and in that Lee did not make a
misrepresentation to Aon, Aon did not rely on
any representation, and reliance, if any, by
Aon was not a substantial factor in causing
harm to Aon;

4.   The Partial Judgment erroneously does not
require USF&G to return all premiums Lee
paid;

5.   The Partial Judgment erroneously
references FRCP 55(b) as the basis for the
judgment;

6.   The Partial Judgment erroneously states
that Lee has stipulated that USF&G's alleged
alter ego claims are reserved for later
determination when Lee has previously
objected to the inclusion of these claims in
the litigation at all and the Court on its
own set them for separate trial;

7.   The Partial Judgment erroneously states
that Lee stipulated to a determination of
Diana Conley's claims;

8.   The Partial Judgment prematurely awards
restitution and erroneously fails to include
as issues remaining for further trial (a)
whether USF&G actually paid and is the real
party in interest respecting any amount for
which its seeks restitution, and (b) USF&G's
breach of its duty to defend Lee in this
action and the WCAB proceeding.

A.   <u>Governing Standards</u>.

With regard to a motion to alter or amend judgment pursuant

to Rule 59(e), Federal Rules of Civil Procedure, Wright, Miller &

Kane, Federal Practice and Procedure: Civil 2nd § 2810.1,

explains:

5

Since specific grounds for a motion to amend
or alter are not listed in the rule, the
district court enjoys considerable discretion
in granting or denying the motion. However,
reconsideration of a judgment after its entry
is an extraordinary remedy which should be
used sparingly. There are four basic grounds
upon which a Rule 59(e) motion may be
granted. First, the movant may demonstrate
that the motion is necessary to correct
manifest errors of law or fact upon which the
judgment is based. Second, the motion may be
granted so that the movant may present newly
discovered or previously unavailable
evidence. Third, the motion will be granted
if necessary to prevent manifest injustice.
Serious misconduct of counsel may justify
relief under this theory. Fourth, a Rule
59(e) motion may be justified by an
intervening change in controlling law.

The Rule 59(e) motion may not be used to
relitigate old matters, or to raise arguments
or present evidence that could have been
raised prior to the entry of judgment. Also,
amendment of the judgment will be denied if
it would serve no useful purpose. [Footnotes
omitted]

Rule 60(a), Federal Rules of Civil Procedure, provides that
"[c]lerical mistakes in judgments, orders or other parts of the
records and errors therein arising from oversight or omission may
be corrected by the court ... on the motion of any party ...."

Rule 60(b), Federal Rules of Civil Procedure, provides in
pertinent part:

On motion and upon such terms as are just,
the court may relieve a party ... from a
final judgment, order, or proceeding for the
following reasons: (1) mistake, inadvertence,
surprise, or excusable neglect; ... (3) ...
misrepresentation, or other misconduct of an
adverse party; (4) the judgment is void; (5)
... it is no longer equitable that the
judgment should have prospective application;
or (6) any other reason justifying relief

6

1        from the operation of the judgment.

2        Other than reciting these standards, Lee does not otherwise

3   refer to them in its memorandum of points and authorities.  While

4   some of the claims are easily relatable to these standards,

5   others are not.  For instance, what is the mistake, inadvertence

6   or excusable neglect of Lee, and what is the misrepresentation or

7   other misconduct of an adverse party?  In addition, Lee does not

8   set forth the standards governing resolution of a Rule 60(b)

9   motion on these two grounds.  The Ninth Circuit in *Lafarge*

10  *Conseils Et Etudes, S.A. v. Kaiser Cement & Gypsum Co.*, 791 F.2d

11  1334, 1338 (9th Cir.1986), explains:

12              A motion brought under 60(b)(6) must be based
              on grounds other than those listed in the
13              preceding clauses ... Clause 60(b)(6) is
              residual and 'must be read as being exclusive
14              of the preceding clauses.' In addition, the
              clause is reserved for 'extraordinary
15              circumstances.' ....

16       B.   <u>WCAB Exclusive Jurisdiction</u>.

17       Lee asserts that the Partial Judgment is void because the

18  WCAB had and has exclusive jurisdiction over USF&G's claim for

19  rescission of the workers' compensation insurance policy.

20       By Order filed on October 23, 1999 (Doc. 21), the Honorable

21  Robert E. Coyle denied the motion to dismiss filed by then

22  Defendant Diana Conley and joined by Lee.  Conley and Lee moved

23  to dismiss this action pursuant to Rule 12(b)(6), Federal Rules

24  of Civil Procedure, for failure to state a claim upon which

25  relief can be granted, on the ground that the WCAB has exclusive

26  jurisdiction over the controversy.  Judge Coyle ruled in

                                   7

pertinent part:

> California Labor Code § 5300(a) provides that a proceeding for the "recovery of compensation, or concerning any right or liability arising out of or incidental thereto" "shall be instituted before the appeals board and not elsewhere".

> In arguing that the allegations of Fidelity's Complaint are subject to the exclusive jurisdiction of the WCAB pursuant to Section 5300(a), defendants rely on a number of California cases.

> Thus, defendants refer the court to General Acc. Etc. Corp. v. Indus. Acc. Com., 196 Cal. 179 (1925).  General Acc. Etc. Corp. involved a review by the California Supreme Court of an award made by the Industrial Accident Commission in favor of the dependents of a deceased employee, the sole [issue] presented to the Commission being whether the petitioner insurance company was, on the day of the fatal accident, the insurance carrier of the employer.  The employer had applied for a workers' compensation insurance policy but had not paid the premium for it.  On the day the employee was killed, the employer presented the premium check to his insurance agent, not advising the agent of the accident until two days later.  The insurance company petitioned the Commission to rescind the policy because of fraud in the procurement of the policy.  The California Supreme Court reversed the award of the Commission on the ground that the Commission's finding was not supported by any evidence.  On appeal, the Supreme Court stated in pertinent part:

>> It is the contention or suggestion of respondent Commission that the dependents of the employee have an enforceable right against petitioner under the alleged policy even though the employer be cut off from any remedy against petitioner. We are unable to understand what principle of law would give the dependents of the employee a cause of action against petitioner upon a

8

contract which is void or voidable
as to the employer ... 'We may
assume that any defense available
to the Insurance Company ...
against ... the employer, would be
equally available against the
employee or his dependents.'
Whether the foregoing quotation be
regarded as doctrine or <u>dicta</u>, it
would seem to express an
unimpeachable principle of law ....

There can be no doubt but that the
Commission is vested by
constitutional and legislative
power to hear and determine every
issue raised by the parties to this
controversy, including the validity
of the policy and the question of
fraud alleged in its procurement
and that the parties are not
required to invoke either a court
of law or equity in the
determination of said question.

196 Cal. at 190-191.

Defendants also rely on <u>Bankers Indem. Ins.
Co. v. Indus. Acc. Com.</u>, 4 Cal.2d 89, 94-98
(1935), wherein the Supreme Court held that
Industrial Accidents Commission "has been
invested with the power and authority to hear
and determine equitable issues, including
those arising in a controversy involving the
reformation of a written instrument" and that
the Supreme Court "was ... in accord with the
policy of the law which invests in one
tribunal the power to dispose of the whole
controversy involving the right of the
injured employee to secure just compensation
for the injury sustained by him."  4 Cal.2d
at 98.

Conley argues that the critical fact that
brings this case within the exclusive
jurisdiction of WCAB is that the outcome of
this controversy will determine her rights to
recovery of workers' compensation benefits.

Conley refers the court to <u>United States
Fidelity and Guaranty Company v. Superior</u>

9

<u>Court</u>, 214 Cal. 468 (1931).  In <u>USF&G</u>, in a proceeding before the Commission in which the employer and the insurance company were defendants, the employee procured a compensation award against the defendants. In the proceeding before the Commission, the employer and the insurance company filed answers presenting the issue whether the insurance company was the compensation carrier for the employer at the time of the accident.  The Commission found that the insurance company was not then the insurance carrier for the employer and ordered the insurance company released and discharged. No appeal was taken and the Commission's award became final.  Some months later, the employer sued the insurance company for breach of the insurance contract, seeking damages for termination of the insurance policy without notice as required by the policy.  The insurance company unsuccessfully demurred on the ground of lack of jurisdiction.  The insurance company petitioned for a writ of prohibition. The California Supreme Court held that issues relating to the existence, at the time of the injury, of an insurance policy affording coverage and issues relating to the enforcement against the insurance company of any liability for compensation or for the payment of the workmans' compensation award had reached a final determination in the proceedings before the Commission.  However, the Supreme Court held, to the extent the action is one for damages for breach of contract to issue and keep in effect the insurance, the complaint stated a cause of action within the jurisdiction of the Superior Court.  In so holding, the Supreme Court explained:

> The cause of action for damages does not involve the construction of an insurance policy with respect to coverage thereunder, the recovery of compensation or incidental liability or the enforcement against an insurance carrier of compensation liability; it attempts to set forth purely a claim for damages based upon the

10

1    breach of a contract to insure in a
     controversy affecting only the
2    employer and the insurance carrier,
     no rights of the employee being
3    involved.  The mere circumstance
     that the damage claimed is the
4    exact amount of the compensation
     award to the employee does not
5    change the essential nature of the
     action and the court should not be
6    prevented from proceeding with it.

7    214 Cal. at 471-472.

8    Defendants further refer the court to
     Hartford Acc. Etc. Co. v. Indus. Acc. Com.,
9    216 Cal. 40 (1932).  In Hartford Acc. Etc.
     Co., the Commission ordered the employer to
10   obtain a surety bond as a prerequisite to the
     issuance to the employer of a certificate of
11   self-insurance to secure the payment to its
     employees of workers' compensation benefits.
12   The employer obtained a surety bond from
     Hartford.  During the time the bond was in
13   force, claims were made by the employees
     which awards were covered by the bond.
14   Thereafter, in the district court, a receiver
     was appointed for all of the property and
15   assets of the employer.  The receiver stopped
     payment of the workers' compensation awards.
16   At the time the receiver did so, the total
     amount of the awards exceeded the amount of
17   the bond.  The employees then petitioned the
     Commission for an order requiring Hartford,
18   as surety on the bond, to pay or provide
     payment of the compensation remaining unpaid
19   on account of the workers' compensation
     awards.  Hartford appeared in the Commission
20   proceedings.  The Commission ordered Hartford
     to pay the amount of the bond.  On appeal,
21   Hartford argued that the Commission had no
     jurisdiction to render an award against the
22   surety on a self-insurer's bond.  The Supreme
     Court rejected this argument, holding that
23   the provisions of the workers' compensation
     act regulating a self-insurer employer and
24   providing for the giving of a bond are one
     method of securing the payment of
25   compensation and, therefore, within the grant
     of power to the Commission.  Id. at 45-46.
26   The Supreme Court further held that the

                        11

employees' petition was a "proceeding for the recovery of compensation, or concerning any right or liability arising out of or incidental thereto" and that, therefore, "[t]here can be no question of the jurisdiction of the Commission to entertain such a proceeding and to determine all issues arising therein and to render an award in accordance with the facts presented to it." Id. at 46.  The Supreme Court further stated in pertinent part:

> Petitioner complains that the granting of relief against it in the proceedings before the ... Commission deprived it of legal and equitable rights to which it would otherwise be entitled.  These rights petitioner claims are given it under sections 2845 and 2846 of the Civil Code and section 1050 of the Code of Civil Procedure.  If petitioner is entitled to any rights under these sections of the code which it could not enforce before the Commission, it might be relegated to the courts for the purpose of enforcing them.  This result would not affect the jurisdiction of the Commission if the Constitution and statutes have conferred jurisdiction upon the Commission to determine the matter involved.  However, if the Commission is vested with jurisdiction over any given subject matter, it has the power to hear and determine every issue raised by the parties in the controversy ... In such cases the parties are not required to resort to the courts.

Id. at 47.

Fidelity argues that Section 5300(a) does not cover a claim for rescission of an insurance policy because a claim for rescission does not involve "the recovery of compensation, or concerning any right or liability arising out of or incidental thereto."  Fidelity asserts that it does not contend that Conley cannot

12

proceed before the WCAB for the recovery of workers' compensation benefits against Lee Investments but, rather, that the WCAB does not have jurisdiction of the claim for rescission of the Policy.  Fidelity argues that the Supreme Court's decision in <u>General Acc. Etc. Corp.</u> is not controlling on this issue.  In so arguing, Fidelity notes that no issue concerning the Commission's jurisdiction was raised by the insurance company in the appeal because the insurance company was the petitioner.  In addition, Fidelity notes that the insurance company in <u>General Acc. Etc. Corp.</u> did not seek rescission of the policy in proceedings before the Commission but rather a determination that the insurance company was not liable.

Fidelity notes that the type of relief that can be granted by the court and by the WCAB differs.  Thus, the trial court cannot award workers' compensation benefits, and the WCAB cannot award damages for injuries.  <u>La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.</u>, 9 Cal.4th 27, 35 (1994); <u>Scott v. Industrial Acc. Com.</u>, 46 Cal.2d 76, 82-83 (1956).  In <u>State Comp. Ins. Fund v. Ind. Acc. Com.</u>, 20 Cal.2d 264 (1942), the California Supreme Court held that the Commission was "without jurisdiction to adjudicate a supplemental controversy involving rights of contribution and reimbursement between two insurance carriers jointly and severally responsible for the payment of a compensation award."  <u>Id.</u> at 266.  In so holding, the Supreme Court distinguished <u>General Acc. Etc. Corp. v. Indus. Acc. Com.</u>, and <u>Bankers Indem. Ins. Co. v. Indus. Acc. Com.</u>, explaining in pertinent part:

> While petitioner concedes that the jurisdiction of the commission is limited to the settlement of disputes arising out of the relationship of the employer to his employee, it urges that once this status is established the commission has judicial power to determine any controversy

13

whatsoever that may develop between parties in interest respecting the compensation awarded.  Upon this basis the petitioner contends that its application for an adjustment of its obligation to make compensation payments falls within the scope and intent of the ... constitutional provision referable to the insurance features of the 'system of workman's compensation' and the legislative enactment adopted in pursuance thereof.  In support of its argument the petitioner first cites several decisions of this court wherein it was held that in determining the liability of an insurance carrier for compensation to an injured employee, the commission had the power to determine all issues of law and fact upon which the liability of the insurance carrier depended ... But in those cases the respective questions regarding the insurance aspect of the proceeding before the commission arose in connection with the rendition of an <u>award in favor of an injured employee or his dependents</u> and necessarily were involved in the enforcement of the compensation benefits contemplated under the basic liability of the employer to his employee.  The present situation is readily distinguishable in that here the right of action in the employee to enforce his claim was finally determined by the joint and several award in his favor against the insurance carriers which had assumed the obligation of the respective employers in the premises.  By such award the employee was assured of the scheduled payments, and the employers were discharged from all liability therefor.  This adjudication concluded the authority of the commission to act

14

in the matter.  Any controversy
between the insurance carriers
relative to the burden of payment
of the award for which both have
been held responsible concerns
neither the employee nor the joint
employers in their essential
relationship.  Application for the
adjustment of such dispute
obviously is not a proceeding 'for
the recovery of compensation' nor
does it involve 'any right or
liability arising out of or
incidental thereto.'  The fact that
the petitioner has joined the
employee as a nominal party in this
proceeding cannot change the basic
character of the litigation as an
independent claim having no
relation to the enforcement of
benefits allowed the employee under
the system of workman's
compensation established in this
state.  The petitioner is seeking
an award in its favor based on a
claim wholly distinct from the
right of an employee to recover
compensation for an industrial
injury.  These considerations
plainly indicate that the
commission is not vested with
constitutional or legislative power
to determine the issues involved in
a proceeding supplemental to the
adjudication of the liability of
the employer to his employee, and
the petitioner must seek its relief
in the ordinary courts ....

Id. at 267-268.

Here, as noted, the Complaint alleges that
Fidelity has paid benefits to Conley under
the Policy because her claims, but for the
rescission of the Policy, would be covered by
the Policy.

Fidelity further argues that, contrary to
Conley's assertion, the outcome of this
Complaint for rescission will not determine
Conley's right to recovery of compensation

15

benefits.  In so arguing, Fidelity notes that, pursuant to California Labor Code § 3715(a), an employee whose employer has failed to secure the payment of compensation under the workers' compensation laws may, in addition to proceeding to proceeding against the employer by civil action, "file his or her application with the appeals board for compensation and the appeals board shall hear and determine the application for compensation in like manner as in other claims and shall make the award to the claimant as he or she would be entitled to receive if the employer had secured the payment of compensation as required ...." Section 3715(a) further requires the employer to pay the award so ordered or furnish a bond to do so.  If the employer fails to pay the award or post the bond as ordered pursuant to Section 3715(a), "the award, upon application by the person entitled thereto, shall be paid ... from the Uninsured Employers Fund ...." California Labor Code § 3716(a).  Therefore, Fidelity argues, if rescission is granted, Conley can recover benefits from her employer or from the Uninsured Employers Fund.

The court concludes that this motion to dismiss is denied on this ground.  The court is not persuaded that Fidelity's claim for rescission is within the exclusive jurisdiction of the WCAB because Fidelity has paid the benefits under the Policy.  That Fidelity sues to recover the benefits paid (less premium) from the employer on a theory of rescission does not affect Conley's proceedings before the WCAB or her entitlement to benefits.

Judge Coyle's denial of the motion to dismiss for lack of jurisdiction is contended by Lee to have required Lee to file a counterclaim against USF&G or risk loss of the counterclaim under Rule 13(a), Federal Rules of Civil Procedure.  *See discussion infra.*  Lee filed its counterclaim on February 7, 2000.  (Doc. 40).  A decision by a Workers' Compensation WCJ issued on October

16

1  20, 1999, found that the WCAB has subject matter jurisdiction

2  over the issue of rescission of the USF&G policy issued to Lee.

3  On December 24, 1999, the WCAB denied USF&G's petition for

4  reconsideration of the decision of the WCJ and ruled that the

5  matter be held in abeyance by the WCJ pending disposition of

6  Conley's motion for reconsideration by Judge Coyle.  After

7  USF&G's petitions for review were denied by the California Court

8  of Appeal, Fifth Appellate District and the California Supreme

9  Court, Conley moved for reconsideration by Judge Coyle of his

10  ruling denying the motion to dismiss.  Lee did not join in

11  Conley's motion for reconsideration.  Conley's motion for

12  reconsideration was denied by Order filed on August 17, 2000

13  (Doc. 57).  Judge Coyle ruled in pertinent part:

14          In moving for reconsideration, Conley relies
            on the decisions of the WCAB that the WCAB
15          has exclusive jurisdiction over the
            rescission claim because, if the Policy is
16          rescinded, there will be an impact on
            Conley's ability to receive benefits.  The
17          WCJ ruled that

18              While there is available to the
                injured worker the Uninsured
19              Employers Fund there is often
                significant delay in obtaining
20              access to that fund and on occasion
                the Fund is not adequately funded
21              for the year and they run out of
                the means to maintain benefit
22              payments.  Also if the rescission
                [sic] action is pending in Federal
23              Court, UEF would not pick up
                benefits for the applicant on the
24              basis that the issue of whether or
                not the employer was insured for
25              workers [sic] compensation
                liability had not been decided.  A
26              final decision in Federal Court

17

could be delayed for a significant
period of time, whereas the Board's
procedures are set up for a prompt
resolution of issues.  From a
reading of the cases cited in the
briefs and also referred to in the
Federal Court's decision the
distinguishing fact as to which
forum has jurisdiction over the
rescission [sic] of the contract
issue appears to be whether or not
the applicants [sic] access to
benefits is going to be affected.
If they are then the WCAB has
jurisdiction if not then the civil
courts (federal or state) have
jurisdiction.  For the reasons
discussed above the WCALJ is of the
opinion that if the Board finds
that they do not have jurisdiction
then there would be a significant
impact on the applicant's ability
to receive benefits in a timely
manner.

This ruling is now final in the California
courts because of the denials of Fidelity's
petitions for review.

However, in a supplemental brief filed on
March 9, 2000, Fidelity notes that Lee
Investments had filed a counterclaim against,
[sic] Fidelity, AON [sic] Risk Services,
American Speciality [sic] Insurance Services,
Inc., and American Speciality [sic] Risk
Management Services, LLC, alleging causes of
action for breach of fiduciary duty, fraud,
conspiracy to defraud, and negligent
misrepresentation.  Fidelity contends that,
because the allegations of the counterclaim
arise out of the same facts as the complaint
for rescission, all of the issues in the
Complaint will be before the court in any
event.  Even if the Complaint for Rescission
is dismissed for lack of jurisdiction,
Fidelity's claim for rescission would be a
compulsory counterclaim to Lee Investments'
counterclaim.  Therefore, the court will have
to decide the rescission claim.  Furthermore,
any decision by the WCAB concerning
Fidelity's claim for rescission would not be

1    binding on the counterdefendants, because
     they are not and cannot be parties to the
2    workers' compensation proceedings.
     Therefore, Fidelity contends, Lee
3    Investments' counterclaim provides an
     independent basis for this court to deny
4    Conley's Application for Reconsideration.

5    The court notes that Conley has not responded
     to these grounds for denial of the
6    Application for Reconsideration.  This
     failure persuades the court that the
7    Application for Reconsideration should be
     denied.  While the decision by the WCAB is
8    entitled to deference, the court remains
     persuaded that its initial decision was not
9    contrary to law.  The filing of Lee
     Investments' counterclaim is another reason
10   for this court to exercise its jurisdiction.

11   Lee's contention that the Partial Judgment is void because

12   of the exclusive jurisdiction of the WCAB is without merit.  As

13   explained in Wright, Miller & Kane, Federal Practice and

14   Procedure: Civil 2nd § 2862, pp.326-329:

15   A judgment is not void merely because it is
     erroneous.  It is void only if the court that
16   rendered it lacked jurisdiction of the
     subject matter, or of the parties, or if it
17   acted in a manner inconsistent with due
     process of law.
18
19   Lee's argument about "exclusive jurisdiction" confuses the

20   issue.  "The jurisdiction of the federal courts - their power to

21   adjudicate - is a grant of authority to them by Congress and thus

22   beyond the scope of litigants to confer."  *Neirbo Co. v.*

23   *Bethlehem Shipbuilding Corporation*, 308 U.S. 165, 167 (1939).

24   This Court had subject matter jurisdiction over this action by

25   virtue of diversity of citizenship, which subject matter

26   jurisdiction may not be enlarged or contracted by state law.  *See*

19

1  *Bergay v. Kerr-McGee Corp.*, 682 F.2d 1311, 1315 (9th

2  Cir.1982)("Although the states have the power to prevent the

3  federal court from granting relief in a diversity case by denying

4  the substantive right of action asserted, they 'have no power to

5  enlarge or contract the federal jurisdiction."); *Beach v. Owens-*

6  *Corning Fiberglas Corp.*, 728 F.2d 407, 409 (7th Cir.), *cert.*

7  *denied,* 469 U.S. 825 (1984)("Even though Indiana law vests

8  exclusive jurisdiction over cases such as this one in its

9  Industrial Disputes Board, a federal court properly may exercise

10  jurisdiction over them.  State law cannot be construed to enlarge

11  or contract federal jurisdiction.").  Lee's contention that the

12  Partial Judgment must be vacated because of the exclusive

13  jurisdiction of the WCAB is an issue relating to failure to state

14  a claim upon which relief can be granted.  *See discussion infra.*

15  Its argument that the federal court lacks diversity subject

16  matter jurisdiction over this case is misplaced and is no basis

17  for setting aside judgment.

18       Lee's motion on this ground is DENIED.

19       C.  <u>Claims of Clear Error and Manifest Injustice By Not</u>

20  <u>Granting Lee Judgment as a Matter of Law on the Original and</u>

21  <u>Amended Complaints of USF&G</u>.

22            1.  <u>WCAB Had and Has Exclusive Jurisdiction</u>.

23       Lee asserts that USF&G's Complaint and Amended Complaint

24  fail to state a claim upon which relief can be granted because

25  the WCAB had and has exclusive jurisdiction.

26       Lee relies on a state case, *Gilford v. State Compensation*

20

1   *Ins. Fund*, 41 Cal.App.3d 828,834 (1974)("'"Where there is any

2   reasonable doubt as to the jurisdiction, the courts must resolve

3   such doubts in favor of jurisdiction of the commission."'"), and

4   argues that Judge Coyle's rulings were clearly in error and

5   manifestly unjust:

6           Ms. Conley now faces precisely the concerns
            that the WCJ expressed.  If there were any
7           reasonable doubt, which there is not, about
            the exclusive jurisdiction of the WCAB to
8           decide the rescission issue ..., that doubt
            must be resolved in favor of the exclusive
9           jurisdiction of the WCAB.

10          Lee preserved its position regarding the
            exclusive jurisdiction of the WCAB by joining
11          Ms. Conley's initial motion.  The denial of
            that motion compelled Lee to file a
12          compulsory counterclaim and to otherwise
            protect its rights in this action.  It was
13          manifestly unjust and clear error for the
            court to deny the initial motion and then,
14          having erroneously put Lee to the necessity
            of filing a compulsory counterclaim, to use
15          that counterclaim as a basis to say the
            motion to dismiss was properly granted in the
16          first place.

17          Since USF&G's complaint was the entire action
            when the original motion to dismiss was
18          filed, the entire action should have been
            dismissed on the original motion.  Had it
19          been, Lee would not have filed a counterclaim
            nor a third party complaint.  The judgment is
20          therefore void in its entirety.

21      USF&G and Aon oppose this motion, contending that Judge

22   Coyle's rulings were correct as a matter of law.  As a matter of

23   practicality, Connelly has received and continues to receive full

24   workers' compensation benefits which have been fully paid by

25   USF&G under a reservation of rights.

26      Rule 59(e) may not be used to relitigate old matters, or to

                                    21

raise arguments or present evidence that could have been raised prior to the entry of judgment.  That is what Lee is doing here. Lee's motion to amend or alter the partial judgment pursuant to Rule 59(e) on the ground that the WCAB had and has exclusive jurisdiction is DENIED.

USF&G argues that Judge Coyle's decision that the district court had jurisdiction over USF&G's complaint for rescission was binding on the WCAB because the district court first obtained jurisdiction over the complaint.  USF&G acknowledges that Ms. Conley's initial application for workers' compensation benefits was filed before USF&G filed the complaint for rescission in the district court.  However, USF&G contends, Ms. Conley's initial application named only The Island and GAB Business Services and only sought liability for temporary disability indemnity and did not seek adjudication of any claim for rescission by USF&G against Lee.  USF&G filed its complaint for rescission in the district court on April 26, 1999.  USF&G contends that the declaration of readiness to proceed seeking arbitration by the WCAB of the rescission complaint was not filed by Conley until two months later.  USF&G cites *Scott v. Industrial Accident Commission*, 46 Cal.2d 76 (1956).

In *Scott*, the California Supreme Court issued a writ of prohibition to halt proceedings in a matter before the Industrial Accident Commission until a final judgment was reached in a superior court action in which damages were sought for the same injuries as were involved in the Industrial Accident Commission

matter.   The California Supreme Court ruled:

> The question thus presented is whether the
> Industrial Accident Commission may, and
> should, be required to suspend the exercise
> of its jurisdiction in the proceeding before
> it because of the pendency of the action in
> the superior court or on appeal therefrom.
> The issue is not one of simultaneous exercise
> of general concurrent jurisdiction; it is,
> rather, the right of proceeding
> simultaneously in two tribunals, the
> jurisdiction of each of which is essentially
> exclusive of the other, but each of which has
> the power to make a determination of
> jurisdiction which, when final, will be
> conclusive upon the other.

*Id.* at 81.   The Supreme Court noted that

> General principles applicable to
> controversies in which the same parties and
> the same subject matter are involved are
> these: When two or more tribunals in this
> state have concurrent jurisdiction, the
> tribunal first assuming jurisdiction retains
> it to the exclusion of all other tribunals in
> which the action might have been initiated.
> Thereafter another tribunal, although it
> ordinarily might originally have taken
> jurisdiction, may be restrained by
> prohibition if it attempts to proceed.

*Id.*   The Supreme Court concluded that "the general rule long

recognized as governing tribunals whose jurisdiction is generally

concurrent should be applied here where jurisdiction to determine

jurisdiction is concurrent."   *Id.* at 89.

Lee replies that California Insurance Code § 11653 defines

"employer" to include the employer's workers' compensation

insurer.   USF&G was a party to Ms. Conley's initial application

for workers' compensation benefits as a matter of law and,

therefore, the WCAB had jurisdiction over USF&G more than one

23

1  month before this action for rescission was commenced.  Further,

2  Lee replies that USF&G's reliance on *Scott* is misplaced because

3  the jurisdiction of the WCAB was exclusive even of this court's

4  jurisdiction to determine jurisdiction.  Lee argues:

5         Here, there was no basis for the District
          Court to have <u>any</u> jurisdiction to determine

6         the rights of Conley and Lee against USF&G.
          Unlike <u>Scott</u>, Conley did not sue Lee in this

7         court seeking damages upon a theory that
          Conley was not within the course and scope of

8         employment.  Conley did not otherwise tender
          to the District Court a precedential

9         jurisdictional ('precedential jurisdiction'
          herein shall refer to concurrent jurisdiction

10        to determine jurisdiction) issue that the
          District Court could properly decide to

11        determine whether the District Court had
          exclusive jurisdiction to proceed with the

12        rescission action.

13  Aon argues that, even if, *arguendo*, it is concluded that the

14  WCAB had exclusive jurisdiction over USF&G's rescission claim and

15  the Partial Judgment for USF&G on rescission were vacated for

16  failure to state a claim, such a ruling should not affect the

17  rest of the Partial Judgment:

18        In such an event, it would be an abuse of
          discretion for this Court not to continue to

19        exercise its supplemental jurisdiction over
          (and confirm its judgment concerning) Lee's

20        claims and defenses against all other
          parties, and Aon's claim and defenses against

21        all other parties.

22  Lee replies that had the motion to dismiss been granted, Lee

23  would have never filed a counterclaim:

24        Hence, Aon cannot use the existence of that
          counterclaim, which the improper retention of

25        jurisdiction in this court forced Lee to
          file, as a basis to contend that the partial

26        judgment ought not to be vacated.  Had the

24

> complaint been dismissed, there would be no
> basis whatsoever for supplemental
> jurisdiction because there were no other
> claims filed at that time.

Lee further argues that, even if it is proper at this time to examine supplemental jurisdiction over Lee's counterclaim and third party complaint, supplemental jurisdiction should not be retained:

> First, there is a strong preference for
> dismissal of supplemental claims where all
> claims over which the court had original
> jurisdiction have been dismissed, even if
> there have been extensive proceedings in
> federal court ... Second, the fundamental
> question whether or not there was a
> misrepresentation that would allow rescission
> of the subject policy is necessarily
> precedent to whether Lee could have any
> liability to Aon. ... [T]he question whether
> the USF&G policy should be rescinded is
> exclusively committed to the jurisdiction of
> the ... WCAB ... It is thus a state law issue
> that substantially predominates ... Third,
> the existence of the parallel proceedings
> before the WCAB ... strongly supports
> dismissal of the entire action rather than
> retention of Lee's counterclaim and third
> party complaint.

Lee's position concerning the exercise of supplemental jurisdiction is categorically meritless.  The district court has discretion to retain pendent claims and may consider the resources invested in a case.  *See Schneider v. TRW, Inc.,* 938 F.2d 986, 993-995 (9th Cir.1991).

Lee assumes, *arguendo*, if there were "concurrent precedential jurisdiction for both the WCAB and this court", i.e., that the district court had jurisdiction to determine whether or not the jurisdiction of the WCAB was exclusive under

25

1  the circumstances, the *Scott* rule required this court to honor

2  the final decision of the WCAB in favor of the WCAB's exclusive

3  jurisdiction.   Lee cites a state case, *Aetna Casualty & Surety*

4  *Co. v. Aceves*, 233 Cal.App.3d 544 (1991).

5       In *Aceves*, Aetna filed an action in the Superior Court

6  before Aceves began proceedings before the WCAB.   On appeal,

7  Aetna argued that the Superior Court had jurisdiction to

8  determine its own jurisdiction, and because Aetna filed the

9  Superior Court action first, the Superior Court's determination

10  took priority.   Relying on *Scott v. Industrial Accident*

11  *Commission*, *supra*, the Court of Appeals agreed.   233 Cal.App.3d

12  at 551-554.

13       Lee also argues that it is immaterial that the WCAB would

14  not afford the same remedy to USF&G that it might otherwise have

15  in the district court.   Lee refers to *Goetz v. Aetna Casualty and*

16  *Surety Company*, 710 F.2d 561 (9th Cir.1983).   In *Goetz*, the

17  Goetzes filed an action with the Industrial Accident Commission

18  when Aetna failed to pay accrued benefits.   The Board issued an

19  award against Aetna, which paid part of the award and failed to

20  pay the balance.   The Goetzes filed a complaint in the district

21  court alleging that Aetna's conduct in delaying and refusing to

22  pay workers' compensation benefits due them violated California

23  Insurance Code § 790.03(h).   The district court granted Aetna's

24  motion to dismiss on the ground that the court lacked

25  jurisdiction over the subject matter of the action because

26  California law vested exclusive jurisdiction of the dispute in

1   the Appeals Board.   710 F.2d at 563.   On appeal, the Goetzes

2   argued that the California workers' compensation scheme violates

3   the equal protection clause of the Fourteenth Amendment.   In

4   rejecting this argument, the Ninth Circuit ruled:

> The Goetzes' equal protection argument
> challenges not classifications apparent from
> the face of a statute but categories which
> result from the differing reaches of the
> workers' compensation and unfair practices
> laws.   While the challenge is unusual, we do
> not reject it for this reason.   A statute
> does not escape equal protection scrutiny
> simply because it does not expressly effect
> the objectionable variation ... The
> California workers' compensation law does not
> arbitrarily deprive claimants of their
> rights, however.   The remedy provided by
> section 5814 of the Labor Code may not be as
> effective as that provided by section 790.03
> of the Insurance Code, but this is merely an
> aspect of the exclusivity trade-off
> underlying the workers' compensation statute.
> The respective legislative classifications
> reasonably relate to the legitimate state
> ends underlying the workers' compensation and
> unfair practices statutes.   Since they
> 'advance[] legitimate legislative goals in a
> rational fashion ..., they do not offend
> equal protection.

18   *Id.* at 564.   It is "completely irrelevant in this case", Lee

19   contends, that the district court cannot award workers'

20   compensation benefits and the WCAB cannot award damages for

21   injuries."

22      USF&G argues that, because Conley abandoned any effort to

23   challenge the jurisdiction of this Court, Lee cannot now do so.

24   USF&G notes that Lee did not join in Conley's Application for

25   Reconsideration but, instead, filed on December 17, 1999, a

26   motion to file a counterclaim in this action against USF&G, ASI,

27

and Aon.   (Doc. 27).   The motion was granted by Magistrate Judge
Snyder on January 26, 2000.   (Doc. 37)   Lee's counterclaim was
filed on February 7, 2000.   (Doc. 40).   Lee was ordered to file
an amended counterclaim by Order filed on August 17, 2000, (Doc.
58), which Lee did on August 31, 2000.   (Doc. 59).   On January
24, 2001, a Stipulation Dismissing Diana Conley from Action
Without Prejudice was ordered, (Doc. 73), wherein USF&G, ASI, and
Diana Conley stipulated in pertinent part:

> 1.   The above-captioned action shall be
> dismissed without prejudice as to defendant
> Diana Conley only.
>
> 2.   Diana Conley shall be bound by all
> orders, findings, conclusions,
> determinations, decrees, stipulations,
> judgments, and/or settlements made, entered
> or entered into, as the case may be, in or in
> connection with the above-captioned action,
> in the same manner and to the same extent as
> if Diana Conley had continued to be a party
> to said action and had participated in the
> litigation therein.

According to the Declaration of Bruce T. Smyth filed in
opposition to Lee's motion, (Docs. 738-740):

> 14.   On April 18, 2006, seven years after
> Diana Conley filed her application for
> benefits before the WCAB, and faced with an
> imminent trial in this court, Lee filed a
> 'declaration of readiness' to have USF&G's
> complaint adjudicated by arbitration by the
> WCAB.   USF&G promptly filed objections to the
> declaration of readiness and request for
> arbitration and reply memorandum to Lee's
> opposition.   Conley subsequently filed a
> declaration of readiness also ... At a
> settlement conference before the Honorable
> Adrienne Allen, Workers Compensation
> Administrative Law Judge, on May 22, 2006,
> Conley *withdrew* her declaration of readiness
> and request for arbitration.   Judge Allen

then set a continued settlement conference
before the presiding judge of the San
Bernardino Division of Workers Compensation
Appeals Board, Honorable Charles Regnell, for
June 13, 2006.  At the settlement conference
on June 13, 2006, Judge Regnell held that a
trial should be conducted on the issue of
whether the matter should not be sent to
arbitration, based on the contentions of
USF&G that Lee had warned [sic] and/or was
estopped from asserting the jurisdiction of
the WCAB, and set another settlement
conference, which subsequently [sic] held on
August 29, 2006.

15.  At that conference, Lee's counsel
asserted that the counsel for USF&G in the
workers compensation matter, Greg Geisler of
Morse, Geisler & Callister, in fact had
previously represented Lee.  The WCAB
accordingly set another status conference for
September 26, 2006 to consider the threshold
issue of whether there was a conflict of
interest by virtue of Mr. Geisler's alleged
representation.  On November 15, 2006, the
parties entered into a stipulation for the
exchange of information and discovery in
connection with Lee's subsequent motion
before the WCAB to disqualify Mr. Geisler and
Charston, Revich & Chamberlin, LLP.  The
Court set a conference for December 13, 2006,
which was subsequently continued to late
January, 2007.  On January 26, 2007, at the
request of counsel for USF&G because of the
trial in this matter, the status conference
before the WCAB was continued to May 2, 2007.

...

16.  USF&G contends that its complaint for
rescission of the insurance policy has been
resolved by the jury's verdict and the
partial judgment.  Lee in any event failed to
bring the complaint for rescission to
adjudication by the WCAB, first by failing to
take *any action to do so for seven years* and
*then* by delaying any action by *a frivolous
motion to disqualify USF&G's counsel*.  If
USF&G's complaint had not been resolved in
this Court, Lee would still need (1) to have
the issue of disqualification of USF&G's

29

1
2
3
4

counsel heard by the WCAB and (2) then have
the issues of whether Lee waived and/or was
estopped from asserting the jurisdiction of
the WCAB tried by the WCAB.  Because the
judgment of rescission against Lee in this
Court bars its claim before the WCAB, Lee
cannot proceed in that forum.

USF&G and Aon argue that Lee's assertion that Judge Coyle's

denial of Conley's initial motion to dismiss compelled Lee to

file a compulsory counterclaim and to otherwise protect its

rights in this action and that it was manifestly unjust and clear

error to use that counterclaim as a basis to say the motion to

dismiss was properly granted in the first place is without merit

and does not justify granting Lee's motion.  First, Lee argues

that it had to assert its counterclaims in this court or lose

them, because they would have been barred by the statute of

limitations and such claims could not be pursued before the WCAB,

which did not have jurisdiction over the claims for fraud,

negligent misrepresentation, breach of oral contract and

negligence alleged by an alleged policyholder against the insurer

and did not have jurisdiction of claims against the managing

general agent, ASI.  Further, it is argued:

Nothing forced Lee to file its claims in
federal court.  Lee could have preserved its
claims by filing them in state court or by
entering into a tolling agreement with USF&G.
Other options were available to Lee as well.
Lee and Ms. Conley could have petitioned the
Ninth Circuit for a writ to review the denial
of Conley's motion.  Lee and Ms. Conley also
could have sought permission from the Ninth
Circuit to take an interlocutory appeal under
28 U.S.C. § 1292(b).  Instead, Lee chose to
litigate its claims in this Court and
aggressively pursued them through summary

30

judgment and trial.

Lee replies that USF&G and Aon cite no authority that the filing of the counterclaim rendered Lee's objections to jurisdiction moot:

> Parties do not waive objections properly made and preserved by continuing to participate in the litigation after their objections have been overruled.  The pertinent question is whether Lee had filed a counterclaim before the motion to dismiss was brought and decided.  No such counterclaim had been filed.

USF&G argues that Lee has waived any right and is estopped to seek adjudication of USF&G's complaint by the WCAB by failing to proceed in that forum for seven years.  USF&G notes that Lee did not assert that the WCAB had jurisdiction in its Answer, as an affirmative defense or otherwise.  Lee did not join in Ms. Conley's application for reconsideration of the motion to dismiss but, rather, filed a counterclaim and expressly sought to have the District Court adjudicate the issues in USF&G's Complaint by moving for summary judgment.  USF&G contends that Lee waited until after its motion for summary judgment had been denied, "after its phony threat of bankruptcy had been rejected by USF&G," and until trial was imminent before filing a "declaration of readiness" for arbitration before the WCAB.  Citing *Sea World Corp. v. Superior Court*, 34 Cal.App.3d 494 (1973)) and *Magliulo v. Superior Court*, 47 Cal.App.3d 760 (1975), USF&G contends that Lee has waived any right to seek and is estopped from obtaining adjudication before the WCAB.

31

Lee replies that it has not waived and is not estopped to have the WCAB adjudicate the rescission issue. Lee asserts that *Sea World* is inapposite:

> Here ... Conley and Lee promptly moved this court to dismiss the action based on the exclusive jurisdiction of the WCAB and did not submit to this court for decision any precedential jurisdictional question of fact as occurred when the employer in <u>Sea World</u> asked the Superior Court to decide the issue of course and scope of employment.  USF&G confuses waiver of the right to have a tribunal determine an issue of concurrent jurisdiction to determine jurisdiction, such as course and scope of employment, with waiver of a right of general jurisdiction once found.  A party can waive having the WCAB determine a precedential jurisdictional issue like course and scope of employment by submitting that issue to the court for it to decide under its concurrent jurisdiction to determine jurisdiction, but one cannot waive the general jurisdiction of either tribunal once that has been found nor can a tribunal's exercise of its own general jurisdiction be a subject of estoppel.
>
> USF&G and ASI have not cited a single case that holds that *general* jurisdiction can be waived or that the exercise of such jurisdiction, once obtained, can somehow be estopped.  Although there may be other remedies for a party's alleged delay in pursuing remedies before a tribunal that has general jurisdiction, USF&G have not pursued any such other remedies.  <u>Sea World</u> and its progeny are inapplicable to the facts of this case.

In its *reply* brief, Lee contends that USF&G's failure to join the Uninsured Employers' Fund (UEF) as a party to this action requires that the judgment be vacated.  This contention has never been raised in this action.  To advance it in a reply is improper.  It should not be considered, but is treated to the

32

1    extent of USF&G's response.

2          Lee contends that, "[b]ased on the uncontradicted evidence

3    of the inadequacy of the UEF," the only way that the UEF could

4    provide adequate compensation for Conley is by establishing that

5    there is coverage under the USF&G workers' compensation policy."

6    Under California Labor Code § 5600, Lee asserts, "it is evident

7    that the UEF's claim for coverage under the USF&G policy falls

8    within the exclusive jurisdiction of the WCAB", citing *Rinaldi v.*

9    *Workers' Compensation Appeals Bd.*, 196 Cal.App.3d 571 (1987).

10   Lee refers to *Aetna Casualty & Surety Co. v. Aceves*, *supra*, 233

11   Cal.App.3d at 554-555:

12                    A trial court has discretion whether or not
                      to exercise an action for declaratory relief.
13                    Aceves contends that the trial court abused
                      its discretion by taking jurisdiction in this
14                    case, because the court created the
                      possibility of inconsistent judgments.
15
                      If an employer is found to be uninsured, an
16                    injured employee has certain rights to
                      proceed against the Uninsured Employers Fund
17                    (Fund), which was set up to pay judgments
                      obtained against uninsured employers.
18                    (Lab.Code, § 3715 et seq.)  The Fund was not
                      named in Aetna's suit, and the judgment in
19                    that suit therefore cannot bind the Fund ...
                      Aceves asserts that the Fund might be able to
20                    demonstrate to the WCAB that Aetna *did* insure
                      Chesler at the time of the accident.  If so,
21                    the Fund would not be liable to Aceves, and
                      Aceves would be left with an unenforceable
22                    judgment against Chesler.

23                    Aetna does not directly respond to this
                      argument.  Instead, it contends that the
24                    superior court's final determination
                      concerning insurance coverage would be
25                    binding on the *WCAB*.  Aetna states that
                      'sound public policy [limits] litigation by
26                    preventing a party who has had one fair trial

                                    33

on an issue from again drawing it into controversy.' ... This proposition, although legally sound, does not respond to Aceves' argument.  The WCAB is a decisionmaking forum, not a party to be bound by a prior judgment.  The Fund, in contrast, is commonly joined as a party in cases involving controversies over insurance coverage of employers.  As the court explained in *Rinaldi v. Workers' Comp. Appeals Bd.* (1987) 196 Cal.App.3d 571 ..., 'Rinaldi, as the Director of the Department of Industrial Relations of the State of California, is the state official responsible for administering the Uninsured Employers Fund.  The fund was created to ensure that workers employed by illegally uninsured employers are not deprived of workers' compensation benefits (Lab. Code, § 3716, subd. (b)).  *Rinaldi is aggrieved by the Board's order, for he is required to pay the award if the employer fails to do so.*  (Lab. Code, § 3716, subd. (a)).'  (*Id.* at p. 572), fn. 1, italics added.)   Thus, although the declaratory judgment is conclusive as to Aceves, it cannot be binding on the Fund.  (See *Scott*, *supra*, 46 Cal.2d at p.83.)

Aetna contends that because Aceves agreed in the settlement agreement not to pursue any personal liability against Chesler in a workers' compensation proceeding, there was no realistic possibility of inconsistent judgments.  Determination of this issue would require us to determine the interpretation of and enforceability of the settlement agreement.  That issue was not presented for resolution in the trial court and is not properly before us on appeal.  See, e.g., Labor Code section 5001, which states, 'No release of liability or compromise agreement is valid unless it is approved by the appeals board ....'  ... The record contains no suggestion that such approval has been obtained.

The issue of possible inconsistent judgments was properly raised before the trial court, yet no measures were taken to lessen or avoid prejudice to Aceves ... A trial court's exercise of discretion under section 1061

34

1

2

3

4

5

> will be upheld on appeal unless an abuse of
> discretion is clearly shown.  The test of
> abuse of discretion is 'whether or not the
> trial court exceeded the bounds of reason,
> all of the circumstances before it being
> considered ...' ... Under the circumstances
> presented in this case, we conclude that the
> trial court did abuse its discretion in
> granting declaratory judgment when the Fund
> was not joined as a party.

6

7

Relying on *Aceves*, Lee argues that USF&G likewise failed to

join the UEF and the UEF is not bound by the Partial Judgment:

8

9

10

11

12

13

14

> The risk of inconsistent judgments is
> likewise present between a judgment by this
> court that USF&G is entitled to rescind and
> to restitution as to Lee, and one by the WCAB
> in favor of the UEF that USF&G's policy was
> not rescinded and USF&G remains liable for
> Conley's workers' compensation benefits.
> Presumably, USF&G never joined the UEF to
> this action for fear that the UEF's
> involvement would cause the court to
> recognize that exclusive jurisdiction and the
> proper forum under the <u>Buford</u> and <u>Colorado
> River</u> abstention doctrines lay with the WCAB.

15

16

17

18

Judge Coyle's Order denying the motion to dismiss also denied

Lee's request for abstention under *Buford* and *Colorado River*.

Lee's reference in the reply brief is the first contention by Lee

that the abstention rulings were in error.

19

20

21

22

23

24

25

26

In its sur-reply brief, USF&G contends that it "is simply

outrageous and in bad faith that Lee would wait eight years after

the case had been filed and after trial and in a Reply brief to

its own motion to vacate to raise the completely new allegation

that UEF was somehow a necessary party."  USF&G notes that Lee

never asserted this contention in its Answer to the Complaint or

to USF&G's amended counterclaim.  Lee has never raised the issue

of UEF's alleged indispensability.  It may not do so now, after the trial is over.

USF&G further contends that Lee is estopped from asserting that the UEF was a necessary party.  Lee's Motion in Limine No. 19 (Doc. 449) and the Order granting Motion in Limine No. 19 (Doc. 596)("There shall be no mention of and no documentary evidence or testimony before the jury or prospective jurors relating to any collateral source of funds for the payment of benefits or damages to Ms. Conley, including, without limitation, the Uninsured Employer's Trust Fund ....").  USF&G notes that at the same time Lee moves to vacate the Partial Judgment because the UEF is a necessary party, Lee moves for a new trial on the grounds of counsel's misconduct in mentioning the UEF during questioning of Hugh Awtrey.

USF&G raises Rule 12 to rebut Lee's contention that the UEF is a necessary party on that ground is made too late.  Fed. R. Civ. Proc. Rule 12(b)(7) is the means by which the defense of failure to join a party under Fed. R. Civ. Proc. Rule 19 is raised by motion.  Rule 12(g) provides in pertinent part:

> ... If a party makes a motion under this rule but omits therefrom any defense or objection then available to the party which this rule permits to be raised by motion, the party shall not thereafter make a motion based on the defense or objection so omitted, except a motion as provided in subdivision (h)(2) hereof on any of the grounds there stated.

Rule 12(h)(2) provides in pertinent part:

> A ... defense of failure to join a party indispensable under Rule 19 ... may be made

36

1                         **in any pleading permitted or ordered under**
                        **Rule 7(a), or by motion for judgment on the**
2                         **pleadings, or at the trial on the merits.**

3      Lee did none of these.  USF&G further argues that *Aceves*

4 does not establish that the Partial Judgment should be vacated

5 pursuant to Rule 19, Federal Rules of Civil Procedure, because of

6 the failure to join the UEF as a party.  USF&G notes that in

7 *Aceves*, the issue of inconsistent judgments was raised in the

8 trial court, while Lee did not do so.  USF&G contends that, in

9 *Rinaldi*, the UEF had been named as a defendant by the applicant

10 in proceedings before the WCAB.  That the case noted in passing

11 that the UEF was an interested party, but did not hold or discuss

12 whether the UEF was a necessary or indispensable party.

13      Finally, USF&G argues, the UEF was neither a necessary nor

14 an indispensable party to USF&G's complaint for rescission, as

15 California Labor Code § 3715(a) vests the right to name the UEF

16 exclusively in the employee:

17               **Any employee ... whose employer has failed to**
              **secure the payment of compensation as**
18               **required by this division ... may, in**
              **addition to proceeding against his or her**
19               **employer by civil action in the courts as**
              **provided in § 3706, file his or her**
20               **application with the appeals board for**
              **compensation and the appeals board shall hear**
21               **and determine the application for**
              **compensation in like manner as in other**
22               **claims and shall make the award to the**
              **claimant as he or she would be entitled to**
23               **receive if the employer had secured the**
              **payment of compensation as required, and the**
24               **employer shall pay the award in the manner**
              **and amount fixed thereby or shall furnish to**
25               **the appeals board a bond, in any amount and**
              **with any sureties as the appeals board**
26               **requires, to pay the employee the award in**

1    the manner and amount fixed thereby.

2  USF&G contends: "More importantly, the claim against the employee

3  [sic] may only be made upon an *award* of the WCAB against the

4  employer, an event which has not taken place."  Only if the

5  employer fails to pay the compensation awarded by the WCAB does

6  the UEF pay the award.  Labor Code § 3716(a) and *Symmar, Inc. v.*

7  *Workers' Comp. Appeals Bd.*, 135 Cal.App.3d 65, 70-71 (1982).

8         Lee's motion to vacate the partial judgment pursuant to Rule

9  60(b) on the ground that the WCAB had and has exclusive

10 jurisdiction is DENIED.  Lee's voluminous briefs on this issue

11 have been fully considered.  Lee's essential arguments were

12 unsuccessfully argued to Judge Coyle.  Based on Judge Coyle's

13 analysis and the arguments of USF&G and Aon in opposition to this

14 motion, Judge Coyle's rulings were not contrary to law.  Lee's

15 failure to join in Conley's motion for reconsideration, the

16 filing of Lee's counterclaim, and the failure to argue that UEF

17 is a necessary party until the reply brief in support of this

18 motion are persuasive factors that Lee has not established

19 grounds to vacate the partial judgment pursuant to Rule 60(b).

20         2.  <u>California Law Re an Insurer's Imposition of a</u>

21 <u>Condition or Exception on a Workers' Compensation Policy Except</u>

22 <u>by Means of an Approved Endorsement and Insurer's Termination</u>

23 <u>Rights</u>.

24         Lee asserts that California law clearly requires that any

25 limitation on a workers' compensation policy be by an approved

26 form of endorsement to the policy, citing California Insurance

38

Code §§ 11657, 11659, 11660 and 10 C.C.R. 2268.

Insurance Code § 11657 provides:

> Subject to the provisions of Sections 11659 and 11660, limited workers' compensation policies may be issued insuring either the whole or any part of the liability of any employer for compensation, provided that the policy is previously approved, as to substance and form, by the commissioner. Subject to those provisions, the policy may restrict or limit the insurance in any manner whatsoever.

Insurance Code § 11659 provides:

> Such approved form of policy, limited pursuant to Section 11657, shall not be otherwise limited except by indorsement thereon in accordance with a form prescribed by the commissioner or in accordance with rules adopted by the commissioner. Such indorsement form shall not be subject to Section 11658. Before prescribing such indorsement form or adopting such rule, the commissioner shall consult concerning it with the Workers' Compensation Appeals Board.

Insurance Code § 11660 provides:

> Failure to observe the requirements of Section 11657 and 11659 shall render a policy issued under Section 11657, and not complying therewith, unlimited.

10 C.C.R. § 2268 provides:

> No collateral agreements modifying the obligation of either the insured or the insurer shall be made unless attached to and made a part of the policy, provided, however, that if such agreements are attached and in any way restrict or limit the coverage of the policy, they shall conform in all respects with these rules.

Lee refers to the trial testimony of Cathy Hacker, contending that Ms. Hacker testified that the requirement for Lee

39

1  to assure underwriting that Lee would not do construction was a

2  "condition" for the issuance of the policy:

3          Q.  Oh.  Now, when you had these - you had a
           discussion or - with Mr. Sackett and Mr.
4          Sheehan about the possibility of a policy
           being issued through American Specialty as a
5          USF&G Workers' Compensation policy.  What was
           discussed in that conversation?

6
           A.  In order for us to write a USF&G policy
7          for Workers' Compensation coverage, there
           were certain criteria that we needed before
8          we could write that policy.

9          Q.  What were the criteria discussed?

10         A.  We needed a verification from the
           insured, Splash Island, in writing that their
11         employees would no longer be performing
           construction work.

12
           ...
13
           Q.  And do you recall what Stan said about
14         potentially issuing a USF&G policy to
           American Specialty to The Island for Workers'
15         Compensation insurance?

16         A.  My recollection is that he would consider
           writing it only on the condition that we had
17         verification that Splash Island employees no
           longer performed any construction work.

18
(Trial testimony of Hacker, Feb. 2, 2007, 52:8-19, 55:16-21).

19
Lee asserts that USF&G argued that Lee's August 12, 1998 letter

20
to ASI clearly stated that certain activities would not be

21
performed and thus constituted an exception to the policy

22
coverage and a limitation thereon.  Lee contends that, as such,

23
the limitation was required to be set forth in the policy and to

24
comply with the above cited California Insurance Code provisions.

25
       USF&G asserts that Lee continues to disregard the issues

26

1   that were tried and applicable California law by arguing that the

2   August 12, 1998 letter to ASI constituted an "endorsement or

3   exclusion" to its policy of insurance.  USF&G has consistently

4   maintained its workers' compensation policy was complete, fully

5   integrated and unrestricted and has never asserted that the

6   August 11 and 12, 1998 letters modified the coverage in the

7   policies.  USF&G asserts that Lee's contention that USF&G argued

8   that Lee's August 12, 1998 letter to ASI clearly stated that

9   certain activities would not be performed and thus constituted an

10  exception to the policy coverage and a limitation thereon is

11  "simply *not true*:"

12          The central issue in this case, as asserted
            by USF&G, was that Lee made material
13          misrepresentations and omissions in the
            policy application process, not that there
14          was any limitation in coverage.

15      USF&G also argues that Lee's reliance on the testimony of

16  Cathy Hacker that Lee's false representations in its August 12,

17  1998 letter constituted a restriction or condition on the policy

18  is totally unfounded:

19          Ms. Hacker did *not* testify that construction
            work would not be covered or that the policy
20          contained a condition that it would not cover
            construction work.  Rather, her testimony
21          clearly states that USF&G would not write the
            policy *in the first place* if Lee was going to
22          perform construction work.

23      Lee replies that Cathy Hacker's testimony established that

24  Mr. Sackett's August 11, 1998 letter stated a condition or

25  exception to coverage under the policy.  In addition to the

26  testimony quoted above, Lee refers to other testimony by Cathy

                                41

Hacker:

        Q.  And what was discussed in that meeting?

        A.  We discussed receipt of the letter
        [Christy Platt's August 12, 1998 letter]
        promising that they would no longer employ
        construction laborers and our considering
        quoting it under USF&G.

        ...

        Q.  All right.  So rather that issuing an
        exclusionary endorsement, Mr. Sackett sent
        this August 11, 1998 letter to Aon in place
        of an exclusionary endorsement?

        A.  No.

        Q.  Well, the letter was serving as stating
        USF&G's condition for providing insurance,
        was it not?

        A.  Yes.

(Trial testimony of Hacker, Feb. 2, 2007, 73:22-25; Feb. 6, 2007,
132:4-10).  Lee argues:

        This was not a mere request for information:
        it sought the agreement of Lee to a condition
        and restriction that its employees would not
        engage in construction and that claims
        arising from construction would not be
        reported under the policy.  Such activities
        were exceptions to the coverage otherwise
        provided by the policy.  As such, Mr.
        Sackett's August 11, 1998 letter was required
        to be clear, plain and conspicuous, but it
        was not.  USF&G and ASI claimed that any kind
        of construction was precluded, but the letter
        stated that Lee employees were to stay within
        their water park classifications, and
        'construction' as used in the letter could
        reasonably be interpreted not to include
        construction activities that were water park
        maintenance within the meaning of water park
        classification codes 9016 and 9180, and to
        include only 'construction' activities that
        were outside of the water park
        classifications and would require a workers'

42

compensation construction classification code.

Lee contends that, contrary to USF&G's contention, there was ample evidence that the latter interpretation was the actual agreement of the parties, referring to Dr. Levine's testimony that insurance industry personnel would be expected to understand "construction" in the latter sense (Trial testimony of Levine, Feb. 14, 2007, pp. 41-49) and Christy Platt's deposition testimony read at trial that "at the time I wrote this letter, as is the same as is my current understanding as it relates to water parks, is my perception of construction laborers are crews brought in to build the water park from the ground up."  (Trial testimony of Platt, Feb. 14, 2007, 21:5-9).

Lee further argues that, given the requirements of Insurance Code §§ 11657, 11659 and 11660 and the express statutory requirements for cancellation of a workers' compensation policy set forth in Insurance Code § 676.8, as a matter of California public policy, a workers' compensation policy cannot be rescinded and can only be terminated in accordance with Section 676.8.

Insurance Code § 676.8 provides:

(a) This section applies only to policies of workers' compensation insurance.

(b) After a policy is in effect, no notice of cancellation shall be effective unless it complies with the notice requirements of this section and is based upon the occurrence, after the effective date of the policy, of one or more of the following:

(1) The policyholder's failure to make any workers' compensation insurance premium

43

1        payment when due.

2            (2) The policyholder's failure to report
         payroll, to permit the insurer to audit
3        payroll as required by the terms of the
         policy or of a previous policy issued by the
4        insurer, or to pay any additional premium as
         a result of an audit of payroll as required
5        by the terms of the policy or of a previous
         policy.

6
             (3) The policy holder's material failure to
7        comply with federal or state safety orders or
         written recommendations of the insurer's
8        designated loss control representative.

9            (4) A material change in ownership or any
         change in the policyholder's business or
10       operations that materially increases the
         hazard for frequency of severity of loss,
11       requires additional or different
         classifications for premium calculations, or
12       contemplates an activity excluded by the
         insurer's reinsurance treaties.

13
             (5) Material misrepresentation by the
14       policyholder or its agent.

15           (6) Failure to cooperate with the insurer in
         the insurer's investigation of a claim.

16
             (c) A policy shall not be canceled for the
17       conditions specified in paragraph (1), (2),
         (5), or (6) of subdivision (b) except upon 10
18       days' written notice to the policyholder by
         the insured ... If the policyholder remedies
19       the condition to the insurer's satisfaction
         within the specified time period, the policy
20       shall not be canceled by the insurer.

21       USF&G responds that Lee's contention that a workers'

22  compensation policy cannot be rescinded as a matter of California

23  public policy is wrong.  USF&G cites *Mitchell v. United National*

24  *Ins. Co.*, 127 Cal.App.4th 457, 468 (2005) and Insurance Code §§

25  331 ("Concealment, whether intentional or unintentional, entitles

26  the injured party to rescind insurance") and 359 ("If a

                              44

representation is false in a material point, whether affirmative or promissory, the injured party is entitled to rescind the contract from the time the representation becomes false"). USF&G contends that there is no limitation in those provisions or under California law barring a claim for rescission of a workers' compensation insurance policy.

In reply, Lee notes that USF&G does not specifically discuss Section 676.8 and contends that "it is axiomatic that the more specific sections of the Insurance Code on Workers' Compensation should control over these general sections", i.e., Sections 331 and 359. Lee also asserts that no case is cited by USF&G that addresses whether a workers' compensation policy can be rescinded or may only be canceled prospectively.

Lee has not previously asserted Section 676.8 and cites no case authority to support its position. California law does not bar the remedy of rescission of a workers' comp policy as between the insurer (USF&G) and policyholder (Lee).

Lee's motion to vacate the partial judgment or to alter or amend the partial judgment on this ground is DENIED.

       3.  <u>As a Condition or Exception Limiting Coverage, Mr. Sackett's August 11, 1998 Letter Was Not Clear, Plain and Conspicuous</u>.

Lee asserts that the August 11, 1998 letter "stated what USF&G claims was a condition on coverage that Lee's employees (a) stay within their designated classification as water park employees and (b) that claims arising from 'construction' not be

1   reported under the workers' compensation policy:"

2           USF&G and ASI never made clear to Lee what
            was and was not included within the
3           designated classification for water park
            employees, nor did USF&G and ASI inform Lee
4           that they were interpreting 'construction' in
            a layperson's terms instead of in the sense
5           that would require a construction
            classification code under the Uniform
6           Statistical Reporting Plan.  Dr. Levine
            established that 'designated classification'
7           and 'construction' in this context would be
            understood by persons in the insurance
8           industry in their technical sense, but USF&G
            claimed that any activity that a layperson
9           could call construction was impermissible.
            This was never clarified for Lee, which, like
10          Mr. Lemasters, understood it was not unusual
            for water park maintenance employees to erect
11          water slides as part of park operations.

12  Lee asserts that, because USF&G and ASI were not clear, plain and

13  conspicuous in their statement of condition or exception to the

14  policy, that condition or exception cannot be enforced.  Lee

15  cites *Thompson v. Occidental Life Insurance Co.*, 9 Cal.3d 904,

16  912 (1973):

17          [A]n insurance company is not precluded from
            imposing conditions precedent to the
18          effectiveness of insurance coverage despite
            the advance payment of premium.  However, any
19          such condition must be stated in conspicuous,
            unambiguous and unequivocal language which an
20          ordinary layman can understand.

21  Lee also cites *E.M.M.I., Inc. v. Zurich American Ins. Co.*, 32

22  Cal.4th 465, 471 (2004):

23          As we have declared time and again, 'any
            exception to the performance of the basic
24          underlying obligation must be so stated as
            clearly to apprise the insured of its
25          effect.'  Thus, 'the burden rests upon the
            insurer to phrase exceptions and exclusions
26          in clear and unmistakable language.'  The

                              46

> exclusionary clause 'must be conspicuous,
> plain and clear.'  This rule applies with
> particular force when the coverage portion of
> the insurance policy would lead an insured to
> reasonably expect coverage for the claim
> purportedly excluded.

Lee's contention assumes that the August 11, 1998 letter imposed a condition or restriction on coverage.  This presented, in part, a question of fact as to the parties' intent which was decided against Lee.

As USF&G responds, Lee's contention that the August 11, 1998 letter constituted a condition modifying the terms of an integrated policy is "completely unfounded as a matter of law".  The August 11, 1998 letter was not part of the insurance policy and did not constitute a condition or exclusion.  The cases upon which Lee relies discuss rules for the interpretation of an insurance policy and, not, as here, statements made by the applicant prior to the written and fully integrated policy contract being formed.  As USF&G contends:

> Sackett's August 11, 1998 letter ... clearly
> was not part of the policy.  Rather, it
> constituted only a request by the insurer in
> the course of the policy application process
> for confirmation that Lee would not use its
> employees to perform construction work.  That
> inquiry was made to allow USF&G and American
> Specialty to determine whether they would be
> willing to issue the policy in the first
> place.

Furthermore, Lee, over the objections of USF&G, requested and Jury Instruction No. 29 was given:

> If you find that USF&G imposed any condition
> to its issuance of the workers' compensation
> policy to Lee, you should determine if any

47

1

2

3

4

> language of such condition is uncertain or
> ambiguous.  If you find that the language of
> any condition to the issuance of the workers'
> compensation policy is uncertain or
> ambiguous, you should consider the language
> it its narrowest sense.

(Doc. 661, p. 30).  Therefore, the jury considered Lee's argument

that USF&G was imposing a condition in the workers' compensation

policy, that such condition should be interpreted in its

narrowest sense, and the jury rejected Lee's position.

Lee's assertion that Jury Instruction No. 29, given at

trial, is of "no moment" because the issue of whether the

condition was clear, plain and conspicuous is a question of law,

is without merit.  The case upon which Lee relies, *20th Century*

*Ins. Co. v. Liberty Mut. Ins. Co.*, 965 F.2d 747, 753 (9th

Cir.1992), does not so hold.  Further, because Lee requested and

obtained Jury Instruction No. 29, the doctrine of invited error

precludes Lee's motion on this ground.  *See Deland v. Old*

*Republic Life Insurance Company,* 758 F.2d 1331, 1336-1337 (9th

Cir.1985).

Lee's motion on this ground is DENIED.

4.  <u>Admissibility of Christy Platt's August 12, 1998</u>

<u>Letter to Mr. Sackett and Related Communications</u>.

Lee asserts that, in addition to the requirement of

California law that all limitations on a workers' compensation

policy be in the policy, Lee's August 12, 1998 letter and related

communications should have been excluded from evidence under the

parol evidence rule.  Lee argues:

48

1
2
3
4
5
6
7
8
9
10
11
12
13

> Because USF&G had conditioned coverage on
> Lee's employees staying within their
> designated classification as water park
> employees and not having workers'
> compensation claims arise from
> 'construction,' Lee's August 12, 1998 letter
> to Mr. Sackett, as interpreted by USF&G, was
> not independent of, but related directly to
> and contradicted the terms of the policy.
> The policy expressly covered activities of
> Lee's employees that were within a water park
> classification code.  Lee's August 12, 1998
> letter, as interpreted by USF&G, contradicted
> the policy in stating that Lee's employee
> would not do activities that were within a
> water park classification and that a
> layperson might view as construction.  As
> such, Lee's August 12, 1998 ... letter should
> have been excluded under the parol evidence
> rule as should have the August 11, 1998 ...
> letter from Mr. Sackett to Mr. Hildebrand,
> the August 27, 1998 letter from Mr. Awtrey
> and Ms. Moore to Christy Platt ... and
> related oral communications.

Lee asserts that, without these letters and communications, there would be no basis for a claim of any alleged misrepresentation or concealment.

   Lee has _twice_ before argued this issue unsuccessfully.  By Order filed on July 30, 2004 (Doc. 194, pp. 55-58), Judge Coyle denied Lee's motion for summary judgment on this ground, ruling in pertinent part:

> Lee further moves for summary judgment with
> respect to Fidelity's claim for rescission on
> the ground that Lee's letter of August 12,
> 1998 is inadmissible as a matter of law to
> prove any fact contradicting the express
> terms of the integrated Policy.

> In arguing that this August 12, 1998 letter
> is inadmissible, Lee cites Bank of America v.
> Pendergrass, 4 Cal.2d 258, 263-264 (1935).

> At issue in Pendergrass was the admission of

49

evidence of a promise that if the appellant
executed a note and mortgage, the appellant
would not be required to make any payments of
interest or principal for a year.   In holding
that this evidence was inadmissible, the
Supreme Court stated:

> [I]t is manifest that the promise
> which it is claimed they relied
> upon was ... that the respondent
> would 'extend' or 'postpone' all
> payments for the period of one
> year.   This promise is in direct
> contravention of the unconditional
> promise contained in the note to
> pay the money on demand.   The
> question then is:   Is such a
> promise the subject of parol proof
> for the purpose of establishing
> fraud as a defense to the action or
> by way of cancelling the note,
> assuming, of course, that it can be
> properly coupled with proof that it
> was made without any intention of
> performing it?   Our conception of
> the rule which permits parol
> evidence of fraud to establish the
> invalidity of the instrument is
> that it must tend to establish some
> independent fact or representation,
> some fraud in the procurement of
> the instrument, or some breach of
> confidence concerning its use, and
> not a promise directly at variance
> with the promise of the writing ...
> Lindemann v. Goryell ... confirms
> the opinion we entertain, for while
> it is said no question of fraud was
> raised, yet the effort was made to
> prove that the note was executed
> upon the understanding that the
> payee would not enforce payment
> until the payor had sold sufficient
> real estate to enable him to pay.
> It was there said ... that fraud
> may not be established by parol
> evidence to contradict the terms of
> the writing 'when the statements
> relate to rights depending upon
> contracts yet to be made, to which
> the person complaining is a party,

1        as under such circumstances he has
    it in his power to guard in advance
2        against any and all consequences of
    a subsequent change of conduct by
3        the person with whom he is dealing,
    and to admit evidence of extrinsic
4        agreements would be to open the
    door to all evils that the parol
5        evidence rule was designed to
    prevent.' ....

6

See also <u>Bank of America v. Lamb Finance Co.</u>,
7    179 Cal.App.2d 498, 502 (1960):

8        A distinction has been made by our
    courts in cases in which the fraud
9        sought to be proved consists of a
    false promise.  They have held that
10       if, to induce one to enter into an
    agreement, a party makes an
11       independent promise without
    intention of performing it, this
12       separate false promise constitutes
    fraud which may be proven to
13       nullify the main agreement; but if
    the false promise relates to the
14       matter covered by the main
    agreement and contradicts or varies
15       the terms thereof, any evidence of
    the false promise directly violates
16       the parol evidence rule and is
    inadmissible.

17

See also <u>Continental Airlines, Inc. v.</u>
18   <u>McDonnell Douglas Corp.</u>, 216 Cal.App.3d 388,
419 (1989):

19

20       But the fraud exception is not
    applicable where 'promissory fraud'
21       is alleged, unless the false
    promise is independent of or
22       consistent with the written
    instrument ... It does not apply
23       where ... parol evidence is offered
    to show a fraudulent promise
24       directly at variance with the terms
    of the written agreement.

25   Relying on these legal principals, Lee argues
in pertinent part as follows:
26

51

1  USF&G contends that it issued the
   workers' compensation policy at
2  issue in this case on USF&G's
   understanding and agreement that
3  the policy would not cover or
   insure any employees performing
4  'construction' at the water park.
   According to USF&G, this was an
5  indispensable part and integral
   condition of issuing the USF&G
6  policy.  However, this contention
   is directly at odds with and
7  contradicts the unrestricted,
   integrated and auditable policy,
8  written, assembled, reviewed and
   approved by American Specialty for
9  USF&G.  This very policy contains
   not one, but two, integration
10 provisions and purports to fully
   describe the entire relationship
11 and all obligations of the parties.
   The policy, which by its very terms
12 is unlimited and unrestricted as to
   employees and occupations covered,
13 directly contradicts USF&G's
   contention that it issued the
14 policy premised upon the condition
   that construction workers would not
15 be covered under the policy.
   Consequently, the August 11 and
16 12th letters are inadmissible and
   cannot provide grounds for
17 rescission of the USF&G policy.

18     Fidelity takes issue with Lee's assertion
   that Fidelity "issued the policy premised
19 upon the condition that construction workers
   would not be covered under the policy".
20 Fidelity's position is that it issued the
   unrestricted policy based on Lee's
21 representation that Lee would not be
   employing any construction workers.
22 Furthermore, Fidelity argues that parol
   evidence is admissible to prove fraud in the
23 inducement of a contract notwithstanding an
   integration clause.  See Ron Greenspan
24 Volkswagen, Inc. v. Ford Motor Land
   Development Corp., 32 Cal.App.4th 985, 995
25 (1995); Airs, Inc. v. Perfect Scents, Ltd.,
   902 F.Supp. 1141, 1145-1147 (N.D.Cal. 1993).

26

                              52

> Lee responds that Fidelity's reliance on these cases is misplaced because this exception to the parol evidence rule does not apply where the evidence in question concerns a matter covered by the main agreement which contradicts the terms of the agreement.
>
> The court does not agree with Lee. Fidelity's position is that Lee's misrepresentations that it would not employ construction workers caused Fidelity to issue an unrestricted policy and that Fidelity would not have done so (or would not have issued any policy at all to Lee) in the absence of that misrepresentation.  This misrepresentation is a separate "false promise" that is not directly at variance with the terms of the contract.  In other words, Lee "promised" that it would not employ construction workers and based on that promise Fidelity issued a policy covering all of Lee's employees.  That Conley was employed as a construction worker is not at variance with the policy because the policy terms apply to Lee's employees but it is at variance with Lee's "promise" that it would not employ construction workers.  Therefore, the court rules that August 11, 1998 memorandum from Mr. Sackett of American Specialty to Mr.  Hildebrand of AON and the August 12, 1998 letter from Ms. Platt to American Specialty are admissible.

In addition, Lee's motion in limine no. 16 (Doc. 446) was "denied without prejudice to Lee submitting a jury instruction that the August 1998 letters may not be considered or used to contradict or vary the integrated insurance policy insofar as that policy insured water park classification codes."  (Doc. 596, p.7).

     As USF&G asserts, Lee's contention that the letters modified or varied the terms of the policy was not urged or argued by any party in the case:

> It was undisputed that the USF&G policy was complete, fully integrated and unrestricted.

1  |  USF&G never asserted that the August 12, 1998
2  |  letter, or the August 11, 1998 letter which
   |  preceded it, modified the coverage under the
3  |  policy.  Rather, the central issue in the
   |  case was whether Lee made misrepresentations
4  |  or material omissions in the policy
   |  application process.  Further, no one argued
5  |  that the classification codes listed in the
   |  policy limited the coverage of employees.
6  |  Neither Mr. Awtrey, who drafted the August
   |  12, 1998 letter, nor Christy Platt, who
7  |  signed it, testified that either had any
   |  special interpretation of the term
8  |  'construction,' limiting it to employees
   |  requiring separate classifications under
9  |  workers' compensation premium determination
   |  provisions.

10  As USF&G further asserts, Lee's contention that the August 1998

11  letters should be excluded under the parol evidence rule

12  "requires an extreme mischaracterization of USF&G's position":

13  |  Lee contended that USF&G wished to introduce
    |  the August letters as evidence that the
14  |  policy excluded construction laborers.  In
    |  fact, USF&G *never* argued that the policy did
15  |  not cover construction laborers.  USF&G
    |  agreed that the policy was unrestricted and
16  |  covered *all* of Lee's employees.  Moreover,
    |  the August letters do not discuss any change
17  |  to the terms of the policies.  Rather, such
    |  letters were intended to address American
18  |  Specialty's concern that Lee's employees were
    |  performing construction work.  Lee's theory
19  |  would eliminate any cause of action for
    |  fraudulent inducement.  Under Lee's theory, a
20  |  party could lie and cheat to induce another
    |  party to enter a contract and such lies would
21  |  be excluded under the parol evidence rule.

22  |  Finally, Lee's contention that the August 27,
    |  1998 letter from its own broker, Aon, to Lee
23  |  should be excluded under the parol evidence
    |  rule, is even more farfetched.  No one has
24  |  contended that that letter modified the terms
    |  of the contract of insurance.  Nor has Lee
25  |  explained how anyone could even contend that
    |  its own broker was able to modify the terms
26  |  of a previously issued fully integrated

54

policy of an independent insurer.

Lee replies that these letters and communications are subject to the parol evidence rule:

> As an integrated policy, the policy clearly provided coverage for 'construction' or 'construction-related' activities that fell within a water park classification.  However, USF&G's and ASI's interpretation of 'construction' precludes those activities and as such the August 12, 1998 letter and related communications were at direct variance with the provisions of the policy.  It is patently absurd for USF&G and ASI to take the position that the subject policy covered construction laborers ..., but if Lee employed construction laborers the policy would be void *in abnitio*.

These issues were thoroughly exhausted before trial through motions in limine and at trial, by rulings on jury instructions. The jury was correctly instructed that they could consider Lee's words and conduct as bearing on its fraudulent intent and inducement to obtain the policy.  The jury was further instructed they could not consider the words and conduct to vary the terms of the insurance policy.  The motion on this ground is DENIED.

5.   <u>Whether An Application for the Subject Insurance Was Required</u>.

Lee argues that, as a matter of law, an application for the workers' compensation policy was required in this case as an element of the claim for rescission.

Lee relies on the testimony during its cross-examination of Stanley Sheehan, an underwriter for ASI:

> Q.  In the course of doing underwriting, American Specialty reviewed applications; is

that correct?

A.  Yes, American Specialty reviews
applications as a part of underwriting.

Q.  And as a matter of policy and procedures,
did you request a signed application?

A.  A signed application is requested as part
of the procedure.

Q.  And that was true in 1998; correct?

A.  Yes.  That was true in 1998.

(Testimony of Sheehan, Feb. 7, 2007, 16:20-17:4).

Lee argues that this testimony establishes that an

application for insurance by USF&G is an element of a claim for

rescission.  Citing CACI Instruction 2308, "Rescission for

Misrepresentation or Concealment in Insurance Application -

Essential Factual Elements", includes in the elements of the

claim the following:

1.  That [*name of insured*] submitted an
application for insurance with [*name of
insurer*];

2.  That in the application for insurance
[*name of insured*] [intentionally] [failed to
state/represented] that [*insert omission or
alleged misrepresentation*] ....

Lee contends that Lee never submitted an application for

insurance with USF&G.  Rather, Lee asserts:

American Specialty pieced together
information from various outdated and
incomplete sources to write the policy,
including an unsigned application for
insurance with Industrial Indemnity.  The
original application was in substantial
conflict with other information American
Specialty had within its Lee file, including,
without limitation, another supplemental

56

1
2
3
4
5

application submitted by Dibudio & DeFendis which clearly indicated Lee's intent to construct and erect new slides with its employees.  USF&G now seeks to rescind based on Lee's alleged misrepresentations regarding the nature and scope of Lee's employees work as it relates to assembling an unfinished water slide.

6

Lee contends:

7
8
9
10
11

Evidence was introduced at trial that the formality of the application puts the applicant on notice that the information provided will be used to determine whether to issue a policy.  Here, the application, and the protections inherent to the applicant therein, were missing.  This missing instruction on the element of an application clearly prejudiced Lee and lead to an unfavorable result.

12    USF&G responds that Lee's position is incorrect as a matter

13 of California law, contending that the provisions of California

14 law governing the right to rescission under the California

15 Insurance Code and case law impose no "requirement" of a formal

16 application.

17    USF&G cites *Mitchell v. United National Ins. Co.*, 127

18 Cal.App.4th 457, 467-469 (2005):

19
20
21
22
23
24

United National based its right to rescind the policy on Insurance Code sections 331 and 359.  Insurance Code section 331 states: 'Concealment, whether intentional or unintentional, entitles the injured party to rescind insurance.'  Insurance Code section 359 similarly provides: 'If a representation is false in a material point, whether affirmative or promissory, the injured party is entitled to rescind the contract from the time the representation becomes false.'

25
26

Insurance Code sections 331 and 359 are part of a larger statutory framework that imposes 'heavy burdens of disclosure' 'upon both

57

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

parties to a contract of insurance, and any
material misrepresentation or the failure,
whether intentional or unintentional, to
provide requested information permits
rescission of the policy by the injured
party.' (*Imperial Casualty & Indemnity Co.
v. Sogomonian* (1988) 198 Cal.App.3d 169, 179-
180 ... Insurance Code section 332, for
example, requires each party to an insurance
contract to disclose, 'in good faith, all
facts within his knowledge which are or which
he believes to be material to the contract
...' The disclosure obligations imposed by
these statutes are directed specifically at
the formation of the insurance contract.
Insurance Code section 334 states:
'Materiality is to be determined not by the
event, but solely by the probable and
reasonable influence of the facts upon the
party to whom communication is due, in
forming his estimate of the disadvantages of
the *proposed contract*, or in making his
inquiries.' (Ins. Code, § 334, italics
added.)  Insurance Code section 356 provides:
"The completion of the contract of insurance
is the time to which a misrepresentation must
be presumed to refer.'

Requiring full disclosure at the inception of
the insurance contract and granting a
statutory right to rescind based on
concealment or material misrepresentation at
that time safeguard the parties' freedom to
contract.  '[An insurance company] has the
unquestioned right to select those whom it
will insure and to rely upon him who would be
insured for such information as it desires as
a basis for its determination to the end that
a wise discrimination may be exercised in
selecting its risks.' ....

USF&G contends that none of these Insurance Code provisions

require an "application" before a contract of insurance may be

rescinded because of an insured's misrepresentation or

concealment.

     USF&G further argues that Sheehan's testimony that a signed

58

application may be requested by American Specialty during the
underwriting process is irrelevant.  USF&G refers to Sheehan's
testimony that an unsigned application is often accepted from an
existing insured-customer.  USF&G also refers to Hugh Awtrey's
trial testimony that signed applications are usually not required
as part of the underwriting process:

> Q.  Let's go down to the bottom of the page,
> please.  This application was not signed; is
> that correct?
>
> A.  That is correct.
>
> ...
>
> THE COURT: Is there some reason for that?
>
> THE WITNESS: Unless companies require
> signatures, we generally don't have
> signatures of apps.  If they come back at the
> time of binding, sometimes I will come back
> and say before we bind coverage, we will need
> a signature, but otherwise, policies are done
> over the phone and we submit it and it's
> written without a signature.
>
> There are certain types of policies where I
> might come back and say we need a signature.
> Workers' Compensation, there is generally
> never signatures on applications.

(Testimony of Awtrey, Feb. 8, 2007, 170:7-20).  USF&G also refers
to the trial testimony of expert, Bennett Bibel, that an
underwriter can use any form of documentation in making an
underwriting decision:

> Q.  Do some workers' comp insurers make
> determinations whether to issue policies to
> particular applicants based solely on this
> standard Acord application?
>
> A.  I would have to say that's the norm.  The
> normal circumstance.  In most circumstances,

1    the Acord application, which was developed by
     the insurance industry, answers or asks the
2    questions that an underwriter needs to write.

3    Q.  Okay.  Is there some guideline as to what
     an underwriter has to have in order to write
4    - to decide to write a workers' compensation
     insurance policy?
5
     A.  At the risk of being facetious, he needs
6    a contract to have the pen in order to be
     able to have the authority to write.
7    Underwriting is an art as well as a science.
     And underwriters have wide latitude in the
8    process of accepting or declining a given
     risk.  And an underwriter on a given day may
9    ask for something, another day he may not ask
     for it.  It depends on how much he knows
10   about the nature of a particular risk and who
     is submitting it.
11
     (Testimony of Bibel, Feb. 17, 2007, 38:4-21).
12
          USF&G further asserts as without merit Lee's contention that
13
     it was prejudiced because the "formality" of the application
14
     would have placed Lee on notice that the information provided
15
     would be used to determine whether to issue the policy:
16
                    As a matter of fact, Lee's broker, Aon,
17              obviously was aware that the information it
                was providing to American Specialty in the
18              August 12, 1998 letter, which it drafted,
                would be utilized to determine whether to
19              issue the policy.

20        In its reply brief, Lee asserts that USF&G previously cited

21   *Cohen v. Penn Mut. Life Ins. Co.*, 48 Cal.2d 720, 726 (1957), for

22   the proposition that the fact the insurer asked specific

23   questions on the application makes the answers material as a

24   matter of law.  Lee asserts that it previously argued that,

25   without a corresponding request for certain information on the

26   application, the information is presumed immaterial, citing

                                    60

1   *Reserve Ins. Co. v. Apps,* 85 Cal.App.3d 228, 231 (1978) and

2   *Ashely v. American Mut. Liab. Ins. Co.*, 167 F.Supp. 125, 132

3   (N.D.Cal. 1958).  Therefore, Lee argues, the application itself

4   is such an important and necessary document that it may be used

5   to prove or disprove the element of materiality.  Lee argues that

6   the issue of an application and the presence of it was key to

7   show the absence of fraud and the lack of a misrepresentation:

8          As set forth in the cases above, the
           application gives notice to the applicant
9          that the information sought is important.
           Along with this, is the assumption that the
10         applicant will see and review the
           application, see the questions asked, review
11         the questions with either the insurer or the
           applicant's broker, and thus be informed of
12         what the insurer wants to know and also to
           know that the information is sought for the
13         purposes of an underwriting determination.
           All of these factors are the reasons for the
14         importance, and necessity of an application.
           This is supported by the CACI instruction ...
15         which lists an application as the first
           element of a claim for rescission.

16
           At trial, USF&G failed to establish the
17         existence of an application.  This is not
           surprising because USF&G was unable to meet
18         this element.  In the present case, two
           separate applications were filled out on
19         Lee's behalf prior to the cancellation of the
           original policy issued by Industrial
20         Indemnity.  Neither were signed by Lee.  The
           most recent application, and not
21         surprisingly, the one not completed by Aon,
           clearly answered the question regarding
22         whether the employees were building or
           erecting slides in the affirmative!  The
23         unequivocal testimony at trial was that this
           application was in the Lee file at ASI when
24         the USF&G policy was issued.  ASI testified
           that it reviewed the file in determining
25         whether to issue the USF&G policy.
           Accordingly, it was uncontroverted that on
26         this earlier application Lee informed ASI

1

2

              that it intended to perform acts that USF&G
              would later construe as construction.

              Moreover, Lee was not provided another
              'fresh' application despite the change in
              circumstances and experience of Lee in
              operating the park.  Lee knew what remained
              to be completed (the red slide) and that it
              intended, as long as Bruce Calomiris was a
              part of the operation, that Lee would
              maintain all the slides and might assemble
              the red slide if it was completed.  On the
              other hand, Lee did not know the contents of
              the August 11, 1998 letter.  Thus, Lee did
              not have sufficient notice of information
              which should have been in the application.

Lee contends that the Partial Judgment must be vacated, altered

and/or amended for failure to decide this allegedly essential

issue.

      Lee's position is without merit, spurious, and ignores the

reality of the transaction.  A contract of insurance was issued

to Lee by USF&G based on USF&G's specific request for Lee's

truthful assurances that Lee would not perform construction

activities or utilize construction workers.  It was known to all

parties that Lee's prior policy was cancelled because its workers

were performing construction activities.  The evidence was

undisputed that ASI was Lee's insurance agent of record for the

workers' compensation policy, not DiBuduo & DeFendis.  ASI had

obtained the prior policy from II for Lee.  Lee instructed ASI to

find and obtain new coverage after Lee's II workers' compensation

policy was cancelled.  Lee's position would sanction fraud and

misconduct by Lee and bar USF&G from rescinding that policy no

matter what the circumstances, merely because an application was

1  not completed and signed by Lee.  The established course of

2  dealing between Lee and Aon explains fully how the USF&G

3  insurance policy came into force after the Industrial Indemnity

4  policy was cancelled, without a fully completed formal written

5  application.  Lee purposefully ignores the well-established

6  practice of brokers binding insurance coverage for existing

7  clients without a new written application.

8      Lee's arguments concerning the importance of the application

9  pertain to materiality, were made to and rejected by the jury on

10  the issue of liability.  There was no failure of proof on an

11  essential issue.  Lee's arguments concerning the importance of

12  the application pertain to materiality and weight of evidence,

13  rather than failure of proof on an essential issue.  Lee's

14  arguments were all presented to the jury on the issue of

15  liability.  The jury overwhelmingly found Lee's actions to be

16  permeated with deceit and decided accordingly.

17      Lee's motion to alter or amend or to vacate the partial

18  judgment on this ground is DENIED.

19      6.  <u>Whether USF&G Failed to Show Lee's Employees</u>

20  <u>Engaged in Activities Outside of a Water Park Classification</u>.

21      Lee asserts that USF&G reported Ms. Conley's accident to the

22  Workers' Compensation Insurance Rating Bureau (WCIRB) as

23  occurring under classification code 9016, as was made clear by

24  Master Stat Report Facsimile (Ex. 675).  Lee asserts that there

25  was no evidence that Ms. Conley's injury was ever classified by

26  USF&G or the WCIRB as occurring under any other classification

1   code.   Lee contends:

2           This admission by USF&G proves that Ms.
            Conley was working within water-park [sic]
3           classifications in accordance with Mr.
            Sackett's August 11, 1998 letter to
4           Hildebrand (Exh. 833) and Ms. Platt's August
            12 letter (Exh. 374).
5
            Clearly, Lee's August 12 letter which USF&G
6           claims serves as the basis for Lee's
            misrepresentation notified USF&G that Lee
7           employees' 'duties would be limited to park
            operations.' (Exh. 374.) Classifications
8           9016 and 9180 were the only code
            classifications that were pertinent to the
9           water park operations in issue. Accordingly,
            the great weigh of the evidence, and indeed
10          the only evidence, was that Ms. Conley was
            injured in the course of her employment with
11          Lee while conducting tasks that were clearly
            'park operations.'
12
13      USF&G argues that Ms. Conley's classification in the Master

14  Stat Report Facsimile is not an admission by USF&G.  First, there

15  was no evidence at trial as to who made the report to the WCIRB

16  or whether the source of the information for the report was

17  anything other than the report of injury filed by Lee.

18      Second, USF&G maintains the insurer was required to report

19  injuries to the WCIRB using only the classification codes set

20  forth in the policy.  USF&G refers to the trial testimony of

21  Lee's workers' compensation expert, Dr. Arthur J. Levine:

22          Q.  It says under No. C, 'Report the standard
            classification code to which the claim has
23          been assigned.  No claims can be assigned any
            standard classifications, unless payroll or
24          other appropriate exposure also has been
            reported for the standard classification.'
25
            So you have to - if you are going to make a
26          report on the Unit Stat Report, it has to be
            for a classification that's in the existing

                                64

1          policy; is that right?

2          A.  Yes, unless the insurance company tells
           the Bureau that they think the classification
3          should be added or changed.

4          ...

5          THE COURT: At the time of an injury, the
           insurer reports to the Board under the
6          classifications that are in the policy.  And
           unless there is a change to those
7          classifications in the policy by endorsement
           or some other means, then those are the
8          classifications used for reporting?

9          THE WITNESS: Right.  It's a control
           mechanism.  The Bureau does not – if
10         something is going on in a classification
           that isn't in the policy, the Bureau needs to
11         know about it.  They can't just have
           insurance companies assigning claims to
12         classes that aren't on there.

13  (Testimony of Levine, Feb. 14, 2007, 56:11-20, 57:24-58:8).

14     From this, USF&G contends that when Ms. Conley was injured,

15  her injury was reported to the WCIRB under the classifications

16  actually contained in the USF&G policy, as an amusement park

17  maintenance worker, classification 9016:

18         The injury was reported as required by law,
           and the manner in which it was reported was
19         not an admission that construction
           classifications come within the scope of an
20         amusement park operations employee.

21     Second, USF&G contends, by the time the classification was

22  reported, USF&G had filed its lawsuit for rescission.  In this

23  lawsuit USF&G unequivocally contended that the work Ms. Conley

24  performed was a construction activity.  Therefore, even if,

25  *arguendo*, the Master Stat Report Facsimile could be viewed an

26  "admission," there was contrary evidence which the jury could and

1  did consider by expressly finding that there was no waiver or

2  estoppel by USF&G based on all the evidence.

3      Lee replies that USF&G misleads the Court concerning its

4  admission because "USF&G fails to remind the Court that the only

5  expert testimony concerning the Master Unit Stat Report was that

6  the purpose was to accurately report injuries."  Lee contends

7  that further testimony by Dr. Levine established that although

8  the reporting party must initially report under an existing

9  classification, the reporting party has a continuing duty to

10 revise the classifications and amend the Master Unit Stat Report

11 so that it accurately reported the classification under which the

12 injury occurred:

13          Q.  Now, by custom and practice in the
            insurance industry, is the carrier's
14          assignment of the 9016 classification code to
            an accident on this Master Unit Statistical
15          Facsimile relied on as accurate?

16          MR. SMYTH: Objection, no foundation.

17          THE COURT: Lay the foundation.  Sustained.

18          ...

19          Q.  Dr. Levine, do you know what use is made
            of the reported classification code for the
20          injuries that employees suffer on the job?

21          A.  Yes, I do.

22          ...

23          Q.  What use is made?

24          A.  The two uses I just mentioned.  The first
            is rate-making by the Rating Bureau, and the
25          second is Experience Modification
            Determination by the Rating Bureau for the
26          individual employer.

1       Q.  And to your knowledge, by custom and
    practice, is an insurance company required to
2   report accurately what classification code
    applies?

3

        A.  Yes.  If they don't, then it contaminates
4   or subverts the whole rating basis as well as
    gives the employer a potential advantage or
5   disadvantage in their Experience Modification
    competing with other competitors in the
6   industry.

7       ...

8       The Rating Bureau is, first and foremost, a
    rating organization, and it takes tremendous
9   pains and is extremely concerned about the,
    let's call it 'purity', or accuracy, of its
10  database.

11      In many of the meetings I attend, the
    president of the Rating Bureau comments that
12  a proposed rule change or a particular
    procedure will have an impact or won't have
13  an impact on the credibility and accuracy of
    the database.
14
        There is probably nothing that they are more
15  concerned about than making sure that this
    information is properly reported and
16  accumulated because is it's not right, then
    they are not giving the right results to the
17  Insurance Commissioner, and their own
    members, the insurance companies, are using
18  data that's skewed.

19      So both for their own self-interest and for
    their role for the Insurance Commissioner,
20  they want to get it right.

21  **(Testimony of Levine, Feb. 14, 2007, 35:8-37:10)**

22      Relying on this testimony, Lee asserts that "this" was

23  ultimately USF&G's responsibility and that the reporting occurred

24  after the rescission action was filed "only makes the admission

25  more egregious [and] does not ... excuse USF&G from its

26  admission."

1    **Third, USF&G contends, whether Ms. Conley's work could be**

2    **covered by a construction code is irrelevant:**

3              USF&G asserted in argument and during the
              case that the issue was whether Lee's
4              employees, not just Ms. Conley, would be
              performing *construction work,* as that term
5              was normally interpreted using common
              language.  The jury could and did reject
6              Lee's hypertechnical interpretation of the
              August 12 letter as referring only to work
7              requiring a separate classification under a
              construction code.  More importantly, none of
8              the parties who participated in the drafting
              of the August 12, 1998 letter, Hugh Awtrey
9              and Christy Platt, testified to any
              understanding of a 'special meaning' of
10             construction work different than its common
              meaning.  Finally, as testified by Bennett
11             Bibel, even if construction work were such
              performed [sic] normally by a water park
12             employee, it still had to be separately
              classified under the WCIRB if it constituted
13             new *construction*.  Testimony of Bennett
              Bibel, February 13, 2007 at 63:13-22 ... It
14             was clear and undisputed that the water slide
              on which Conley was injured was a completely
15             new slide under original construction.

16   **Lee contends that the testimony of Lee's workers'**

17   **compensation expert, Arthur Levine, confirms that Ms. Conley was**

18   **performing park operations when she was injured.  Lee asserts**

19   **that Dr. Levine "is one of the preeminent experts on California**

20   **Workers' Compensation Insurance, arguably one of the most**

21   **knowledgeable outside the actual workers' compensation**

22   **administration", that he has authored a book and taught classes**

23   **on workers' compensation and liability insurance, and has served**

24   **as the attorney for the Public Members of the Governing Committee**

25   **on the Workers' Compensation Insurance Rating Bureau.  Lee**

26   **asserts:**

Dr. Levine testified that work performed by Ms. Conley during the time of her injury, and any construction-related activity performed by Ms. Conley or Mr. Calomiris after the park opened for business was considered to be part of park operations and as such, it was covered under the water park classification codes 9016 or 9180.  This evidence was unrebutted by other expert testimony.  This evidence cannot be disregarded absent contradicting expert testimony.  Dr. Levine's opinion was supported by Lee's water park expert Kent Lemasters who testified that it was not unusual for water parks to use their own employees to erect new slides, depending on the skills of park personnel and other issues.

As set forth above, the key communications, all indicate that American Specialty would agree to insure Lee's employees performing 'their designated classification as water park employees,' and Lee agreed that its employees 'would be restricted to park operations.'  Taken together, and in light of Dr. Levine's uncontroverted testimony, it is clear that Ms. Conley (and Mr. Calomiris and the remaining Lee employees assembling the Red Wave Slide in February 1999) was performing within park operations and performing a task that is within a designated water park classification code.

Thus, even though classification codes are technically only used to calculate premiums, the clear weight of the evidence was that they were used by the parties in this case to designate and describe USF&G's claimed underwriting limitation and Lee's expected and anticipated scope of work by its employees.  The clear weight of the evidence was that water park operations included erecting water slides, Lee's employees would perform those tasks, Lee expected to be insured for those tasks, and USF&G and American Specialty should have expected to insure those tasks.  Accordingly, the clear weight of the evidence is that there was no misrepresentation concerning the nature and scope of Lee employees' work and that Ms. Conley was performing a task contemplated and

1      accepted by USF&G.

2          Both USF&G and Aon assert that Lee's contention ignores all

3   of the evidence at trial and all of the relevant legal issues.

4   USF&G rejoins:

5              First, Lee ignores the clear and explicit
               language in its August 12, 1998 letter that
6              Lee would no longer employ construction
               laborers and that any construction work would
7              be performed by independent contractors.
               Although Lee would like to rephrase the
8              language of that letter to state that Lee's
               employees would only perform construction
9              work requiring a separate classification
               under the Uniform Statistical Reporting Plan
10             of the WCIRB, the letter clearly did not so
               state.  In determining the falsity of Lee's
11             representations and its intentional
               concealment of its plans to use its own
12             employees to finish construction of the water
               park slide, whether or not its employees fell
13             within a workers [sic] compensation
               classification is irrelevant.  Any alleged
14             testimony by Levine that Conley's work fell
               within a water park operations classification
15             thus also was irrelevant.  Lee's contention
               that the clear weight of the evidence
16             established the classification codes were
               used by the parties to designate USF&G's
17             claimed underwriting limitation as to the
               expected and anticipated scope of work by its
18             employees ... is absurd.  No one, not even
               Ms. Ehrlich, testified to that effect.

19

20             Second, Lee's representation that it would
               not perform construction work with its own
               employees was not limited to Conley.  During
21             trial, Bruce Calomiris testified that he
               utilized a ten-ton crane and reach forklifts
22             to assemble the water park slide.  Conley
               herself testified that she performed work,
23             including bolting together portions of the
               slide while other workers were on manlifts 30
24             to 40 feet in the air, which clearly
               constitute construction.

25
               Third, as even Lee admits ...,
26             'classification codes are technically only

                              70

used to calculate premiums, ...' ... It thus
was irrelevant as to whether the work of any
construction worker, including Conley, fell
within an amusement park classification.  Lee
represented that it would not use its own
employees to perform construction work.  It
did not reference workers [sic] compensation
classifications.  In any event, USF&G's
expert, Bennett Bibel, testified that under
the WCIRB, *new construction* must always be
separately classified ... Even Levine
testified that new construction had to be
separately classified.

Finally, Levine in fact did not testify
specifically that Conley was performing work
that fell within a water park classification.
However, he did provide his preposterous and
unbelievable testimony that while
construction of a six-story building
constituted 'construction,' construction of a
[new] six-story water slide did not and that
while construction of a temporary structure
over a college graduation ceremony was
considered assembly and not construction,
even though the USRP had a *construction*
classification for tent erection.  The weight
of the evidence was that Levine's testimony
was preposterous and unbelievable.

This is a reasonable interpretation of the trial testimony

of Dr. Levine.  His opinions on what constituted "construction"

work were so unrealistic as to support a finding of bias in favor

of his unorthodox view of the meaning of "construction" for the

purpose of classification codes as opposed to use of the term to

determine whether USF&G was willing to undertake insurance

business with Lee, to justify the jury rejecting his opinions.

No testimony was adduced that the conversations between Lee's and

AIS's representatives ever identified or considered

classification codes rather than the commonly understood meaning

of construction activities or construction workers.

1    Lee's motion on this ground is DENIED.

2    Aon argues that Lee's contention that Ms. Conley was

3  performing work within the scope of water park operations is

4  irrelevant:

5           [T]here was evidence that (1) all of the
            parties understood American Specialty's
6           concern to be any type of construction work
            performed by Lee's employees, and (2) Lee
7           understood the August 12, 1998 letter to mean
            that Lee's employees would not perform such
8           work.

9  Aon refers to the trial testimony of Lee's Christy Platt:

10          Q. ... If you look to the last sentence of
            the letter, and it says ..., 'The coverage
11          with [USF&G] has been issued on the premise
            that there will be no construction laborers
12          employed by [Lee].'

13          Now, that was your understanding as well?

14          A.  Correct.

15          Q.  So in your dealings with Mr. Awtrey and
            Aon around the time of the August 12th letter
16          ... you understood that Mr. Awtrey was
            relaying to you ... the new insurance
17          company's concerns about water park employees
            doing construction, correct?
18
            A.  Yes.
19
            Q.  Okay.  And you understood that the August
20          12th letter was intended to address those
            concerns, correct?
21
            A.  Correct.
22
            Q.  And you discussed the insurance company's
23          concerns with Lisa Ehrlich, correct?

24          A.  I'm sure I did.

25  (Testimony of Platt, Feb. 14, 2007, 16:3-21).  Aon also refers to

26  the trial testimony of Cathy Hacker:

                              72

Q. And do you recall what Stan said about
potentially issuing a USF&G policy to
American Specialty to The Island for Workers'
Compensation insurance?

A. My recollection is that he would consider
writing it only on the condition that we had
verification that Splash Island employees no
longer would perform any construction work.

(Testimony of Hacker, Feb. 2, 2007, 55:16-21)

Aon contends that since the jury reasonably could conclude that
Ms. Conley was performing construction work, the jury's verdict
was not against the clear weight of the evidence.

Lee replies that the August 11 and August 12, 1998 letters
make clear that USF&G intended to cover any work done by Lee
employees if properly classified within water park classification
and that Lee clearly informed ASI that it intended its workers to
perform normal water park operations.   Lee refers to the August
11, 1998 letter (Ex. 833):

Attached is a copy of The Island's workers'
compensation loss runs.  Bill, I think we
have a problem.  The loss runs seem to
evidence an interchange of labor between the
water park employees and the construction
employees.  Please review the type of losses
that have occurred and help us understand how
this fits with our understanding of the
client/employee relationship.  We would have
anticipated training losses rather than
construction losses.

After seeing the loss runs, we are concerned.
The loss runs seem to support Industrial
Indemnity auditors' position.  Please help me
to prove to our underwriter the following:

1. *Island employees will not be performing
tasks outside of their designated
classification as water park employees;*

73

                    2.  Construction has ceased at The Island and
                    all construction laborers working for Rexford
                    Development Corporation have moved to a
                    different job site.  Therefore, workers'
                    compensation claims arising from construction
                    will not be reported under Lee Investments
                    workers' compensation policy. [Emphasis
                    added]

Lee again contends that neither Kent LeMasters' testimony or Dr.

Levine's testimony has been rebutted.  Lee refers to Dr. Levine's

trial testimony:

                    Q. ... Dr. Levine, I would like you to assume
                    that in response to the underwriter's inquiry
                    on the previous hypothetical that I gave to
                    you, the prospective insured responded using
                    the term or phrase 'construction laborers,'
                    and stated that the prospective insured would
                    not employ construction laborers.

                    In 1998, would that phrase have been
                    generally understood in the insurance
                    industry to have had a specialized meaning?

                    ...

                    A.  Yes.

                    Q.  Dr. Levine, I would ask you to assume the
                    same facts, except the prospective insured
                    has stated that the prospective insured will
                    not to do [sic], 'construction.'  In 1998,
                    would that term have generally been
                    understood in the insurance industry to have
                    had a specialized meaning?

                    A.  Yes.

                    Q.  Now, I want you to further assume that
                    the prospective insured stated that the
                    insured would limit its activities to 'park
                    operations.'  In 1998, would such phraseology
                    generally have been understood in the
                    insurance industry to have had a specialized
                    meaning?

                    ...

                                    74

1    THE WITNESS: When you said 'park operations,'
     you are talking about a water park?
2
     ...
3
     Q.  Any kind of park for hypothetical
4    purposes, an amusement park,

5    ...

6    THE WITNESS: I mean as opposed to a public
     park with grass in it?
7
     MR. JAMISON: Right.
8
     ...
9
     THE WITNESS: Yes.  That would have a - that
10   would be understood in the insurance industry
     to have a particular meaning.
11
     ...
12
     Q.  And what meaning would it have?
13
     A.  Well, once again, it would mean
14   operations that are performed by a contractor
     or by a construction company that was
15   classified or for some other reason had to be
     classified under one of the several dozen of
16   specific construction codes or - I'm using
     'code' and 'classification' interchangeably.
17
     Q.  Okay.  And earlier in this series of
18   hypotheticals, I asked you about the phrase,
     quote, 'construction laborers,' and you
19   indicated that it would have been generally
     understood in the insurance industry to have
20   a specialized meaning.  What would that
     meaning have been?
21
     A.  I would distinguish it from, say,
22   maintenance workers, repair workers, general
     grounds workers.  All of those kinds of
23   people can do what might be considered in a
     lay sense or generic sense construction work,
24   but that's not what it means in the Workers'
     Comp industry.  And maybe an example of that,
25   let's talk about a water park.

26   If the - one of the sections of a slide at

                          75

1    the top, I don't know how high the things
     are, 70 feet or whatever they are, were to
2    break and need to be welded.  You could have
     a park maintenance employee go up or operate
3    a crane or whatever was required, and
     disassemble this thing and load this heavy
4    pipe to the ground and weld it and then
     reverse the process.  That might sound like a
5    construction activity if you just generally
     talked about construction.
6
     But very clearly, it's a repair activity and
7    'repair',' it doesn't matter how heavy duty
     it is, if it's repair, then in the Workers'
8    Comp rules, the classification language and
     so on, that's included in whatever the basic
9    nonconstruction classification is.

10   So construction laborers, to me, doesn't mean
     people who are doing maintenance repair and
11   other kinds of activities that are in the
     regular classification. It means people that
12   are doing specifically construction
     classification things, usually contractors,
13   employees those do those sorts of things
     [sic].
14
     ...
15
     Q.  In other words, you have to look at the
16   fact that it's being used in a Workers'
     Compensation insurance context; is that
17   right?

18   A.  Yes.

19   (Testimony of Levine, Feb. 14, 2007, 45:9-49:80).  Lee contends

20   that because Dr. Levine's testimony establishes that, in the

21   context of Workers' Compensation insurance, the terms

22   "construction" and "construction laborer" do not refer to

23   incidental repair or maintenance that is construction-like work,

24   that may be performed by a water park maintenance employee, Ms.

25   Conley's work on the red wave slide in February 1999 was normal

26   park operations and was covered and expected within water park

classifications 9180 or 9016.  This entire argument assumes the validity of Dr. Levine's opinions about and definition of construction.  The jury could easily have found unintelligible, the above-quoted testimony of Dr. Levine, and rejected it as incredible.

All Lee's arguments are centered on factual disputes, most especially Lee's credibility.  The jury was free to reject Dr. Levine's testimony which, in places, was nonsensical, biased and sufficiently arbitrary as to be of no help to the trier of fact.

Lee's motion on this ground is DENIED.

D.  <u>Whether Lee Made a Misrepresentation to Aon, Intended to Induce the Reliance of Aon, Aon's Reliance and Causation</u>.

Lee argues that there was no legally sufficient evidence for a reasonable jury to find Lee liable to Aon under the "tort of another" doctrine.  In addition, Lee asserts, Christy Platt's August 12, 1998 letter and all of Lisa Ehrlich's statements to Hugh Awtrey in response to his questions on August 12, 1998 were intended to be transmitted to ASI.  Lee argues:

> Lee did not intend to induce any reliance on the part of Aon on any representations by Lee and Aon did not in fact rely on any such representations.  Instead, Aon on [August 12, 1998] was, with the exception noted below, only delivering communications between Lee and American Specialty.  Since Aon was not the intended recipient of any alleged misrepresentations and did not itself rely on any such representations, there could be no claim for a misrepresentation to Aon or other breach of duty by Lee to Aon.

The exception referred to by Lee is Lee's acknowledgment that

77

1  Aon, on August 12, 1998, took upon itself to draft for Lee the
2  language that was to be sent to ASI.  However, Lee contends, this
3  was at Aon's initiative.  In addition, Lee contends, Aon, in Mr.
4  Awtrey's and Ms. Moore's August 27, 1998 letter (Ex. 841), of its
5  own volition and for its own purposes, took it upon itself to
6  advise Lee that the policy had been issued on the premise that no
7  construction laborers would be employed by Lee.  Lee asserts that
8  Aon's own conduct, and not any breach of duty by Lee to Aon,
9  resulted in Aon being sued by USF&G and ASI for indemnity and
10 resulted in Aon's counterclaim against USF&G and ASI for
11 indemnity.  Lee argues that Aon cannot recover for the "tort of
12 another" where Lee breached no duty as to Aon or Aon's own
13 conduct necessitated its involvement in litigation, citing *Burger*
14 *v. Kuimelis,* 325 F.Supp.2d 1026, 1041-1043 (N.D.Cal.2004).

15         Aon responds that Lee presents a wholly partisan, one-sided
16 view of the evidence and ignores substantial trial testimony to
17 the contrary.  Aon asserts that the jury reasonably concluded
18 that Lee intentionally made misrepresentations to Aon during the
19 effort to replace Lee's workers' comp insurance policy through
20 USF&G, and that those misrepresentations harmed Aon.  Aon
21 contends there was substantial evidence that Lee knew Aon was
22 relying on the truth of Lee's statements in preparing the letter
23 to ASI and that Lee intended Aon to so rely.  Aon refers to Aon's
24 cross-examination of Lisa Ehrlich:

25              Q.  He [Hugh Awtrey] may have told you that
                 whatever work - the insurance company wanted
26              to know that whatever work was going to be

1    done was going to be done by subcontractors
     and that Lee would obtain certificates of
2    insurance?

3    A.   Yes.

4    Q.   He told you that?

5    A.   That they wanted a letter regarding that
     work that was done would be done by
6    subcontractors and that certificates of
     insurance would be obtained.

7
     ...
8
     Q.   Whatever work was going to be done was
9    going to be done by subcontractors?

10   A.   Let me see if I can remember.  We talked
     about - we talked about the status of
11   operations, and then he told me that they
     wanted a letter.  I know we talked about the
12   construction laborers, and then we did talk
     about, yes, construction work, and that it
13   would be done by subcontractors, and that
     certificates of insurance would be issued.

14
     ...
15
     Q.   Okay.  And in fact, this letter was
16   prepared and sent to Christy Platt by Mr.
     Awtrey, as far as you know, right?

17
     A.   It was prepared by Mr. Awtrey and she
18   signed it and sent it back to him, I believe.

19   Q.   Again, I think you testified that you
     talked to Christy Platt and told her that Mr.
20   Awtrey would be proposing some language for a
     letter, right?

21
     A.   That is correct, that is what he said,
22   that he might want to do that.

23   Q.   And that as long as the language in the
     letter was consistent with your discussion
24   with Mr. Awtrey and with Ms. Platt, that Ms.
     Platt could go ahead and sign that letter?

25
     A.   That is correct.
26

                        79

1  (Trial testimony of L. Ehrlich, Feb. 9, 2007, 7:10-18; 7:22-8:4;

2  8:14-9:1).  Aon also refers to Aon's cross-examination of Christy

3  Platt:

4         Q.  Okay.  And you were clarifying that issue
            for Hugh, correct?  If I could rephrase.
5
           In other words, if the concern at the time of
6          the cancellation of the Industrial Indemnity
           policy was that there were some employees
7          doing construction that were employed by the
           water park, you were helping Hugh and Joanne
8          understand that maybe those employees were in
           fact under Rexford or some other company?
9
           A.  Correct.
10
           ...
11
           Q. ... Do you recall that Mr. Awtrey was
12         seeking your assistance in helping the second
           insurance company, USF&G, feel more
13         comfortable about issuing an insurance policy
           in light of these construction concerns?
14
           A.  As it relates to who was doing that work.
15
           Q.  Right.
16
           A.  I believe that to be true, yes.
17

18  (Trial testimony of Platt, Feb. 14, 2007, 5:17-25; 6:17-23).

19      Aon further responds that Aon did not "take it on itself" to

20  write the letter to ASI.  Instead, Aon was acting prudently in

21  responding to ASI's requirement that it receive a letter from Lee

22  before issuing the policy.  Lee had full knowledge of this

23  requirement, referring to the testimony set forth above, and to

24  the trial testimony of Cathy Hacker:

25         Q.  And do you recall what Stan said about
           potentially issuing a USF&G policy to
26         American Specialty to The Island for Workers'

                                80

1          Compensation insurance?

2          A.  My recollection is that they would
           consider writing it only on the condition
3          that we had verification that Splash Island
           employees no longer would perform any
4          construction work.

5          ...

6

7          Q.  Now, in the meeting, was there any
           discussion about whether the response to any
           inquiry by Aon had to come from the insured,
8          the policy holder or prospective policy
           holder?

9
           A.  Yes, we were requiring that we receive a
10         written response from the insured.

11         ...

12         Q.  Okay.  Was there anything in that letter,
           as you read it, that states, 'American
13         Specialty is requesting a written response'?

14         A.  Yes.

15         Q.  And where is that?

16         A.  The second paragraph, the second - third
           sentence, says, 'Please help me prove to our
17         underwriter the following: Number 1, Island
           employees will not be performing tasks
18         outside of their designated classification as
           water park employees.'
19
           So a proof would mean a response.
20
           Q.  All right.  So you understood the
21         sentence, 'Please help me to prove to our
           underwriter,' to be a request for a written
22         response; is that correct?

23         A.  A response, which, since we like to have
           things in writing in the insurance world so
24         that we have documentation, but it
           specifically does not say 'written proof.'
25
(Trial testimony of Hacker, Feb. 2, 2007, 55:16-21, 71:17-21,
26

1   108:5-21).

2       Aon asserts that Lee's reliance on *Burger v. Kuimelis,*

3   *supra*, to negate any breach of duty by Lee to Aon is misplaced

4   because the Northern District ruled that "[t]he duty not to

5   mislead is a duty that runs from counterdefendants [insureds] to

6   Kumeilis [broker]."  *Burger, supra*, 325 F.Supp.2d at 1044.  Aon

7   responds that Lee's argument that Aon's own conduct in drafting

8   the letter necessitated its involvement in this litigation

9   ignores the fact that Lee provided misinformation to Aon:

10           Accordingly, just as the insureds in <u>Burger</u>
             lied to their broker to induce him to prepare
11           a document used to defraud HUD, Lee provided
             misinformation to Aon knowing that the August
12           12 letter would be used to secure an
             insurance policy through USF&G/American
13           Specialty.

14       In its reply brief, Lee completely changes its position.

15   Lee now argues:

16           Dr. Levine's testimony was unrebutted that
             insurance industry personnel would be
17           expected to understand 'construction,' as
             used in the terminology between the parties,
18           not to include construction activities that
             were a part of water park maintenance within
19           the meaning of water park classification
             codes 9016 and 9180, and to include only
20           'construction' activities that were outside
             of a water park classification and that would
21           require a workers' compensation construction
             classification code.  Ms. Platt testified by
22           deposition to her understanding of the
             terminology as referring to 'ground-up'
23           construction of the park.  Mr. Awtrey was
             both in the insurance industry and had worked
24           for years at Clovis Lakes, later known as
             Wild Waters Adventures, where park employees
25           built slides.  Mr. Awtrey admitted that he
             never discussed construction of water slide
26           [sic] with Lee.  (2/8/07 Awtrey testimony at

                                82

126:13-128:4.)  There was no evidence that
Mr. Awtrey, Cathy Hacker or anyone else in
the insurance industry conveyed to Lee that
they interpreted 'construction' differently
than Dr. Levine testified they would have
been expected to interpret it.

Lee (and Aon ...)  could reasonably (and did
by Dr. Levine's and Ms. Platt's deposition
testimony) have understood that completion of
the red slide was not 'construction' within
the meaning of Mr. Sackett's August 11, 1998
letter and Ms. Platt's August 12, 1998 letter
(and Mr. Awtrey's and Ms. Moore [sic] August
27, 1998 letter to Lee), but instead would be
considered activity within a water park
classification.  There was no
misrepresentation if the completion of the
red slide was such activity.  Uncontradicted
expert evidence from Mr. Lemasters
established that it was not unusual for water
parks to do slide erection with their own
maintenance employees and Dr. Levine's
testimony that such work would fall within a
water park classification was uncontradicted.
USF&G's citation to the testimony of both Mr.
Bibel and Dr. Levine that 'new construction'
would be separately classified begged the
question about how to classify the completion
of the red slide.  Aon cites no testimony
indicating that any expert other than Dr.
Levine answered this question.

Furthermore, by the time USF&G filed its
Master Unit Statistical Report designation of
the Conley accident as falling within
classification code 9016, USF&G has already
filed its rescission action.  Dr. Levine
testified that USF&G could and should have
sought to change how it designated the
accident, but never did.  Accordingly,
USF&G's Master Unit Statistical Report was
contrary to its contention in its rescission
action and stands, along with Dr. Levine's
testimony, as unrebutted evidence that
Conley's accident arose from activity within
a water park classification.

Accordingly, there was no evidence to support
that Lee made a misrepresentation to Aon,
that Lee intended to induce Aon to rely on a

83

1
2
3
4

> misrepresentation, or that Aon actually
> relied on a misrepresentation.  Furthermore,
> if Aon had relied on Ms. Platt's August 12,
> 1998 letter to mean that Lee could not
> complete the red slide, that reliance, as a
> matter of law and uncontradicted evidence,
> would have been unjustified.

All these contentions have been discussed.  They represent Lee's view of the evidence, ignoring the alternative decisions the jury reached.  Once Lee sought replacement coverage, the insurer willing to write new coverage, USF&G, would not do so unless Lee agreed in writing not to engage in further construction activities and to have third party contractors perform any construction work.  The insurer USF&G, through American Specialty, required such written representation, undertaking and commitment from Lee.  Once it made such representations, Lee had a duty to speak truthfully.  Its failure to be honest and forthright caused its insurance broker, Aon, to be sued.  Absent Lee's wrongful conduct in misrepresenting material facts (fraud), Aon would not have been sued by USF&G, requiring Aon to expend attorneys' fees in its defense.

Lee's motion on Aon's tort of another claim is DENIED, subject to allocation of recoverable fees for tort of another where the direct claims and defenses between the Lee parties and Aon do not implicate USF&G's indemnity case.

E.  <u>Amendment of Partial Judgment to Require USF&G To Return All Premiums Paid by Lee</u>.

Lee, citing California Civil Code § 1691(b), contends that, before rescission can be effected, USF&G is required to restore

1   all premiums, plus interest, paid by Lee for the policy.  Lee,

2   refers to Exhibit Nos. 411, JX84, JX84.003-008, and asserts that

3   the amount of the principal is $38,554.  Lee argues that the

4   Partial Judgment should be amended to read that USF&G shall pay

5   Lee $38,554 plus interest.  USF&G does not argue this is not the

6   law.

7        This is an issue that will be resolved in the Findings of

8   Fact and Conclusions of Law that will be issued in connection

9   with the Hearing re Remaining Damages conducted on April 4-5,

10  2007.  Because those Findings of Fact and Conclusions of Law have

11  not yet been issued, Lee's motion to amend the Partial Judgment

12  in this regard is premature.

13       F.   **Partial Judgment's References to FRCP 55(b)**.

14       This reference to Fed. R. Civ. Proc. 55(b) was a

15  typographical error.  Lee's motion to amend the Partial Judgment

16  to reflect that it was entered pursuant to Rule 54(b), Federal

17  Rules of Civil Procedure, is well-taken and is GRANTED *nunc pro*

18  *tunc.*

19       G.   **Whether The Partial Judgment Erroneously States Lee Has**

20  **Stipulated to Certain Matters**.

21       The Partial Judgment (Doc. 681) states in pertinent part:

22            The parties have reserved, by written
             stipulation and order: USF&G's alter ego
23            claims against Richard K. Ehrlich, an
             individual, et al. ... Any claims as to Diana
24            Conley have been determined by the parties'
             stipulation.

25

26       Lee contends that it has not stipulated to the inclusion of

85

the alter ego claims against Richard Ehrlich, but acknowledges that USF&G was allowed to amend its Complaint to add alter ego allegations and trial of these claims were severed by Order filed on July 18, 2006, (Doc. 256, pp. 12-16), and by Order filed on December 12, 2006.  (Doc. 395, p.3).  Lee contends that the Partial Judgment should be amended to reflect this background.

USF&G responds that whether Lee stipulated to this or not is irrelevant.

The Partial Judgment should reflect correctly the positions of the parties.  Therefore, this aspect of Lee's motion is GRANTED.

With regard to Diana Conley, Lee asserts that it has not stipulated to any determination of claims as to Diana Conley, noting that the Stipulation by which Ms. Conley was dismissed from this action was signed only by Ms. Conley's counsel and counsel for USF&G.  Therefore, Lee moves for amendment of the Partial Judgment to reflect this.

USF&G responds that Lee's position is irrelevant because Lee never asserted a claim against Ms. Conley.

The Partial Judgment should correctly reflect all parties' positions.  Lee's motion to amend the Partial Judgment in these respects is GRANTED.

H.   Partial Judgment's Failure to Include as Issues Remaining for Further Trial (a) Whether USF&G is Entitled to Any Restitution, and (b) USF&G's Duty to Defend Lee in the WCAB Proceedings and In This Action.

86

a.   <u>Restitution Award is Premature</u>.

Lee contends that entry of Partial Judgment in favor of USF&G and against Lee for restitutionary damages of $875,034.99 is premature.  Lee contends that the Partial Judgment fails to list as reserved issues all of those issues.  Lee refers to the Stipulation and Order Regarding Issues to Be Determined by the Court, (Doc. 682) filed by the Court on either February 27, 2007 or March 1, 2007 (both dates are listed), wherein the parties stipulated, in pertinent part, that the Court will hear and decide the following issues:

3.   Whether USF&G is entitled to restitution of any amount in light of Aon and Lee's contention that USF&G did not actually incur the costs or expenses associated with Ms. Conley's injury (i.e., whether USF&G is the real party in interest);

4.   The amount, if any, of restitution that USF&G is entitled to recover from Lee for fees, costs and expenses paid allegedly to defend Lee in the Workers' Compensation proceeding (and whether USF&G is the real party in interest in relation to this restitution).

Lee also refers to the Stipulation re Handling of Claims for Attorneys Fees and Litigation Expenses, (Doc. 654), filed on either February 21, 2007 or February 23, 2007 (both dates are listed):

2.   It is further stipulated and agreed that if restitution of USF&G's alleged attorney fees and expenses is awarded in the pending phase of the trial, and if Lee is otherwise entitled to recover from USF&G for breach of the duty to defend, Lee may seek to recover back from USF&G the attorney fees and litigation expenses in the trial phase of

87

1    this action that will address breach of the
     duty to defend.
2
     3.   It is further stipulated and agreed that
3    in the pending phase of the trial, the jury
     will address only the respective liabilities,
4    if any, of Lee to USF&G, of the other parties
     to the pending phase to Lee, and of Lee to
5    Aon, including the basis, if any, for
     punitive damages sought by Lee, and will not
6    address any party's damages in the pending
     phase except that if rescission of the
7    subject USF&G insurance contract is awarded,
     the jury shall address the amount of USF&G's
8    restitution, if any, unless such amount is to
     be determined by the Court.
9
        Lee contends that these stipulations and orders make the
10
award of restitution to USF&G premature:
11
             [I]t remains for USF&G to demonstrate that it
12           actually incurred the costs and expenses
             associated with Ms. Conley's injuries and
13           that it is the real party in interest with
             respect to those amounts and with respect to
14           the attorney fees and expenses paid to Lee.
             Accordingly, none of the monetary amount of
15           $875,034.99 in the Partial Judgment should at
             this time be awarded pending USF&G's proof
16           that it incurred and paid the amounts and is
             the real party in interest.
17
             Although USF&G will argue that at least the
18           amount of $623,320.09 should be awarded
             because of the ruling of Judge Coyle on the
19           cross-motions for summary judgment, this
             argument should be rejected.  In case the
20           jury did not award an amount satisfactory to
             USF&G, USF&G consciously elected to stipulate
21           that the Court would try the amount of
             restitution and cannot now be heard to claim
22           that the $623,320.09 was already determined
             as paid by USF&G.  In all events, USF&G must
23           prove that it paid and is the real party in
             interest regarding (a) the $251,714.90 paid
24           to Ms. Conley for the period May 2002 to the
             present, and (b) the amount claimed for
25           attorney fees and litigation expenses paid to
             Lee.
26

88

Lee therefore contends that the Partial Judgment should be vacated pending the Court's determination of the amount of restitution, if any, to which USF&G is entitled.

As USF&G asserts, the Court has already determined by summary judgment that USF&G is entitled to restitution of $623,320.09.  The Pretrial Order (Final Form), (Doc. 700), sets forth as Undisputed Fact No. 37 that USF&G paid $623,320.09 to or on behalf of Ms. Conley.  The jury found that USF&G is entitled to an additional among of $251,714.19 paid to or on behalf of Diana Conley for the period May 2002 to the present.

In reply, Lee acknowledges the hearing on April 4-5, 2007 and contends that the Partial Judgment will need to be amended to conform to the judgment yet to be made by the court.

Lee's motion on this ground is DENIED.

b.  <u>Whether USF&G Breached the Duty to Defend Remains for Separate Trial</u>.

Whether or not the Court awards restitution to USF&G for the attorney fees and expenses paid to Lee, Lee contends that the issue of whether USF&G breached the duty to defend in the WCAB proceedings and in this action remains to be tried before a separate jury.

USF&G responds that Lee's contention is frivolous because Lee can claim no breach of any duty to defend under the policy because, as a matter of law following rescission, and under the Partial Judgment, no contract ever existed between Lee and USF&G.

Lee responds that this issue is not properly before the

89

court, **except to correct any possible suggestion in the Partial Judgment as written that this issue is not among those remaining to be tried in a separate trial.**

**Because any issue of USF&G's breach of a duty to defend Lee is not presently at issue and was reserved for trial in a later proceeding, Lee's motion to amend the Partial Judgment on this ground is GRANTED.**

## CONCLUSION

**For all the reasons stated above, the following orders are entered:**

**1.   Lee's motion that the Partial Judgment is void and/or that Lee is entitled to judgment as a matter of law because the WCAB had and has exclusive jurisdiction is DENIED;**

**2.   Lee's motion that it is entitled to judgment as a matter of law because California law requires any limitation on a worker's compensation policy be by an approved form of endorsement is DENIED;**

**3.   Lee's motion that Mr. Sackett's August 11, 1998 letter imposed a condition or restriction on coverage is DENIED;**

**4.   Lee's motion that Christy Platt's August 12, 1998 letter to Mr. Sackett and related communications should have been excluded from evidence under the parol evidence rule is DENIED;**

**5.   Lee's Motion that an application for the subject insurance was required is DENIED;**

**6.   Lee's motion that USF&G failed to show Lee's employees engaged in activities outside of a water park classification is**

90

1  DENIED;

2      7.    Lee's motion that there was no legally sufficient

3  evidence for a reasonable jury to find Lee liable to Aon for the

4  "tort of another" is DENIED;

5      8.    Lee's motion to amend the Partial Judgment to require

6  USF&G to return all premiums paid by Lee is DENIED as premature;

7      9.    Lee's motion to amend the Partial Judgment to refer to

8  Rule 54(b), Federal Rules of Civil Procedure, rather than Rule

9  55(b), Federal Rules of Civil Procedure, is GRANTED *nunc pro*

10  *tunc*;

11     10.    Lee's motion to amend the Partial Judgment to reflect

12  that Lee did not stipulate to certain matters is GRANTED *nunc pro*

13  *tunc;*

14     11.    Lee's motion to amend the Partial Judgment because it

15  fails to include as issues remaining for further trial (a)

16  whether USF&G is entitled to any restitution and (b) USF&G's duty

17  to defend Lee in the WCAB proceedings and in this action is

18  DENIED IN PART AND GRANTED IN PART.

19     12.    Counsel for USF&G and Aon shall prepare and lodge a

20  form of order that reflects the specific rulings on each issue

21  addressed by this decision within five (5) days following the

22  date of service of this decision by the Court's Clerk.

23         IT IS SO ORDERED.

24  Dated:   __March 14, 2008__          _____/s/ Oliver W. Wanger_____
                                         UNITED STATES DISTRICT JUDGE
25

26