IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES FIDELITY & GUARANTY COMPANY, | ) ) ) | No. CV-F-99-5583 OWW/SMS |
| | ) ) | MEMORANDUM DECISION DENYING LEE INVESTMENTS LLC'S MOTION |
| Plaintiff, | ) ) | FOR NEW TRIAL (Doc. 706) |
| vs. | ) ) | |
| | ) | |
| LEE INVESTMENTS LLC dba THE ISLAND, | ) ) ) | |
| | ) ) | |
| Defendant. | ) ) ) | |

Lee Investments LLC (hereafter referred to as Lee) moves for an order setting aside the Judgment entered on March 1, 2007 in favor of United States Fidelity & Guaranty Company (hereafter USF&G), American Specialty Insurance Services, Inc. (hereafter American Specialty or ASI), and Aon Risk Services Inc. of Central California Risk Services (hereafter Aon), and to grant Lee a new trial on every claim and every issue.  Lee states as grounds for the motion:

1.  Error in jury instructions;

1

**2.   Verdict against clear weight of evidence;**

**3.   Prejudicial misconduct by opposing counsel; and**

**4.   Clear error, abuse of discretion, and miscarriage of justice in Court's refusal to admit certain deposition testimony of Christy Platt.**

A.   <u>Governing Standards</u>.

A motion for new trial "may be granted to all or any of the parties and on all or part of the issues ... for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States."  Rule 59(a), Federal Rules of Civil Procedure.  "The grant of a new trial is 'confided almost entirely to the exercise of discretion on the part of the trial court.'"  *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir.1990).

B.   <u>Error in Jury Instructions</u>.

"[E]rroneous jury instructions, as well as the failure to give adequate instructions, are ... bases for a new trial."  *Murphy v. City of Long Beach, supra*, 914 F.2d at 187.

With regard to Lee's contention that it is entitled to a new trial on the basis of instructional error, Lee asserts that it timely objected to the instructions and lack thereof during the jury instruction conference pursuant to Rule 51, Federal Rules of Civil Procedure.

1.   <u>Whether An Element of an Application For Rescission Instructions was Excluded</u>.

Lee contends that the failure to include the element of an

1   application in Jury Instructions Nos. 19 and 20 is error.

2   Jury Instruction No. 19, captioned "<u>RESCISSION:</u>

3   <u>MISREPRESENTATION OF FACTS</u>", stated:

USF&G claims that it is entitled to rescind
the workers' compensation policy it issued to
Lee Investments because of false
representations or concealment (whether
intentional or unintentional) by Lee
Investments, when Lee Investments applied for
the policy of workers' compensation
insurance.  The court will determine whether
USF&G is entitled to rescission based on your
findings.  Your must determine whether USF&G
has established each of the following by a
preponderance of the evidence:

1.  That Lee made a misrepresentation of fact
that its employees would not perform
construction or that Lee would not employ
construction laborers, when Lee applied for
the workers' compensation policy; and

2.  Whether USF&G reasonably relied upon such
misrepresentation of facts in deciding
whether or not to issue the workers'
compensation policy of insurance to Lee.

16   Jury Instruction No. 20, captioned "<u>RESCISSION: CONCEALMENT OF</u>

17   <u>MATERIAL FACTS</u>", stated:

USF&G claims that it is entitled to rescind
the workers' compensation policy it issued to
Lee Investments because of concealment
(whether intentional or unintentional) by Lee
Investments, when Lee Investments applied for
the policy of workers' compensation
insurance.  The Court will determine whether
USF&G is entitled to rescission.  You must
determine whether USF&G has established each
of the following by a preponderance of the
evidence:

1.  Whether Lee Investments concealed
material facts (whether intentionally or
unintentionally) or failed to advise USF&G of
material facts when Lee Investments applied
for the workers' compensation policy; and

3

1

2.   If you find that any facts were concealed
(intentionally or unintentionally) whether
such facts were material; and

2

3

3.   If USF&G had known any material facts
concealed or not disclosed, it would probably
and reasonably not have issued the workers'
compensation policy.

4

5

As used in this instruction, 'material fact'
means any fact that, if known by USF&G, would
probably and reasonably have caused USF&G to
issue or not to issue the workers'
compensation insurance policy.

6

7

8

9    (Doc. 661, pp. 20-21).

10        In contending that the failure to include the element of an

11   application in these instructions was error, Lee selectively and

12   incompletely relies on the testimony during its cross-examination

13   of Stanley Sheehan:

14

Q.   In the course of doing underwriting,
American Specialty reviewed applications; is
that correct?

15

16

A.   Yes, American Specialty reviews
applications as a part of underwriting.

17

Q.   And as a matter of policy and procedures,
did you request a signed application?

18

19

A.   A signed application is requested as part
of the procedure.

20

21

Q.   And that was true in 1998; correct?

A.   Yes.   That was true in 1998.

22

23   (Testimony of Sheehan, Feb. 7, 2007, 16:20-17:4).

24        Lee argues that this testimony establishes that an

25   application for insurance by USF&G is an element of a claim for

26   rescission.   Lee cites CACI Instruction 2308, "Rescission for

4

Misrepresentation or Concealment in Insurance Application -
Essential Factual Elements", as including in the elements of the
claim the following:

>    1.   That [*name of insured*] submitted an
>    application for insurance with [*name of
>    insurer*];
>
>    2.   That in the application for insurance
>    [*name of insured*] [intentionally] [failed to
>    state/represented] that [*insert omission or
>    alleged misrepresentation*] ....

Lee contends that Lee never submitted an application for
insurance with USF&G.  Rather, Lee asserts in its Motion for
Judgment as a Matter of Law:

>    American Specialty pieced together
>    information from various outdated and
>    incomplete sources to write the policy,
>    including an unsigned application for
>    insurance with Industrial Indemnity.  The
>    original application was in substantial
>    conflict with other information American
>    Specialty had within its Lee file, including,
>    without limitation, another supplemental
>    application submitted by Dibudio & DeFendis
>    which clearly indicated Lee's intent to
>    construct and erect new slides with its
>    employees.  USF&G now seeks to rescind based
>    on Lee's alleged misrepresentations regarding
>    the nature and scope of Lee's employees work
>    as it relates to assembling an unfinished
>    water slide.

Lee argues that the failure to include the element of an
application prejudiced Lee because the jury was lead to believe
that an application was unnecessary in proving rescission and, if
the element had been included, the jury would have been required
to find that element, of which Lee asserts there is no evidence,
before finding for USF&G.  Lee contends:

> Evidence was introduced at trial that the
> formality of the application puts the
> applicant on notice that the information
> provided will be used to determine whether to
> issue a policy.  Here, the application, and
> the protections inherent to the applicant
> therein, were missing.  This missing
> instruction on the element of an application
> clearly prejudiced Lee and lead to an
> unfavorable result.

USF&G responds that Lee's position is incorrect as a matter of California law, contending that the provisions of California law governing the right to rescission under the California Insurance Code and case law impose no "requirement" of an application.  Moreover, Lee's position ignores all the evidence about insurance industry practice and the prior course of dealings between these parties.

USF&G cites *Mitchell v. United National Ins. Co.*, 127 Cal.App.4th 457, 467-469 (2005):

> United National based its right to rescind
> the policy on Insurance Code sections 331 and
> 359.  Insurance Code section 331 states:
> 'Concealment, whether intentional or
> unintentional, entitles the injured party to
> rescind insurance.'  Insurance Code section
> 359 similarly provides: 'If a representation
> is false in a material point, whether
> affirmative or promissory, the injured party
> is entitled to rescind the contract from the
> time the representation becomes false.'
>
> Insurance Code sections 331 and 359 are part
> of a larger statutory framework that imposes
> 'heavy burdens of disclosure' 'upon both
> parties to a contract of insurance, and any
> material misrepresentation or the failure,
> whether intentional or unintentional, to
> provide requested information permits
> rescission of the policy by the injured
> party.'  (*Imperial Casualty & Indemnity Co.*

> *v. Sogomonian* (1988) 198 Cal.App.3d 169, 179-180 ... Insurance Code section 332, for example, requires each party to an insurance contract to disclose, 'in good faith, all facts within his knowledge which are or which he believes to be material to the contract ...' The disclosure obligations imposed by these statutes are directed specifically at the formation of the insurance contract. Insurance Code section 334 states: 'Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom communication is due, in forming his estimate of the disadvantages of the *proposed contract*, or in making his inquiries.' (Ins. Code, § 334, italics added.) Insurance Code section 356 provides: "The completion of the contract of insurance is the time to which a misrepresentation must be presumed to refer.'

> Requiring full disclosure at the inception of the insurance contract and granting a statutory right to rescind based on concealment or material misrepresentation at that time safeguard the parties' freedom to contract. '[An insurance company] has the unquestioned right to select those whom it will insure and to rely upon him who would be insured for such information as it desires as a basis for its determination to the end that a wise discrimination may be exercised in selecting its risks.' ....

USF&G contends that none of these Insurance Code provisions require an "application" before a contract of insurance may be rescinded because of misrepresentation or concealment.

USF&G further argues that Sheehan's testimony that a signed application is requested by ASI during the underwriting process is irrelevant. It is also incomplete. USF&G points to Sheehan's testimony that an unsigned application is often accepted by an insurer. USF&G also refers to the trial testimony of Hugh Awtrey

7

1  that signed applications are usually not required as part of the

2  underwriting process:

3          Q.  Let's go down to the bottom of the page,
           please.  This application was not signed; is
4          that correct?

5          A.  That is correct.

6          ...

7          THE COURT: Is there some reason for that?

8          THE WITNESS: Unless companies require
           signatures, we generally don't have
9          signatures of apps.  If they come back at the
           time of binding, sometimes I will come back
10         and say before we bind coverage, we will need
           a signature, but otherwise, policies are done
11         over the phone and we submit it and it's
           written without a signature.

12
           There are certain types of policies where I
13         might come back and say we need a signature.
           Workers' Compensation, there is generally
14         never signatures on applications.

15  (Testimony of Awtrey, Feb. 8, 2007, 170:7-20).  USF&G also refers

16  to the trial testimony of Bennett Bibel that an underwriter can

17  use any form of documentation in making an underwriting decision:

18         Q.  Do some workers' comp insurers make
           determinations whether to issue policies to
19         particular applicants based solely on this
           standard Acord application?

20
           A.  I would have to say that's the norm.  The
21         normal circumstance.  In most circumstances,
           the Acord application, which was developed by
22         the insurance industry, answers or asks the
           questions that an underwriter needs to write.

23
           Q.  Okay.  Is there some guideline as to what
24         an underwriter has to have in order to write
           - to decide to write a workers' compensation
25         insurance policy?

26         A.  At the risk of being facetious, he needs

                                  8

>                     a contract to have the pen in order to be
>                     able to have the authority to write.
>                     Underwriting is an art as well as a science.
>                     And underwriters have wide latitude in the
>                     process of accepting or declining a given
>                     risk.  And an underwriter on a given day may
>                     ask for something, another day he may not ask
>                     for it.  It depends on how much he knows
>                     about the nature of a particular risk and who
>                     is submitting it.

(Testimony of Bibel, Feb. 17, 2007, 38:4-21).

     USF&G further asserts as without merit Lee's contention that it was prejudiced because the "formality" of the application would have placed Lee on notice that the information provided would be used to determine whether to issue the policy:

>                     As a matter of fact, Lee's broker, Aon,
>                     obviously was aware that the information it
>                     was providing to American Specialty in the
>                     August 12, 1998 letter, which it drafted,
>                     would be utilized to determine whether to
>                     issue the policy.

Therefore, USF&G contends, Lee's claim that it was prejudiced because the element of an application was not included in the jury instructions is without merit because "[i]ts broker knew the importance of the information sought by American Specialty and that knowledge is chargeable to Lee."

     In its reply brief, Lee asserts that USF&G previously cited *Cohen v. Penn Mut. Life Ins. Co.*, 48 Cal.2d 720, 726 (1957), for the proposition that the fact the insurer asked specific questions on the application makes the answers material as a matter of law.  Lee asserts that it previously argued that, without a corresponding request for certain information on the

9

application, the information is presumed immaterial, citing *Reserve Ins. Co. v. Apps,* 85 Cal.App.3d 228, 231 (1978) and *Ashely v. American Mut. Liab. Ins. Co.*, 167 F.Supp. 125, 132 (N.D.Cal. 1958). Therefore, Lee argues, the application itself is such an important and necessary document that it may be used to prove or disprove the element of materiality. Lee argues that the issue of an application and the presence of it was key to show the absence of fraud and the lack of a misrepresentation:

> As set forth in the cases above, the application gives notice to the applicant that the information sought is important. Along with this, is the assumption that the applicant will see and review the application, see the questions asked, review the questions with either the insurer or the applicant's broker, and thus be informed of what the insurer wants to know and also to know that the information is sought for the purposes of an underwriting determination. All of these factors are the reasons for the importance, and necessity of an application. This is supported by the CACI instruction ... which lists an application as the first element of a claim for rescission.
>
> At trial, USF&G failed to establish the existence of an application. This is not surprising because USF&G was unable to meet this element. In the present case, two separate applications were filled out on Lee's behalf prior to the cancellation of the original policy issued by Industrial Indemnity. Neither were signed by Lee. The most recent application, and not surprisingly, the one not completed by Aon, clearly answered the question regarding whether the employees were building or erecting slides in the affirmative! The unequivocal testimony at trial was that this application was in the Lee file at ASI when the USF&G policy was issued. ASI testified that it reviewed the file in determining whether to issue the USF&G policy.

> Accordingly, it was uncontroverted that on
> this earlier application Lee informed ASI
> that it intended to perform acts that USF&G
> would later construe as construction.
>
> Moreover, Lee was not provided another
> 'fresh' application despite the change in
> circumstances and experience of Lee in
> operating the park.  Lee knew what remained
> to be completed (the red slide) and that it
> intended, as long as Bruce Calomiris was a
> part of the operation, that Lee would
> maintain all the slides and might assemble
> the red slide if it was completed.  On the
> other hand, Lee did not know the contents of
> the August 11, 1998 letter.  Thus, Lee did
> not have sufficient notice of information
> which should have been in the application.

Lee's position is without merit and spurious.  A contract of insurance was issued to Lee by USF&G based on a specific request to Lee's broker, Aon, that Lee represent in writing that it would not perform construction or utilize construction workers at the Island Water Park.  The evidence was undisputed that Aon was Lee's agent of record for the workers' compensation policy, not DiBuduo & DeFendis.  ASI had the "pen" for USF&G and acted as underwriter for USF&G.  Lee instructed ASI to find and obtain the coverage after Lee's Industrial Indemnity workers' compensation policy was cancelled due to Lee's employees' performance of construction work.  Lee knew that USF&G would not issue it a workers' comp policy without those express written representations of no construction activities.

Lee's position would negate any ability of USF&G to rescind its policy merely because an application was not completed and signed by Lee.  Lee's arguments concerning the importance of the

11

application pertaining to materiality were all presented to and decided adversely to Lee by the jury on the issue of liability. The jury found Lee's position to be permeated with deceit and decided accordingly.  As discussed in accompanying rulings on post-trial motions, there was no question that Lee fully understood the importance of its truthful representations about no construction activities before a policy would be issued, as evidenced by Lisa Erlich's and Cindy Platt's testimony.  The requested instruction was misleading and would have confused the jury based on the unique facts of the case.

Lee's motion for new trial on this ground is DENIED.

**2.   Lee's Instruction Regarding Duties Created by American Specialty's Representation of Special Expertise.**

Lee contends that the refusal to give Lee's proposed Jury Instruction No. 17 was prejudicial error.

Lee's proposed Jury Instruction No. 17 was captioned "SPECIAL EXPERTISE" and stated:

> Where an insurance company's agent holds itself out as having a special expertise for the benefit of the prospective insured, the insurance company's agent assumes duties to the insured and may be found to be an agent for both the insurer and the insured.

(Doc. 570-2, p.22).  The authority cited for the proposed instruction was *Kurtz, Richards, Wilson & Co. v. Insurance Communications Marketing Corp.*, 12 Cal.App.4th 1249, 1257 (1993). (Doc. 570-2, p.22).

Contending that ASI expressly marketed itself directly to

1    Lee through its promotional brochures that touted its special

2    expertise, Lee refers to the trial testimony of Matt Sackett:

3              Q. ... Now, American Specialty, in addition
               to the general statements about its expertise
4              in sports and entertainment, risk management
               and insurance, it also holds itself out as
5              having expertise in meeting water park
               insurance needs; is that correct?  Or it did,
6              at least, in 1998?

7              A.  Per the marketing materials, 1998, I
               believe it did, yes.
8
     (Testimony of Sackett, Feb. 1, 2006, 165:15-21).
9
          Lee states that "those same brochures described Lee as
10
     American Specialty's 'client.'" Lee asserts that it relied on
11
     these representations and expected ASI to use its expertise to
12
     protect Lee to the extent insurance could protect it, citing Lisa
13
     Ehrlich's trial testimony:
14
               Q.  Had you ever developed any water parks?
15
               A.  No.
16
               Q.  Was this a totally new area for you and
17             your dad?

18             A.  Absolutely new.

19             Q.  Okay.  So was it important to you to have
               special expertise to assist you with the
20             insurance needs for this new venture?

21             A.  Yes.

22             Q.  How important?

23             A.  Extremely important on a number of
               different levels.  Number one, we, having not
24             operated a water park, we had no idea what
               kind of exposures there might be.  We didn't
25             even know the types of insurance that you
               needed.

26

                                    13

1  (Testimony of Lisa Ehrlich, Feb. 12, 2007, 11:5-17).

2      *Kurtz, Richards, Wilson & Co. v. Insurance Communicators

3  Marketing Corp.*, *supra*, 12 Cal.App.4th 1249, involving review by

4  a demurrer, stated in pertinent part:

5              On the element of duty, respondents argued
               that KRW had not and could not allege that
6              ICMC or Hoge had breached any duty to KRW,
               because an insurance agent who is known to
7              the insured to be an agent of the insurance
               company has no duty to the insured, but only
8              to the insurer.  Even if that were a correct
               statement of the law, the demurrer was
9              improperly granted, since the complaint does
               not allege that the relationship of ICMC and
10             Hoge to Union was disclosed to KRW, but only
               that it existed.  More importantly, it is not
11             a correct statement of the law.

12             At a minimum, an insurance agent has a duty
               to use reasonable care, diligence, and
13             judgment in procuring the insurance requested
               by its client.  An agent may assume
14             additional duties by an agreement or by
               holding himself or herself out as having
15             specific expertise.  (*Jones v. Grewe*, *supra*,
               180 Cal.App.3d at p. 954.)  These duties do
16             not disappear because the agent is also the
               agent for an insurer.  Dual agencies are not
17             uncommon, and do not negate the agent's duty
               to the client. ....

18
       Lee argues that the failure to give proposed Instruction No.
19
   17 prejudiced Lee because the jury was led to believe that ASI
20
   did not have an agency relationship with Lee:
21
               Had the jury been provided this instruction,
22             the jury would have been able to determine
               that American Specialty had a duty to Lee and
23             breached that duty.  Without the instruction,
               Lee's theories of liability against American
24             Specialty, and its defenses against USF&G,
               were prejudicially undercut.
25
       USF&G responds that proposed Instruction No. 17 misstates
26

                                    14

the law, is factually inapplicable under the circumstances, and is argumentative, all reasons it was rejected by the court.

In arguing that Lee misstates the law, USF&G refers to *Kurtz's* conclusion:

> When an insurance agent deliberately misrepresents a material fact in an application for insurance presented on behalf of a client who is unaware of the misrepresentation, the agent breaches the duty of reasonable care owed to the client. This is true whether or not those actions might also constitute a breach of a duty owed by the agent to the insurer. The cross-complaint thus states a cause of action for negligence.

12 Cal.App.4th at 1258.  USF&G contends:

> There simply was no evidence that American Specialty had any role in preparing any application for insurance on behalf of Lee or made any representations in the application.

Lee replies, although *Kurtz* involved an affirmative misrepresentation by a broker, the dual agency described in *Kurtz* at page 1257, is equally applicable "where a broker such as ASI fails to meet the standard of care by omission rather than an affirmative action."

USF&G contends, the *Kurtz* court reversed on the ground that the insured should have an opportunity for trial of its claim of negligence by the agent of the insurer.  Here, USF&G asserts, Lee unreservedly had that opportunity and introduced evidence in support of its claim that ASI professed its expertise in insurance for sports and entertainment risks and was negligent by not obtaining coverage for Lee's construction activities.  Lee

1  also strenuously argued that ASI was a dual agent for Lee and

2  USF&G.  What Lee failed to establish, and the jury did not find,

3  were any breaches of any duties to Lee by ASI.

4        With regard to the contention that proposed Instruction No.

5  17, based on *Kurtz*, was inapplicable under the circumstances,

6  USF&G argues:

> All those cases involve circumstances where
> an agent for an insurer directly dealt with
> and/or made misrepresentations to the
> applicant or insured.  None of those cases
> involve the circumstances before the jury,
> where Lee was represented in the policy
> application process not only by Aon's offices
> in Fresno, but by an extremely experienced
> and prominent entertainment risk broker,
> Aon/Albert G. Rubin [of Los Angeles].  The
> evidence clearly established that all of the
> communications from American Specialty went
> through Aon/Albert G. Rubin and/or Aon Risk
> Services before reaching Lee, or went from
> Lee through Aon to American Specialty.
> Indeed, specific communications in issue in
> this case all went through Aon.  The August
> 11, 1998 letter from American Specialty went
> to Aon/Albert G. Rubin and the response, the
> August 12, 1998 letter, was drafted by Aon
> and forwarded by Aon to American Specialty.

18  The evidence overwhelmingly establishes that Lee's chosen

19  workers' compensation insurance broker was Aon.  Aon dealt with

20  ASI for Lee on all policy formation issues.  The manner in which

21  the parties chose to conduct themselves in their dealings that

22  led to issuance of the USF&G workers' compensation insurance

23  policy was disputed in all respects and for the jury to decide.

24  The evidence at trial did not support the misleading and

25  argumentative instruction Lee proposed which would not

26  unequivocally leave the issue of ASI's agency vis-a-vis Lee for

the jury to determine.

USF&G refers to the trial testimony of Lee's expert, Edgar Clark, that ASI was <u>not</u> acting as Lee's broker in the transaction under which the USF&G policy was issued:

> Q.  I want to briefly go over what your understanding of the role of the various parties were in the transaction leading up to USF&G's workers' compensation policy.
>
> You testified earlier that American Specialty was performing the function or role of the managing general agent; is that right?
>
> A.  Yes.
>
> Q.  Okay.  And Aon was performing a function of Lee Investments' broker in that transaction; is that -
>
> A.  Retail broker, yes.
>
> Q.  Retail broker.  And American Specialty, in that transaction, was not acting as Lee's broker; is that right?
>
> ...
>
> A.  That's correct.

(Testimony of Clark, Feb. 16, 2007, 66:7-23).

Lee ignores its expert's omission as it consistently ignores unfavorable evidence in this case, and replies that the trial testimony establishes that ASI held itself out to Lee as an expert in the field of entertainment risk management and that ASI courted Lee as a client, "seeking more of a relationship with Lee than holding itself out as merely the managing general agent for USF&G". Lee asserts:

> It is without dispute that ASI is a major, if not *the* major player in the

17

> **sports/entertainment insurance business. Even Aon/Alfred G. Rubin, the sports/entertainment division of Aon, turned to ASI for the workers' compensation insurance at issue here instead of turning to its own wholly owed subsidiary.**
>
> **Even after the policy was issued Matt Sackett from ASI traveled to Fresno to meet with personnel from Lee at the water park to discuss the water park business and loss prevention strategies.  However, he did not warn Lee that completion of the red slide or any other maintenance staff activity would void the subject policy.**

However, seeking more insurance business as a managing general agent does not create an agency relationship with the insured, Lee, in the transaction at dispute, where Lee was represented by an independent insurance broker, Aon, and provided ASI as managing general agent, a representation statement to limit ASI's direct dealings with Lee.

Citing *Good v. Prudential Insurance Co.*, 5 F.Supp.2d 804, 808 (N.D.Cal.1998) and *Lippert v. Bailey*, 241 Cal.App.2d 376, 382 (1966), USF&G contends that, under California law, an insured may not maintain a cause of action for negligence against an agent of an insurer unless it pleads facts establishing that the agent is either an independent broker or had a long-term relationship with the insured.  Here, the facts before the jury established that any relationship between ASI and Lee existed barely six months from February or March 1998 until the policy issued in mid-August 1998.

Lee replies that "the relationship was more than a year old at the time of Diana Conley's accident, and ASI knew that Lee was

relying on its expertise in the waterpark insurance business."
That is not the time the representations by Lee were made.  By
then, "the horse was out of the barn and long gone."

　　　Finally, USF&G argues that the refusal to give proposed
Instruction No. 17 did not prejudice Lee because the jury found
no negligence by Aon, ASI or USF&G and found for ASI and USF&G on
five affirmative defenses, any one of which would have barred
Lee's insurance broker negligence claim even if, *arguendo*, the
jury had found negligence.  (Special Verdict of Trial Jury re
Lee's Claims, Doc. 686, pp. 33-38)  Lee was fully permitted to
and did argue to the jury that ASI touted its expertise in its
marketing materials and proposals and breached duties of
disclosure to Lee as a result.  Referring to Instruction No. 41,
requiring both a duty and a breach of duty, Lee failed to
establish a breach and, even if it had, would have been barred
from recovery by the findings in favor of USF&G and ASI on their
affirmative defenses.  USF&G notes that Aon, Lee's broker, who
had a direct relationship with Lee, was also found not liable to
Lee, thereby negating Lee's claim to have been prejudiced by the
failure to give proposed Instruction No. 17.  None of the third
party defendants was found to have committed fraud, rather, Lee
was found to have committed fraud and to have engaged in
misconduct and to have itself been negligent in dealing with Aon
and ASI.

　　　Lee replies that the jury's findings against it on the
affirmative defenses were allegedly tainted by the failure to

19

give proposed Instruction No. 17:

> USF&G's argument glosses over the severe
> impact the improper jury instruction had on
> the jury.  The jury likely determined the
> underlying issue based on the flawed jury
> instruction and made sure its other
> decisions, including any affirmative
> defenses, were consistent.  Thus, the jury's
> findings on the affirmative defenses do not
> establish harmless error.

Even if, *arguendo*, the failure to give proposed Instruction No. 17 was error, it was harmless because the jury's found no negligence or fraud of any other party except Lee.  Lee's explanation for the jury's findings on the affirmative defenses is speculative, self-serving, and wrong.

Lee's motion for new trial on this ground is DENIED.

3.  <u>Instruction That American Specialty Could Be Liable for Breach of Oral Contract</u>.

Lee argues that the limitation in Jury Instruction No. 30 of breach of oral contract to Aon, excluding ASI, was error because evidence admitted at trial was sufficient for a jury to find that ASI, through its oral communications with Aon, entered into and breached an oral agreement to obtain an insurance policy for Lee to replace the Industrial Indemnity policy that had been cancelled.

Lee refers to the trial testimony of Hugh Awtrey:

> Q.  Right.  Did you understand at this period
> of time, when you are starting to communicate
> with American Specialty about a new policy of
> insurance that they were now a Managing
> General Agent for USF&G?
>
> A.  Matt Sackett informed me that they had a

20

1   new company coming in that they were kind of
    rolling their business into and that they
2   would approach them with this risk and it
    should not be a problem to have it written
3   there.

4   Q.  Did you understand that this was an
    exclusive type of relationship between
5   American Specialty and USF&G?

6   A.  I don't know if I really knew exactly the
    relationship.  I assumed it was a program
7   they had.

8   ...

9   Q.  Now, Mr. Awtrey, as I understand it, you
    did not discuss with Lisa Ehrlich the
10  possibility of getting another policy besides
    the USF&G policy; is that correct?

11
    A.  That is correct.
12
    Q.  And that was because Mr. Sackett, at
13  American Specialty, had assured you that
    American Specialty would take care of
14  obtaining a replacement policy for the
    Industrial Indemnity policy; is that correct?
15
    A.  Correct.  And I had a conversation with
16  Christy Platt, who I had talked to, if there
    was going to be construction, we could do a
17  State Fund policy, but she said, 'We are not
    going to need it.'
18
    Q.  When was that discussion with Christy
19  Platt:

20  A.  Somewhere in that time, I'm not sure.

21  Q.  All right.  But in any event, you had
    been assured by American Specialty that
22  American Specialty would obtain a replacement
    for the Industrial Indemnity policy; is that
23  correct?

24  A.  That is correct.

25  ...

26  Q.  Well, did you understand that it was a

21

1    condition for American Specialty to issue the
     USF&G policy for Lee to make a representation
2    to USF&G regarding the construction laborers?

3    A.  We were never told that if they did not
     do a letter saying they weren't doing this,
4    that there would be - we would not issue a
     policy, if that's what you are asking me.

5    ...

6
     THE COURT: All right.  Let's rephrase the
7    question.  And you are being asked, in your
     capacity as broker, considering getting new
8    coverage, whether, at the that specific time,
     which is after the Notice of Cancellation has
9    come, in the period of time that we are
     talking about, after the loss report hadn't
10   been provided to you, but it had been
     received, at that time, what was your
11   knowledge about American Specialty's
     willingness to issue Workers' Compensation
12   coverage to your client, Lee, if Lee was
     engaged, its employees were engaged in
13   construction?

14   THE WITNESS: At a later date, not at this
     time, did I know that the construction was an
15   issue.  At a later date, I knew that USF&G
     and American Specialty had an issue with
16   construction.

17   MR. CHARLSTON: Okay.

18   Q.  At some point in time before the policy
     was actually issued by USF&G, okay, I'm now
19   talking about, I'm giving you a time period
     here, ultimately, in that process, before the
20   policy was issued by USF&G, you knew, as
     Lee's broker, that if Lee was going to be
21   engaging in construction, American Specialty
     wouldn't issue the policy, correct?

22
     A.  American Specialty never told us, 'We are
23   not issuing this policy if there is not
     construction,' but they showed they had a big
24   concern that the construction exposure would
     no longer be there.
25
(Testimony of Awtrey, Feb. 8, 2007, 112:12-23, 158:22-159:15;
26

22

Feb. 9, 2007, 192:10-15; Feb. 8, 2007, 118:18-119:18).

This testimony, Lee asserts, shows that "American Specialty had orally agreed with Lee's agent to replace the coverage, Aon relied on the oral commitment, the oral commitment was never withdrawn and if, arguendo, ASI attempted to withdraw it, the attempted withdrawal was too late as an oral contract had already arisen."  Lee claims the failure to include ASI in Jury Instruction No. 30 prejudiced Lee because the jury was led to believe that ASI's breach of oral contract was not an issue and that, had the jury considered ASI's breach of oral contract, Lee would have been entitled to damages as a result of that breach.

This is nonsense.  The evidence showed that Aon told Lee there was an alternative market to cover construction work, the State Fund.  Ms. Platt, Lee's authorized agent and employee, told Aon it wouldn't be needed.  ASI told Aon's Mr. Awtrey that it had another workers' compensation carrier, USF&G, from which it could get coverage.  This was before any underwriting analysis by ASI for USF&G.  Lee is talking "apples and oranges", *i.e.*, ASI did not make any direct contract with Lee, because ASI well knew Lee was represented by Aon and that USF&G was never a contracting party with Lee, as the jury found.  Lee continues to ignore the disputed facts were decided against it.

USF&G responds that Lee's requested instructions concerning Lee's claim for breach of an oral agreement against ASI were denied because the evidence at trial failed to provide any evidence upon which the jury could find an oral contract between

23

ASI and Lee, or any breach thereof.  The Court found that the evidence introduced at trial by Lee failed to establish any basis for a "meeting of the minds" on the requisite and definite terms. *See Weddington Productions, Inc. v. Flick*, 60 Cal.App.4th 792, 811 (1998):

> An essential element of every contract is 'consent.' ... The 'consent' must be 'mutual.' ... 'Consent is not mutual, unless the parties all agree upon the same thing in the same sense.' ....
>
> ... If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation.

Moreover, the proposed jury instruction was argumentative and without support in the evidence.  USF&G argues that Lee failed to establish any mutual assent to the same, definite and certain terms.  Awtrey's testimony relied upon by Lee is a hearsay statement by Awtrey that Matt Sackett told him that ASI "had a new company coming in that they were kind of rolling their business into and that they would approach them with this risk and it should not be a problem to have it written there."  This testimony, USF&G contends, does not establish mutual consent to the "same thing" but, at most, provides evidence of a proposal or preliminary negotiations, that as managing general agent, ASI had another market for workers' compensation coverage, both of which are insufficient to form an oral contract.  "In order for acceptance of a proposal to result in the formation of a contract, the proposal 'must be sufficiently definite, or must

24

call for such definite terms in the acceptance, that the
performance promised is reasonably certain.'"  *Weddington
Productions, Inc.*, *id*.  "If ... a supposed 'contract does not
provide a basis for determining what obligations the parties have
agreed to, and hence does not make possible a determination of
whether those agreed obligations have been breached, there is no
contract.  *Id.*  USF&G argues that the Court properly determined
that Lee did not provide any evidence of the terms, including
premium, for any new contract of workers' compensation insurance
arising from Sackett's statement to Awtrey that Sackett would
approach the insurer.  "'It is a necessary requirement that an
agreement, in order to be binding, must be sufficiently definite
to enable the courts to give it an exact meaning.'"  *Weddington*,
*id*.  "Whether a contract term is sufficiently definite to be
enforceable is a question of law for the court."  *Ladas v.
California State Auto. Assn.*, 19 Cal.App.4th 761, 770 n.2 (1993).

USF&G further argues that the refusal to give Lee's proposed
instructions was not error because Lee did not establish the
existence of any consideration on the part of ASI to provide
workers' compensation insurance to Lee.

USF&G additionally asserts that even if, *arguendo*, the
refusal to give the requested instruction was error, Lee was not
harmed.  The jury found in favor of ASI on all affirmative
defenses, except laches, including affirmative defenses of fraud,
negligent misrepresentation, estoppel, waiver and unclean hands.
Any of these affirmative defenses would have prevented Lee from

recovering even if the jury had found an oral contract with ASI.

Ignoring the evidence and the jury's verdicts, Lee replies that the evidence at trial was sufficient for the jury to find an oral contract between Lee and ASI:

> The evidence at trial was uncontroverted that ASI, by agreeing with Hugh Awtrey, agreed to write a workers' compensation policy for Lee through USF&G.  In fact, the agreement was so defined and certain that Awtrey and Aon did absolutely nothing more to obtain a replacement policy for Lee after the agreement was reached.  The Court disregarded this fact and ignored the reliance placed on the understanding by Awtrey, which could be nothing other than an oral agreement by ASI to provide Lee with a workers' compensation insurance policy.  There was little more to agree on as all Workers' Compensation policies are integrated, cover all employees, and charge a premium based on California rate classification and the payroll assigned to those classifications.  Of course the policy would be subject to audit, where the premium amount could be retroactively adjusted to accurately reflect the risk actually assumed under the policy.  Because of the 'flexibility' in the premium, sufficient detail was exchanged between the parties to allow the Court to instruct the jury on the issue of oral contract.

The evidence established nothing of the sort.  The jury found no contract between Lee and ASI, because ASI's alleged promise was to Aon as agent for a disclosed principal.

Lee's motion for new trial on this ground is DENIED.

4.  <u>Requirement of Expert Testimony to Determine Broker/Managing General Agent Negligence</u>.

Jury Instruction No. 43, captioned "<u>PROFESSIONAL NEGLIGENCE – STANDARD OF CARE</u>", stated in pertinent part:

26

> You must determine the level of skill and
> care that other reasonably careful insurance
> brokers or managing general agents would use
> in similar circumstances based only on the
> testimony of the expert witnesses who have
> testified in this case.

(Doc. 661, p.45).

Lee contends that this instruction was error because Aon's failure to market the policy through someone other than ASI/USF&G during the thirty-day period after notice of cancellation of the Industrial Indemnity policy and whether ASI should have informed Aon that ASI would not market the policy does not require someone with specialized knowledge to determine whether these inactions breached the duty of care owed by an insurance broker. Lee responds that this is within the common knowledge and experience of any juror and argues that an expert witness may not testify as to opinion on matters of common knowledge and experience. Lee cites Rule 702, Federal Rules of Evidence ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert ... may testify"); *Godfrey v. Steinpress*, 128 Cal.App.3d 154, 186 (1982)("California courts ... hold expert testimony is not required where a question is 'resolvable by common knowledge'"); *Meier v. Ross General Hospital*, 69 Cal.2d 420, 429 (1968)("The courts ... have established an exception to this requirement for the testimony of experts if the subject matter of the litigation is such that laymen could infer *as a matter of common knowledge* that the

27

injury would not have occurred unless the defendant were negligent"). This diversity action is governed by the Federal Rules of Evidence.

Lee argues that Instruction No. 43 prejudiced Lee because the jury was unable to consider non-expert testimony, including their own common knowledge, with regard to the standard of care and that, had the jury considered non-expert witness testimony, the jury likely would have determined that Aon's conduct in failing to market the policy was negligent as was ASI's in failing to tell Aon that it would not market the policy. This is more nonsense and an unmitigated misstatement of the law. The standards of performance and care for insurance brokers and specialized professional and industry agents within the highly regulated insurance industry are not generally known to lay persons or even to lawyers and judges. An example was the "expert" testimony of Lee's workers' compensation insurance "expert" who gave testimony so bizarre and unexpected about the meaning of "construction" and "construction activities" that no lay person, let alone an attorney or judge, could have been expected to have such opinions expressed as within matters of common understanding or experience. These definitions of the alleged specialized meaning of construction were allegedly required to be known and applied by Aon and ASI in procurement of a new workers' comp policy.

USF&G and Aon argue that the authorities upon which Lee relies do not support Lee's contention that requiring expert

1    opinion on the standards of care for commercial insurance brokers

2    is error because such matters are allegedly common knowledge to

3    lay persons.  USF&G asserts that, because Lee's claim against ASI

4    was for negligence as a managing general agent, Lee had to

5    satisfy the requirements for proof of professional negligence by

6    a commercial insurance broker.  In support of this position,

7    USF&G cites *Valentine v. Membrika Ins. Services, Inc.*, 118

8    Cal.App.4th 462, 474-475 (2004), holding that the proper method

9    of calculating damages in an action for negligence against an

10   insurance broker is based upon the standards for evaluating

11   liability for professional negligence.  USF&G asserts that

12   professional negligence can only be established by the testimony

13   of an expert that the broker's conduct does not satisfy the

14   standard of care, citing 1 Witkin, California Evidence (3rd Ed.)

15   § 525(1), and BAJI 6.37.4.

16       USF&G refers to the trial testimony of Lee's expert, Edgar

17   Clark:

18           Q.  I want to briefly go over what your
             understanding of the role of the various
19           parties were in the transaction leading up to
             USF&G's workers' compensation policy.
20
             You testified earlier that American Specialty
21           was performing the function or role of the
             managing general agent; is that right?
22
             A.  Yes.
23
             Q.  Okay.  And Aon was performing a function
24           of Lee Investments' broker in that
             transaction; is that -
25
             A.  Retail broker, yes.
26

                                   29

1          Q.   Retail broker.  And American Specialty,
           in that transaction, was not acting as Lee's
2          broker; is that right?

3          ...

4          A.   That's correct.

5    (Testimony of Clark, Feb. 16, 2007, 66:7-23).  USF&G correctly

6    contends that the duties of a managing general agent of an

7    insurance company, particularly where Lee had its own broker, are

8    not within the knowledge of the average lay juror.[1]  Although Lee

9    retained Mr. Clark to testify as to his opinions concerning the

10   alleged acts or omissions of ASI, Mr. Clark did not testify that

11   ASI breached the standard of care by failing to market Lee's

12   policy in circumstances where Lee had its own broker:

13         Q.   Okay.  Now, would you please state your
           opinions as they related to ASI.
14
           A.   ASI held itself out as an MGA.  ASI held
15         itself out to have particular expertise in
           the entertainment business.  They also had
16         the pen for an insurer to write the insurance
           for that kind of risk, the entertainment kind
17         of risk, which is what the water parks are
           included in generally.  It - I found that
18         they did not meet the standard of care of an
           experienced MGA in the entertainment business
19         by not coping with the problem of
           construction with the water park.
20
           I find it very difficult to fathom that
21         almost any operation, not just an
           entertainment risk or a water park risk, any
22         operation has some kind of repair and
           maintenance construction repair going on
23         almost all the time.  I am sure that this

24   _____

25        [1]Lee's contention that ASI was obligated to market Lee's
     application for a replacement policy is refuted by Mr. Clark's
     testimony that Aon was acting as Lee's broker and that ASI, as the
26   managing general agent, was not acting as Lee's broker.

                                  30

1
2
3
4

> courthouse has people doing repair and
> maintenance work.  Which is why I never
> understood why they objected to writing
> construction type risk within the water park
> operation.  I just never understood it.
> Which I think they did not follow -

5
6

> THE COURT: Is that within the standard of
> care now or are you venturing into some
> personal subjective -

7
8
9
10

> THE WITNESS: No, it's not subjective.  I
> really, Your Honor, believe that it one holds
> oneself out to be a certain expert - I don't
> mean expert, but a certain - have certain
> expertise in underwriting certain risks, one
> can - should not then say they don't have
> that expertise.

11

(Testimony of Clark, Feb. 16, 2007, 30:19-31:19).  USF&G argues

12

that a proper inference can be drawn from Mr. Clark's testimony

13

that Lee did not have him testify that ASI did not meet the

14

standard of care in marketing Lee's application in circumstances

15

where Lee had its own broker because Mr. Clark would not give

16

that opinion.

17

        Lee responds that expert opinion was not required on these

18

issues:

19
20
21
22
23
24
25

> ... [N]o expert is needed to know that a
> wholesale broker like ASI, who promises to
> obtain a replacement policy must do so, or
> inform the retail broker that the replacement
> policy will not be issued in time to allow
> the cancelled policyholder to seek a
> substitute policy elsewhere ... [I]t is also
> within the common knowledge of any juror that
> the wholesale broker must notify the retail
> broker of a change in its marketing
> relationships when it no longer has unlimited
> markets for its policy and instead has
> converted to an exclusive relationship that
> does not allow a true marketing of the

26

31

1        risk.[2]

2        USF&G further argues that the failure to give Lee's

3   requested instruction did not prejudice Lee.  Even if the jury

4   had found that ASI breached the standard of care based on lay

5   opinion, such claim would be barred by the jury's findings in

6   favor of ASI on the affirmative defenses of Lee's fraud,

7   negligent misrepresentation, waiver, estoppel, and unclean hands.

8        Again, Lee argues that the jury's findings of the

9   affirmative defenses was tainted by the failure to give an

10  instruction concerning lay determination of the standard of care:

11              USF&G's argument glosses over the severe
                impact the improper jury instruction had on
12              the jury.  The jury likely determined the
                underlying issue based on the flawed jury
13              instruction and made sure its other
                decisions, including any affirmative
14              defenses, were consistent.  Thus, the jury's
                findings on the affirmative defenses do not
15              establish harmless error.

16       Aon argues in opposition to this claim for a new trial that

17  Lee's expert, Edgar Clark, admitted that Aon did not breach the

18  standard of care and, therefore, a new trial based on Lee's

19  contention of instructional error is not required:

20              Q.   Okay.  I want you to assume that Lee told
                Aon our park is open on August 6th, our
21              operation will no longer employ construction
                laborers and any construction work would be
22              performed by independent contractors with
                their own certificates of insurance.

23

24       [2]As a matter of common sense and experience, it is generous to
     assume one out of one hundred lay persons know the difference
25   between a wholesale and retail insurance broker and insurance
     marketing relationships between insurers, retail, and wholesale
26   agents and brokers.  Most lawyers do not.

1              With these assumptions in mind, was Aon still
                obligated to offer a State Fund policy to
2              Lee?

3              A.  No.

4              Q.  I want you to assume that Lisa Ehrlich
              had a conversation with Hugh Awtrey about
5              this letter, that she understood that the
              insurance company wanted a letter saying all
6              the construction laborers are gone and any
              future construction work would be performed
7              by independent contractors.  I want you to
              further assume that Ms. Ehrlich authorized
8              Ms. Platt to sign a letter consistent with
              Ms. Ehrlich's conversation with Mr. Awtrey,
9              that Ms. Platt reviewed this letter drafted
              by Mr. Awtrey, discussed its contents with
10            Ms. Ehrlich and signed it.  And further
              assume that Ms. Ehrlich testified, after
11            reading it, that all of these statements are
              true.

12
              Under those circumstances, was Aon still
13            obliged to give a State Fund policy option to
              Lee in August?
14
              A.  No.
15
(Testimony of Clark, Feb. 17, 2007, 62:20-63:17).
16
     Lee replies that Mr. Clark did not admit that Aon did not
17
breach the standard of care:
18
              Aon ignores Lee's primary contention against
19            Aon ... Lee contends that Aon should have re-
              marketed the policy.  However, the underlying
20            issue is that Aon should have done something
              to make sure (including re-marketing the
21            policy) that Lee had the opportunity to
              review and consider replacement policies
22            prior to the cancellation of the original
              Industrial Indemnity policy.  The
23            overwhelming evidence was that there was
              little, if anything, done by Aon to confirm
24            the availability of a policy from ASI or seek
              a policy from another market.  Had Aon
25            pressed ASI regarding the replacement policy,
              the issue of construction would have come up
26            in a timely manner and been adequately

1          discussed, eliminating the confusion relating
           to what Lee employees could and could not do.
2          Moreover, had the issue been adequately
           explained, Lee could have directed Aon to re-
3          market the policy, or could itself have gone
           to the State Compensation Fund and obtained a
4          policy absolutely clear of any underwriting
           position relating to construction.  That a
5          broker should preserve its client's rights in
           such a manner is within the common knowledge
6          of a juror and no expert testimony should be
           required.
7
     Lee refers to the trial testimony of Mr. Clark:
8
           Q.  Mr. Clark, assume these following facts.
9          That a retail insurance broker with resources
           within his or her organization of vast
10         amusement experience represents a newly
           constructed and recently owned amusement park
11         owned by persons without personal knowledge
           in operating and insuring amusement risks and
12         who had their original workers' compensation
           insurance that was placed with the same
13         broker canceled due to a purported increased
           risk related to unexpected exposures of
14         construction laborers.

15         Assume also, please, that the broker received
           a letter from a managing general agent for an
16         insurer that believed it was replacing - from
           a managing general agent that the broker
17         believed was replacing the canceled policy
           and that MGA stated the concern with the loss
18         run of the original insurer and sought help
           to prove to the underwriter that park
19         employees will not perform tasks outside the
           designated classifications and that
20         construction has ceased and that workers'
           comp claims arising from construction will
21         not be reported under the workers' comp
           policy at issue.
22
           Would - in that factual circumstance, does
23         the standard of care - what does the standard
           of care require of a broker as it relates to
24         the policy and potential underwriting
           position?
25
           A.  The standard of care would be, first of
26         all, that the large risk broker in a complex

                              34

case such as this explain to the insured what
all that means.  And provide solutions to the
problem.

Q.  By 'solutions,' what do you mean?

A.  Replacement of the insurer.  Replacement
of the MGA.  Change in approach.  Could be
several different solutions.

...

Q.  And what do you mean by 'explain'?

A.  Communicate and document, document,
document.

(Testimony of Clark, Feb 16, 2007, 32:16-33:25).  Lee asserts

that Mr. Clark's testimony does not absolve Aon from liability

and does not cure the prejudice of the jury not being instructed

that expert testimony was not required.  Lee asserts that it was

entitled to an instruction that expert testimony was not required

concerning the standard of care applicable to ASI and Aon

"concerning the timing of providing the replacement policy, the

effect of the representation, and the failure to re-market the

policy in a timely manner."  However, as Mr. Clerk's testimony

demonstrates, the issues were so complex that an explanation to

the insured of "what all that means" was required.

Aon contends that the jury could not reasonably rely on

their own common knowledge to conclude that Aon should have re-

marketed Lee's workers' compensation insurance:

Aon recently had marketed Lee's insurance
needs – about four months before the
Industrial Indemnity cancellation.  At that
time only State Fund and Industrial Indemnity
(through American Specialty) were willing to
entertain the risk and Lee picked the less

35

expensive Industrial Indemnity policy.
Shortly after notice of the Industrial
Indemnity cancellation Matt Sackett told Hugh
Awtrey that American Specialty had another
'market' (or insurance company) which likely
would write the insurance.  If anything, the
jurors' common sense would tell them that in
this context a broker should not have to re-
market Lee's risks to some other insurance
company.  This is especially true since Lee
apparently did not want coverage for
construction risks, and the premium rate for
construction employees is more expensive (per
dollar of payroll) than the premium rate
covering most other classes of non-
construction employees.  Accordingly, there
was no error in the instruction given.

Aon argues that the failure to give Lee's requested
instruction did not prejudice Lee because of the jury's findings
in favor of Aon on its affirmative defenses.

Lee responds that the failure to give the instructions with
regard to Aon prejudiced Lee:

The jury finding of no comparative fault
against Aon is clearly against the weight of
the evidence.  Aon failed to monitor ASI
during the cancellation period while ASI was
purportedly 'marketing' the policy to USF&G.
Aon did nothing to follow up with ASI, nor
discover its 'underwriting position' until
contacted by ASI on August 11, the day the
original Industrial Indemnity policy was to
cancel.  Finally, there was absolutely no
evidence that any person at Aon explained to
Lee the potential devastating consequences of
the representations made in the August 12,
1998 letter.  This, coupled with the failure
to consider the State Compensation Insurance
Fund as an alternative market, was clearly a
breach by Aon of the standard or care that
should have subjected Aon to liability for
its share of comparative fault.  The failure
to include this instruction resulted in the
jury failing to attribute significant fault
to Aon.

1    Lee seems to be confused.  As to Aon, Lee's expert did

2    testify with regard to Aon's duty of care and its breach.  Given

3    that testimony, Lee cannot be prejudiced by the alleged failure

4    to give an instruction that the duty of care can be determined by

5    lay persons with regard to whether Aon breached the duty of care

6    because of Aon's failure to re-market the policy before the

7    cancellation date of the Industrial Indemnity policy.

8        Lee's motion for new trial on this ground is DENIED.

9        5.   <u>Failure to Instruct Jury That It Could Not</u>

10   <u>Consider the August 1998 Letters to Contradict the Coverage That</u>

11   <u>USF&G Agreed to Provide</u>.

12       Lee contends that it was error not to give Lee's Proposed

13   Instruction No. 11, captioned "LIMITED PURPOSE OF AUGUST

14   LETTERS":

15           The August 11, 1998 letter from ASI to Aon
             and Lee's August 12, 1998 letter to ASI,
16           including alleged conversations, relating to
             either, are admissible for the limited
17           purpose of showing Lee represented that its
             employees would not engage in construction
18           activities that were outside of activities
             that were within the water park
19           classification codes.  They may not be
             considered to vary or contradict the terms of
20           the insurance policy.

21   (Doc. 570-2, p. 16).  The authority cited for the Proposed

22   Instruction was *Bank of America v. Pendergrass*, 4 Cal.2d 258

23   (1935).

24       Lee argues that the failure to give Proposed Instruction No.

25   11 prejudiced it "because the jury was lead to believe that the

26   August 1998 letters could be used for all purposes, including as

a limitation on 'construction' that was within a water park

classification" and that "[h]ad the jury been instructed on the

limited purposes of the letters, the jury would not have

considering the letters for contradicting the agreed, coverage,

which use likely led to jury's finding for rescission."

USF&G opposes this ground for new trial, contending that the

proposed instruction was irrelevant to the issues in the case on

three grounds.

First, USF&G argues that Lee's contention that the August

1998 letters varied the terms of the policy of insurance issued

by USF&G was not urged by any party in the case.  It was

undisputed that the USF&G policy was complete, fully integrated

and unrestricted:

> The issue in the case was solely whether Lee
> made misrepresentations or material omissions
> in the policy application process.  No party
> argued that the classification codes listed
> in the policy limited the coverage of
> employees.  Rather, all witnesses testified
> that the classification codes were utilized
> to determine the amount of premium based on
> the amount of payroll.

Second, USF&G argues that the ruling that the August letters

were not barred by the parol evidence rule was correct, because

parol evidence is admissible to prove fraud in the inducement of

a contract, *Ron Greenspan Volkswagen, Inc. v. Ford Motor Land

Development Corp.*, 32 Cal.App.4th 985, 995 (1995), where the

letters did not contradict the policy terms.  *Airs Intern., Inc.

v. Perfect Scents Distributions*, 902 F.Supp. 1141, 1145-1147

(N.D.Cal.1995).  USF&G contends:

38

> Lee's argument that the August 11 and 12, 1998 letters should be excluded [sic] is based on an extreme mischaracterization of USF&G's position.  Lee contended that USF&G wished to introduce the August letters as evidence that the policy excluded construction laborers.  In fact, USF&G *never* argued that the policy did not cover construction laborers.  USF&G agreed that the policy it issued was unrestricted and covered all of Lee's employees.  Moreover, the August letters do not state anything about changing the terms of the policies [sic].  Rather, such letters were intended to address American Specialty's concern that Lee's employees were performing construction work.

Third, USF&G argues that Lee's proposed instruction was properly refused because it "blatantly" misrepresented the language of the August 12, 1998 letter:

> Lee proposed an instruction which directly misstated the language of the letter, stating that it could be interpreted *only* for the purpose of showing that Lee represented that its employees would not engage in construction activities that were outside of activities that were within water park classification codes.  The Court's refusal to adopt this argumentative and false interpretation in a jury instruction was correct.

Lee responds that Proposed Instruction No. 11 was relevant to the issues in the case and, therefore, Lee was prejudiced by the ruling.  Contending that the August 1998 letters were "clearly the keystones of the case", Lee asserts:

> Lee's proposed limiting instruction was consistent with the scope of the request set out in the August 11, 1998 letter.  ASI set out in that letter what it intended to insure, which was all work within normal water park classifications.  Because these classifications necessarily contemplated some construction within them, it was manifest

39

1
2
3
4

> that the court limit the August letters to
> not contradict the integrated policy and its
> water park classifications.  Failing to do so
> allowed the jury to decide that *any*
> construction was a violation of the
> representations made by Lee in the August 12,
> 1998 letter.

5      The Court refused to give argumentative or formula

6  instructions that advanced a party's partisan position.  The

7  letters were relevant to show what the insurer required before it

8  was willing to issue a policy.  Lee's proposed instruction was

9  confusing and argumentative because it adopted one party's

10  interpretation of the evidence.

11      Lee's motion for new trial on this ground is DENIED.

12      C.   <u>Verdict Against Clear Weight of Evidence</u>.

13      Lee argues that it is entitled to a new trial on the ground

14  that the verdict is against the clear weight of evidence on two

15  grounds: (1) USF&G is bound by the admission that Ms. Conley was

16  performing within water park classifications; and (2) unopposed

17  expert testimony confirmed that Ms. Conley was performing park

18  operations.

19          1.   <u>Governing Standards</u>.

20      "If there is substantial evidence presented at trial to

21  create an issue for the jury, a trial court may not grant a

22  motion for a directed verdict or for judgment notwithstanding the

23  verdict."  *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833

24  F.2d 1365, 1371 (9th Cir.1987).  "The existence of substantial

25  evidence does not, however, prevent the court from granting a

26  motion for a new trial pursuant to Fed.R.Civ.P. 59 is the verdict

is against the clear weight of evidence."  *Id.*  "[T]he district court should only enter an order granting a new trial based upon the insufficiency of the evidence if the verdict is against the great weight of the evidence."  *Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 190 (9th Cir.1989), *cert. denied*, 493 U.S. 1058 (1990).  The Ninth Circuit explains:

> The judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party ... But after weighing the evidence, the trial judge faces a difficult task:
>
> > It may be doubted whether there is any verbal formula that will be of much use to trial courts in passing on motions [for a new trial on the grounds that the verdict is against the clear weight of the evidence]. Necessarily all such formulations are couched in broad and general terms that furnish no unerring litmus for a particular case.  On the one hand, the trial judge does not sit to approve miscarriages of justice.  His power to set aside the verdict is supported by clear precedent at common law and, far from being a denigration or a usurpation of jury trial, has long been regarded as an integral part of trial by jury as we know it.  On the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter.  Probably all that the judge can do is to balance these conflicting principles in the light of the facts of the particular case.  If, having given full respect to the

41

> jury's findings, the judge on the
> entire evidence is left with the
> definite and firm conviction that a
> mistake has been committed, it is
> to be expected that he will grant a
> new trial ....

*Landes Const. Co., Inc., id.,* at 1371-1372; *see also United States v. 4.0 Acres of Land,* 175 F.3d 1133, 1139 (9th Cir.), *cert. denied,* 528 U.S. 1047 (1999):

> The trial court may grant a new trial, even
> though the verdict is supported by
> substantial evidence, if 'the verdict is
> contrary to the clear weight of the evidence
> ... We must uphold the district court if ...
> [the] ground[] for granting a new trial [is]
> reasonable ... The corollary ... is that a
> district court may not grant or deny a new
> trial merely because it would have arrived a
> different verdict.

2. <u>USF&G Bound by Admission that Ms. Conley Was Performing Within Water Park Classifications</u>.

Lee asserts that USF&G reported Ms. Conley's accident to the Workers' Compensation Insurance Rating Bureau (WCIRB) as occurring under classification code 9016, as was made clear by Master Stat Report Facsimile (Ex. 675). Lee asserts that there was no evidence that Ms. Conley's injury was ever classified by USF&G or the WCIRB as occurring under any other classification code. Lee contends:

> This admission by USF&G proves that Ms.
> Conley was working within water-park [sic]
> classifications in accordance with Mr.
> Sackett's August 11, 1998 letter to
> Hildebrand (Exh. 833) and Ms. Platt's August
> 12 letter (Exh. 374).

> Clearly, Lee's August 12 letter which USF&G
> claims serves as the basis for Lee's

42

                    misrepresentation notified USF&G that Lee
                    employees' 'duties would be limited to park
                    operations.'  (Exh. 374.)  Classifications
                    9016 and 9180 were the only code
                    classifications that were pertinent to the
                    water park operations in issue.  Accordingly,
                    the great weigh of the evidence, and indeed
                    the only evidence, was that Ms. Conley was
                    injured in the course of her employment with
                    Lee while conducting tasks that were clearly
                    'park operations.'

        USF&G argues that Ms. Conley's classification in the Master

Stat Report Facsimile is not an admission by USF&G as has been

analyzed in accompanying motions.

        First, USF&G contends, there was no evidence at trial as to

who authored the report to the WCIRB or whether the source of the

information for the report was anything other than the report of

injury filed by Lee.

        Second, USF&G asserts that the insurer was required to

report injuries to the WCIRB using only the classification codes

set forth in the policy.  USF&G refers to the trial testimony of

Lee's workers' compensation expert, Dr. Arthur J. Levine:

                    Q.  It says under No. C, 'Report the standard
                    classification code to which the claim has
                    been assigned.  No claims can be assigned any
                    standard classifications, unless payroll or
                    other appropriate exposure also has been
                    reported for the standard classification.'

                    So you have to - if you are going to make a
                    report on the Unit Stat Report, it has to be
                    for a classification that's in the existing
                    policy; is that right?

                    A.  Yes, unless the insurance company tells
                    the Bureau that they think the classification
                    should be added or changed.

                    ...

43

1            THE COURT: At the time of an injury, the
             insurer reports to the Board under the
2            classifications that are in the policy.  And
             unless there is a change to those
3            classifications in the policy by endorsement
             or some other means, then those are the
4            classifications used for reporting?

5            THE WITNESS: Right.  It's a control
             mechanism.  The Bureau does not - if
6            something is going on in a classification
             that isn't in the policy, the Bureau needs to
7            know about it.  They can't just have
             insurance companies assigning claims to
8            classes that aren't on there.

9  (Testimony of Levine, Feb. 14, 2007, 56:11-20, 57:24-58:8).

10      From this, USF&G contends, when Ms. Conley was injured, her

11  injury was reported to the WCIRB under the classifications

12  actually contained in the USF&G policy, as an amusement park

13  maintenance worker, classification 9016:

14            The injury was reported as required by law,
              and the manner in which it was reported was
15            not an admission that construction
              classifications come within the scope of an
16            amusement park operations employee.

17      Second, USF&G contends, by the time the classification was

18  reported, USF&G had filed its action for rescission.  It was

19  clear that USF&G contended that the work performed by Ms. Conley

20  was a construction activity.  Even if, *arguendo*, the Master Stat

21  Report Facsimile was an admission, there was contrary evidence

22  which the jury could and did consider by expressly finding that

23  there was no waiver or estoppel by USF&G on all the evidence.

24      Lee replies that USF&G misleads the Court concerning its

25  admission because "USF&G fails to remind the Court that the only

26  expert testimony concerning the Master Unit Stat Report was that

44

1  the purpose was to accurately report injuries."  Lee contends

2  that further testimony by Dr. Levine established that although

3  the reporting party must initially report under an existing

4  classification, the reporting party has a continuing duty to

5  revise the classifications and amend the Master Unit Stat Report

6  so that it accurately reported the classification under which the

7  injury occurred:

8          Q.  Now, by custom and practice in the
            insurance industry, is the carrier's
9          assignment of the 9016 classification code to
            an accident on this Master Unit Statistical
10         Facsimile relied on as accurate?

11         MR. SMYTH: Objection, no foundation.

12         THE COURT: Lay the foundation.  Sustained.

13         ...

14         Q.  Dr. Levine, do you know what use is made
            of the reported classification code for the
15         injuries that employees suffer on the job?

16         A.  Yes, I do.

17         ...

18         Q.  What use is made?

19         A.  The two uses I just mentioned.  The first
            is rate-making by the Rating Bureau, and the
20         second is Experience Modification
            Determination by the Rating Bureau for the
21         individual employer.

22         Q.  And to your knowledge, by custom and
            practice, is an insurance company required to
23         report accurately what classification code
            applies?
24
           A.  Yes.  If they don't, then it contaminates
25         or subverts the whole rating basis as well as
           gives the employer a potential advantage or
26         disadvantage in their Experience Modification

                              45

competing with other competitors in the
industry.

...

The Rating Bureau is, first and foremost, a
rating organization, and it takes tremendous
pains and is extremely concerned about the,
let's call it 'purity', or accuracy, of its
database.

In many of the meetings I attend, the
president of the Rating Bureau comments that
a proposed rule change or a particular
procedure will have an impact or won't have
an impact on the credibility and accuracy of
the database.

There is probably nothing that they are more
concerned about than making sure that this
information is properly reported and
accumulated because is it's not right, then
they are not giving the right results to the
Insurance Commissioner, and their own
members, the insurance companies, are using
data that's skewed.

So both for their own self-interest and for
their role for the Insurance Commissioner,
they want to get it right.

(Testimony of Levine, Feb. 14, 2007, 35:8-37:10)

        Relying on this testimony, Lee asserts that "this" was

ultimately USF&G's responsibility and that the reporting occurred

after the rescission action was filed "only makes the admission

more egregious [and] does not ... excuse USF&G from its

admission.

        Third, USF&G contends, whether Ms. Conley's work could be

covered by a construction code is irrelevant:

                USF&G asserted in argument and during the
                case that the issue was whether Lee's
                employees, not just Ms. Conley, would be
                performing *construction work,* as that term

46

was normally interpreted using common
language.  The jury could and did reject
Lee's hypertechnical interpretation of the
August 12 letter as referring only to work
requiring a separate classification under a
construction code.  More importantly, none of
the parties who participated in the drafting
of the August 12, 1998 letter, Hugh Awtrey
and Christy Platt, testified to any
understanding of a 'special meaning' of
construction work different than its common
meaning.  Finally, as testified by Bennett
Bibel, even if construction work were such
performed [sic] normally by a water park
employee, it still had to be separately
classified under the WCIRB if it constituted
new *construction*.  Testimony of Bennett
Bibel, February 13, 2007 at 63:13-22 ... It
was clear and undisputed that the water slide
on which Conley was injured was a completely
new slide under original construction.

More argument does not alter the jury's finding on

substantial evidence that Ms. Conley was engaged in new

construction work, which Lee had promised not to do.  The bizarre

testimony of Dr. Levine does not make it otherwise.  His

testimony evidenced such a bias in favor of his partially

unintelligible opinions about the meaning of construction that

justified the jury's rejection of the entirety of his testimony.

The jury's verdict on this issue is not against the clear

weight of the evidence.

Lee's motion for new trial on this ground is DENIED.

3.   <u>Unopposed Expert Testimony Confirmed Ms. Conley</u>
<u>Was Performing Park Operations</u>.

Lee contends that the testimony of Lee's workers'

compensation expert, Arthur Levine, confirms that Ms. Conley was

performing park operations when she was injured.  Lee asserts

that Dr. Levine "is one of the preeminent experts on California Workers' Compensation Insurance, arguably one of the most knowledgeable outside the actual workers' compensation administration", that he has authored a book and taught classes on workers' compensation and liability insurance, and has served as the attorney for the Public Members of the Governing Committee on the Workers' Compensation Insurance Rating Bureau.  Lee argues:

> Dr. Levine testified that work performed by Ms. Conley during the time of her injury, and any construction-related activity performed by Ms. Conley or Mr. Calomiris after the park opened for business was considered to be part of park operations and as such, it was covered under the water park classification codes 9016 or 9180.  This evidence was unrebutted by other expert testimony.  This evidence cannot be disregarded absent contradicting expert testimony.  Dr. Levine's opinion was supported by Lee's water park expert Kent Lemasters who testified that it was not unusual for water parks to use their own employees to erect new slides, depending on the skills of park personnel and other issues.
>
> As set forth above, the key communications, all indicate that American Specialty would agree to insure Lee's employees performing 'their designated classification as water park employees,' and Lee agreed that its employees 'would be restricted to park operations.'  Taken together, and in light of Dr. Levine's uncontroverted testimony, it is clear that Ms. Conley (and Mr. Calomiris and the remaining Lee employees assembling the Red Wave Slide in February 1999) was performing within park operations and performing a task that is within a designated water park classification code.
>
> Thus, even though classification codes are technically only used to calculate premiums,

1     the clear weight of the evidence was that
      they were used by the parties in this case to
2     designate and describe USF&G's claimed
      underwriting limitation and Lee's expected
3     and anticipated scope of work by its
      employees.  The clear weight of the evidence
4     was that water park operations included
      erecting water slides, Lee's employees would
5     perform those tasks, Lee expected to be
      insured for those tasks, and USF&G and
6     American Specialty should have expected to
      insure those tasks.  Accordingly, the clear
7     weight of the evidence is that there was no
      misrepresentation concerning the nature and
8     scope of Lee employees' work and that Ms.
      Conley was performing a task contemplated and
9     accepted by USF&G.

10    Both USF&G and Aon oppose this ground for a new trial.  Both

11    correctly assert that Lee's contention ignores all of the

12    evidence at trial, except Dr. Levine's opinions, and all of the

13    relevant legal issues.  USF&G contends:

14            First, Lee ignores the clear and explicit
          language in its August 12, 1998 letter that
15        Lee would no longer employ construction
          laborers and that any construction work would
16        be performed by independent contractors.
          Although Lee would like to rephrase the
17        language of that letter to state that Lee's
          employees would only perform construction
18        work requiring a separate classification
          under the Uniform Statistical Reporting Plan
19        of the WCIRB, the letter clearly did not so
          state.  In determining the falsity of Lee's
20        representations and its intentional
          concealment of its plans to use its own
21        employees to finish construction of the water
          park slide, whether or not its employees fell
22        within a workers [sic] compensation
          classification is irrelevant.  Any alleged
23        testimony by Levine that Conley's work fell
          within a water park operations classification
24        thus also was irrelevant.  Lee's contention
          that the clear weight of the evidence
25        established the classification codes were
          used by the parties to designate USF&G's
26        claimed underwriting limitation as to the

49

1    expected and anticipated scope of work by its
     employees ... is absurd.  No one, not even
2    Ms. Ehrlich, testified to that effect.

3    Second, Lee's representation that it would
     not perform construction work with its own
4    employees was not limited to Conley.  During
     trial, Bruce Calomiris testified that he
5    utilized a ten-ton crane and reach forklifts
     to assemble the water park slide.  Conley
6    herself testified that she performed work,
     including bolting together portions of the
7    slide while other workers were on manlifts 30
     to 40 feet in the air, which clearly
8    constitute construction.

9    Third, as even Lee admits ...,
     'classification codes are technically only
10   used to calculate premiums, ...' ... It thus
     was irrelevant as to whether the work of any
11   construction worker, including Conley, fell
     within an amusement park classification.  Lee
12   represented that it would not use its own
     employees to perform construction work.  It
13   did not reference workers [sic] compensation
     classifications.  In any event, USF&G's
14   expert, Bennett Bibel, testified that under
     the WCIRB, *new construction* must always be
15   separately classified ... Even Levine
     testified that new construction had to be
16   separately classified.

17   Finally, Levine in fact did not testify
     specifically that Conley was performing work
18   that fell within a water park classification.
     However, he did provide his preposterous and
19   unbelievable testimony that while
     construction of a six-story building
20   constituted 'construction,' construction of a
     six-story water slide did not and that while
21   construction of a temporary structure over a
     college graduation ceremony was considered
22   assembly and not construction, even though
     the USRP had a *construction* classification
23   for tent erection.  The weight of the
     evidence was that Levine's testimony was
24   preposterous and unbelievable.

25   Aon argues that Lee's contention that Ms. Conley was

26   performing work within the scope of water park operations is

                                50

1   irrelevant:

2           [T]here was evidence that (1) all of the
            parties understood American Specialty's
3           concern to be any type of construction work
            performed by Lee's employees, and (2) Lee
4           understood the August 12, 1998 letter to mean
            that Lee's employees would not perform such
5           work.

6   Aon refers to the trial testimony of Christy Platt:

7           Q. ... If you look to the last sentence of
            the letter, and it says ..., 'The coverage
8           with [USF&G] has been issued on the premise
            that there will be no construction laborers
9           employed by [Lee].'

10          Now, that was your understanding as well?

11          A.   Correct.

12          Q.   So in your dealings with Mr. Awtrey and
            Aon around the time of the August 12th letter
13          ... you understood that Mr. Awtrey was
            relaying to you ... the new insurance
14          company's concerns about water park employees
            doing construction, correct?
15
            A.   Yes.
16
            Q.   Okay.  And you understood that the August
17          12th letter was intended to address those
            concerns, correct?
18
            A.   Correct.
19
            Q.   And you discussed the insurance company's
20          concerns with Lisa Ehrlich, correct?

21          A.   I'm sure I did.

22  (Testimony of Platt, Feb. 14, 2007, 16:3-21).  Aon also refers to

23  the trial testimony of Cathy Hacker:

24          Q.   And do you recall what Stan said about
            potentially issuing a USF&G policy to
25          American Specialty to The Island for Workers'
            Compensation insurance?

26

                                    51

> A.  My recollection is that he would consider
> writing it only on the condition that we had
> verification that Splash Island employees no
> longer would perform any construction work.

(Testimony of Hacker, Feb. 2, 2007, 55:16-21)

Aon contends that since the jury reasonably could conclude that

Ms. Conley was performing construction work, the jury's verdict

was not against the clear weight of the evidence.

Lee replies that the August 11 and August 12, 1998 letters

make clear that USF&G intended to cover any work done by Lee

employees if properly classified within water park classification

and that Lee clearly informed ASI that it intended its workers to

perform normal water park operations.   Lee refers to the August

11, 1998 letter (Ex. 833):

> Attached is a copy of The Island's workers'
> compensation loss runs.  Bill, I think we
> have a problem.  The loss runs seem to
> evidence an interchange of labor between the
> water park employees and the construction
> employees.  Please review the type of losses
> that have occurred and help us understand how
> this fits with our understanding of the
> client/employee relationship.  We would have
> anticipated training losses rather than
> construction losses.
>
> After seeing the loss runs, we are concerned.
> The loss runs seem to support Industrial
> Indemnity auditors' position.  Please help me
> to prove to our underwriter the following:
>
> 1.  *Island employees will not be performing
> tasks outside of their designated
> classification as water park employees;*
>
> 2.  Construction has ceased at The Island and
> all construction laborers working for Rexford
> Development Corporation have moved to a
> different job site.  Therefore, workers'
> compensation claims arising from construction

1          will not be reported under Lee Investments
           workers' compensation policy. [Emphasis
2          added]

3    Lee again contends that neither Kent LeMasters' testimony or Dr.

4    Levine's testimony has been rebutted.   Lee refers to Dr. Levine's

5    trial testimony:

6          Q. ... Dr. Levine, I would like you to assume
           that in response to the underwriter's inquiry
7          on the previous hypothetical that I gave to
           you, the prospective insured responded using
8          the term or phrase 'construction laborers,'
           and stated that the prospective insured would
9          not employ construction laborers.

10         In 1998, would that phrase have been
           generally understood in the insurance
11         industry to have had a specialized meaning?

12         ...

13         A.  Yes.

14         Q.  Dr. Levine, I would ask you to assume the
           same facts, except the prospective insured
15         has stated that the prospective insured will
           not to do [sic], 'construction.'  In 1998,
16         would that term have generally been
           understood in the insurance industry to have
17         had a specialized meaning?

18         A.  Yes.

19         Q.  Now, I want you to further assume that
           the prospective insured stated that the
20         insured would limit its activities to 'park
           operations.'  In 1998, would such phraseology
21         generally have been understood in the
           insurance industry to have had a specialized
22         meaning?

23         ...

24         THE WITNESS: When you said 'park operations,'
           you are talking about a water park?

25         ...

26

53

1      Q.  Any kind of park for hypothetical
       purposes, an amusement park,
2
       ...
3
       THE WITNESS: I mean as opposed to a public
4      park with grass in it?

5      MR. JAMISON: Right.

6      ...

7      THE WITNESS: Yes.  That would have a - that
       would be understood in the insurance industry
8      to have a particular meaning.

9      ...

10     Q.  And what meaning would it have?

11     A.  Well, once again, it would mean
       operations that are performed by a contractor
12     or by a construction company that was
       classified or for some other reason had to be
13     classified under one of the several dozen of
       specific construction codes or - I'm using
14     'code' and 'classification' interchangeably.

15     Q.  Okay.  And earlier in this series of
       hypotheticals, I asked you about the phrase,
16     quote, 'construction laborers,' and you
       indicated that it would have been generally
17     understood in the insurance industry to have
       a specialized meaning.  What would that
18     meaning have been?

19     A.  I would distinguish it from, say,
       maintenance workers, repair workers, general
20     grounds workers.  All of those kinds of
       people can do what might be considered in a
21     lay sense or generic sense construction work,
       but that's not what it means in the Workers'
22     Comp industry.  And maybe an example of that,
       let's talk about a water park.
23
       If the - one of the sections of a slide at
24     the top, I don't know how high the things
       are, 70 feet or whatever they are, were to
25     break and need to be welded.  You could have
       a park maintenance employee go up or operate
26     a crane or whatever was required, and

                         54

disassemble this thing and load this heavy
pipe to the ground and weld it and then
reverse the process.  That might sound like a
construction activity if you just generally
talked about construction.

But very clearly, it's a repair activity and
'repair',' it doesn't matter how heavy duty
it is, if it's repair, then in the Workers'
Comp rules, the classification language and
so on, that's included in whatever the basic
nonconstruction classification is.

So construction laborers, to me, doesn't mean
people who are doing maintenance repair and
other kinds of activities that are in the
regular classification. It means people that
are doing specifically construction
classification things, usually contractors,
employees those do those sorts of things
[sic].

...

Q.  In other words, you have to look at the
fact that it's being used in a Workers'
Compensation insurance context; is that
right?

A.  Yes.

(Testimony of Levine, Feb. 14, 2007, 45:9-49:80).  Lee contends

that because Dr. Levine's testimony establishes that, in the

context of Workers' Compensation insurance, the terms

"construction" and "construction laborer" do not refer to

incidental construction work that may be performed by a

maintenance employee, it is clear that Ms. Conley's work on the

red slide in February 1999 was normal park operations and would

be covered and expected within water park classifications 9180 or

9016.

    This is yet another example where Lee has tortured and

55

manipulated the unambiguous meaning of the terms and clear

intention of the parties that Lee would not engage in any

construction activities or would subcontract for third party

construction workers who would provide insurance certificates.

The jury easily saw through this and rejected the testimony of

Dr. Levine as to the meaning of construction as intended by the

parties.

Lee's motion for new trial on this ground is DENIED.

D.   **Prejudicial Misconduct by Opposing Counsel**.

Lee contends that it is entitled to a new trial because of

the prejudicial misconduct of opposing counsel.

1.   **Governing Standards**.

"Generally, misconduct by trial counsel results in a new

trial if the 'flavor of the misconduct sufficiently permeate[s]

an entire proceeding to provide conviction that the jury was

influenced by passion and prejudice in reaching its verdict.'"

*Hemmings v. Tidyman's Inc.*, 283 F.3d 1174, 1192 (9th Cir.2002),

*cert. denied*, 537 U.S. 1110 (2003).[3]

2.   **Evidence by USF&G/American Specialty in Alleged**

**Violation of Order Granting Motion in Limine**.

Lee's motions in limine, (Docs. 444 and 449), were granted

by Order filed on February 1, 2007, (Doc. 596):

---

[3]In its reply brief, Lee, noting that USF&G cited a Sixth
Circuit opinion for this standard, contends that USF&G "provides no
support, nor is there support, that this is the position of the
Ninth Circuit." Lee's position is incorrect – this is also the
standard in the Ninth Circuit as evidenced by *Hemmings v.
Tidyman's, Inc.*, *supra*.

14. Lee's Motion in Limine No. 14 is granted
in part and denied in part.  The motion is
granted to the extent that there will be no
testimony or documentary evidence concerning
the exact mechanism of Ms. Conley's injuries
or the nature and extent of her injuries.
Specifically, there will be no evidence
concerning the 'reason' the cable fell, no
close up pictures of the forklift tines, etc.
It is denied insofar as counsel will be able
to introduce evidence concerning the task(s)
that Ms. Conley was performing at or near the
time of the accident at issue, what kind of
equipment was present, and what, in a very
general sense, happened that caused the
injury.

...

19. Lee's Motion in Limine No. 19 is
granted.  There shall be no mention of and no
documentary evidence or testimony before the
jury or prospective jurors relating to any
collateral source of funds for the payment of
benefits or damages to Ms. Conley, including,
without limitation, the Uninsured Employer's
Trust Fund or a civil action by Conley
against Lee.  The Court will address by
declaratory judgment the rights and
liabilities of the parties as to claims, if
any, that might be asserted against Lee in
the future by Conley or any other person or
entity.

Lee asserts that USF&G and ASI violated this Order when Mr.
Charlston introduced evidence of the existence and purpose of the
Uninsured Employer's Fund in questioning Hugh Awtrey.  Although
Lee objected to the questioning and the Court gave a limiting
instruction to the jury, Lee argues that "the proverbial skunk
was in the jury box and the blatant attempt at prejudicing the
jury against Lee was successful."

The testimony at issue is as follows:

Q.  So there is a fund somewhere that, if an

57

1    employee is injured by an employer that
     doesn't have insurance, they could collect
2    otherwise?

3    MR. JAMISON: Excuse me, objection.

4    MS. PARKER: Motion in Limine.

5    THE COURT: As to the question, as to a fund
     without regard to insurance, that has been
6    the subject of a prior ruling, ladies and
     gentlemen, and you need not concern
7    yourselves.  That is not an issue in this
     case.
8
     MR. CHARLSTON: I'm sorry.  I will withdraw
9    the question.  I'm sorry, your Honor.

10   THE COURT: Thank you.

11   BY MR. CHARLSTON: Q.  Now -

12   MR. JAMISON: Your Honor, we will move to
     strike the prior testimony that was given in
13   response to questions that were in violation
     of the motion in limine.
14
     THE COURT: As I am looking at it, there is
15   only one question, and I will - I have
     already sustained the objection.
16
     MR. JAMISON: All right.
17
     THE COURT: I will strike the answer and tell
18   the jury to disregard the subject of some
     other fund, if there is no insurance.  There
19   is not such an issue in this case.  The
     jurors have nodded yes.
20
     You may proceed, Mr. Charlston.
21
     MR. CHARLSTON: Thank you, your Honor.
22
(Trial testimony of Awtrey, Feb. 8, 2007, 74:9-75:10).
23
     "'A timely instruction from the judge usually cures the
24
prejudicial impact of evidence unless it is highly prejudicial or
25
the instruction is clearly inadequate.'" *B.K.B. v. Maui Police*
26

*Dept.*, 276 F.3d 1091, 1105 (9th Cir.2002).  The question was not answered, the objection was sustained, the question was withdrawn by counsel, the jury was admonished to disregard the questions, told that they were not to consider the subject of any other fund, and the motion to strike was granted.  The jurors nodded their confirmation they understood the admonition that some other fund was not in issue in the case.

In addition, as USF&G contends, the lack of prejudice to Lee, even with the court's admonition to the jury to disregard Mr. Awtrey's testimony, is underscored by the disingenuous efforts of Lee and Aon to introduce evidence and make arguments that Ms. Conley would lose her future benefits, which are violative of the spirit of Lee's motion in limine.  USF&G refers to Lee's opening statement that USF&G had filed this action "seeking to have paid back benefits that it was paying to Diana Conley, and seeking to end any obligation to pay future benefits to Diana Conley", (Lee Opening Statement, Jan. 31, 2006, 63:11-13), and to Aon's opening statement, "And, by the way, if you conclude that Diana Conley was doing normal park operations when she was injured and that gets her coverage, Aon doesn't have a problem with that at all."  (Aon Opening Statement, Jan. 31, 2007, 90:17:20).[4]  USF&G also refers to Aon's closing argument

---

[4]USF&G also notes that Lee and Aon insisted on Ms. Conley's personal appearance and testimony at trial solely for the purpose of eliciting sympathy from the jury.  However, USF&G's objections were overruled by the Court and cannot form the basis for alleged of similar misconduct by counsel for Lee (or Aon).  It does provide circumstantial evidence that Lee continued to "keep the door open"

that if the jury finds that Lee made a misrepresentation the jury will be "terminating the benefits to someone as severely injured as Diana Conley". (Aon Closing Argument, Feb. 22, 2007, 43:21-44:10). Lee's contention that Mr. Awtrey's stricken testimony prejudiced the entire trial is wrong. Lee opened the door and invited any such question by its opening statement. As USF&G contends:

> There was absolutely no other mention of the Uninsured Employers' Fund at any other time at trial and no argument that Conley would be covered under the fund, although she would. Indeed, any mention of the Uninsured Employers' Fund was not prejudicial. If anything, even if the jury had given any cognizance to it, it would only have mitigated slightly the prejudice from the blatant arguments of Lee and Aon that Conley would be harmed if the jury made factual findings that led to rescission.

Lee further contends that Mr. Charlston, in questioning Mr. Calomiris over Lee's objection, was allowed to introduce photographic evidence including the close-up of the "spreader-bar," cable and forklift tines. Lee contends that this evidence was clearly prejudicial "as it took the jury's focus from the issue at hand, i.e., what task Ms. Conley was performing, and directed the jury's focus to Lee's possible fault as it related to the accident, and other possible sources of compensation for Ms. Conley, including the manufacturer, distributor, and provider of the forklift in question."

Lee's contention that it is entitled to a new trial on the

---

on the Diane Connely issue.

basis of opposing counsel misconduct concerning the introduction

of these photographs is without merit.  Lee admits that the

photographs were admitted over Lee's objection, i.e., the Court

ruled that the photographs were admissible for the limited

purpose to show the nature of Ms. Conley's work activities at the

time.  This cannot be misconduct of counsel.  This is entirely

consistent with the court's in limine order that evidence to

describe the type of work and activities was admissible.  Lee

admits that the photographs admitted by USF&G were not the

photographs the subject of the motion in limine order, but

"nearly identical photographs."  There is no prejudice.

Lee's motion for new trial on this ground is DENIED.

> 3.  <u>Misrepresentation in Closing Argument by Aon</u>.

Lee asserts that Ms. Parker, counsel for Aon, misrepresented

to the jury during closing argument that Lisa Ehrlich had never

before stated the detail of Ms. Ehrlich's conversation with Ms.

Moore wherein Ms. Moore told Ms. Ehrlich that slide assembly was

within the 9180 classification code.  Lee contends that such

details had been described in Ms. Ehrlich's May 2, 2001

deposition at pages 233-235, that was read to the jury.  Lee

asserts that even greater detail regarding Ms. Ehrlich's

communication with Ms. Moore was contained at pages 106-113 of

Ms. Ehrlich's deposition and argues:

> Because pages 233-235 had been read to the
> jury, a reading of pages 106-113 would have
> been cumulative, but counsel's
> misrepresentation took unfair advantage of
> the fact that this additional deposition

testimony was not read.

As Aon notes in opposition, Lee did not object to Ms. Parker's closing argument at the time nor itself read the additional testimony in Lee's arguments.  As explained in *Settlegood v. Portland Public Schools*, 371 F.3d 503, 517 (9th Cir.), *cert. denied*, 543 U.S. 979 (2004):

> There is an even 'high[er] threshold' for granting a new trial where, as here, defendants failed to object to the alleged misconduct during trial ... A higher threshold is necessary for two reasons: 'First, raising an objection after the closing argument and before the jury begins deliberations "permit[s] the judge to examine the alleged prejudice and to admonish ... counsel or issue a curative instruction, if warranted."' ... Second, 'allowing a party to wait to raise the error until after the negative verdict encourages that party to sit silent in the face of claimed error.' ... We thus review for plain or fundamental error where no contemporaneous objection was made. Plain error requires: (1) an error; (2) that the error be plain or obvious; (3) that the error have been prejudicial or affect substantial rights; and (4) that review might be necessary to prevent a miscarriage of justice.

Although Lee does not quote the allegedly improper closing argument, Aon contends that Lee is referring to Ms. Parker's comment: "I felt [it] is significant for you to see the depth of the conversation that Lisa Ehrlich testified in this trial or because it's the only time apparently that she remembered [the detail of the conversation]."  (Aon closing argument, Feb. 22, 2007, 28:11-14).  Aon argues that this statement is not misconduct:

While Ms. Ehrlich testified about some details of this alleged conversation during her deposition (which was read to the jury), Ms. Ehrlich did not testify about all of the details in her deposition.  For example, Ms. Ehrlich testified at trial (but not in her deposition) that Ms. Moore allegedly assured her that all of Lee's employees were covered because, among other things, the policy was auditable at the end of the year.  (Compare Parker's closing quoting Ms. Ehrlich's trial testimony on February 22, 2007 (RT 28:1-5) with pages of Ms. Ehrlich's Deposition cited by Lee (pp. 106-113, 233-235).

The jury also could reasonably have understood Ms. Parker's comment to refer to several other important instances in which Ms. Ehrlich simply failed to mention, or memorialize, the alleged conversation.  For example, Ms. Ehrlich failed to mention this alleged conversation with Ms. Moore in multiple sworn Interrogatory Responses (and amended responses) that she prepared and signed for Lee (Aon's cross-examination of Lisa Ehrlich on Feb. 9, 2007, RT pp. 39-40; 41:25-42:25; 43:6-44:23; 45:16-46:21.)

Aon contends, any misstatement by Ms. Parker could not reasonably have affected the jury's verdict.  Aon argues that Ms. Ehrlich's testimony lacked credibility on so many levels, reiterating that Ms. Ehrlich failed to mention the alleged conversation with Ms. Moore in sworn interrogatory responses prepared by Ms. Ehrlich and contending that Ms. Ehrlich did not memorialize this conversation in any correspondence with Aon, even though this was a critical conversation from Ms. Ehrlich's perspective:

Ms. Ehrlich testified that in August 1998 she knew that the Red Wave slide was not completed and wanted to confirm with Aon that Lee's employees would be covered if they constructed it.  (February 9, 2007

63

proceedings, RT pp. 13:19-14:12.)  During the general time frame of her alleged conversation with Ms. Moore, Ms. Ehrlich knew that the insurance company wanted a letter representing that whatever work would be done at the Island would be done by subcontractors (not Lee's employees).  (Id. at pp. 7:10-8:13; Ms. Ehrlich's Deposition p. 124:15-125:12.)  And Ms. Ehrlich knew that a letter was being prepared to be sent to the insurance company on this point.  (RT of February 9, 2007 proceedings, p.13:2-12.)  Although she knew these facts, she admitted that she never discussed the Red Wave Slide with Ms. Moore and never confirmed the alleged conversation with her in writing.  (Id. at pp. 13:13-15:2.)  This was true even though Ms. Ehrlich testified that she could not 'make hide nor hare' out of the construction classification codes, even after her discussion with Ms. Moore. (Id. at 14:17-20.).

Finally, Aon contends, any prejudice was cured by Mr. Jamison, Lee's counsel who, during his rebuttal closing argument, argued that Ms. Ehrlich previously testified at her deposition about the alleged conversation with Ms. Moore even though Ms. Ehrlich did not set forth this conversation in interrogatory responses.

Lee replies that Ms. Parker's statement was "nothing other than a blatant attempt to mislead the jury by misrepresenting the evidence" and that her misconduct was "substantial enough to warrant a mistrial whether or not Lee objected at the time."

This dispute centers on the give and take of a dispute over the credibility of a principal witness and opposing counsel's interpretation of the evidence in their closings.  No plain or fundamental error occurred nor was there any prejudice.  Lee's

1   motion for new trial on this ground is DENIED.

2       **E.   Court's Refusal to Admit Certain Deposition Testimony of**

3   **Christy Platt**.

4       Asserting that Christy Platt was a "key witness on the

5   question whether Lee made a misrepresentation or concealed any

6   facts as well as on other issue [sic]", but that Ms. Platt's

7   "memory was poor and contradicted by deposition testimony taken

8   much closer to the events in question", Lee contends that it is

9   entitled to a new trial because of the Court's denial of Lee's

10   request to read to the jury the following deposition testimony of

11   Ms. Platt at pages 65:24-67:5; 121:5-19; 122:3-14; and 126:13-

12   127:1.

13       Ms. Platt's deposition testimony at pages 65:24-67:5 was as

14   follows:

15               Q.  I'm going back to Exhibit 81.  The second
                page contains estimated labor for Splash
16               Island.  Was this the information you got
                from Steve Rodgers?

17
                A.  Yes.
18
                Q.  Did you understand that any of these
19               labor items included persons who would be
                performing any type of construction work?
20
                A.  I'm not sure that I understand what you
21               mean by 'construction work.'

22               Q.  Did you understand that these included
                any people who would be doing work involved
23               in building Splash Island?

24               MS. EHRLICH: Objection, vague and ambiguous
                as to the term 'building.'
25
                MR. SHERWOOD: And construction.  Join.
26

1        THE WITNESS: These numbers were based on past
         experience derived from Wild Water
2        Adventures.  And under - based on my
         experience at Wild Water Adventures, park
3        service did a lot of maintenance.  But, I
         mean, but they also did things like when we
4        put in a new ride out there, it was the park
         service department that did it.
5
         If, you know, we were building more shades,
6        park services department did it.  You know,
         if we were putting in sprinklers, the park
7        service department did it.
8        So those are all things that - so I'm still a
         little bit unclear.  When I first saw this, I
9        would - my assumption was that park services
         department would be doing functions similar
10       to what they had done at Wild Water
         Adventures.
11
During trial, the Court sustained an objection to reading this
12
deposition testimony on Lee's redirect examination of Ms. Platt:
13
         MR. COVINGTON: I think this was covered on
14       direct, Your Honor.
15       MS. PARKER: I think he went through this
         specifically.
16
         MR. COVINGTON: It was not covered on cross.
17
         THE COURT: It has been covered.  I think you
18       went through this testimony with her on
         direct.  The objection is sustained.
19
(Trial Transcript, Feb.14, 2007, 56:24-57:6).
20
     Ms. Platt's deposition testimony at page 121:5-19 was as
21
follows:
22
         Q.  Did you have any information that anybody
23       provided you from any of the insurers for
         Splash Island about that meaning for the term
24       'construction laborers'?
25       A.  I think that I assumed that everybody
         understood that, such [sic] Hugh has vast
26       experience in the water park business,

                              66

1       American Specialties [sic] writes insurance
        for a lot of water parks.  I think that's
2       standard operating procedure in the water
        park business.
3
        Q.  Okay.  My question, though, was did you
4       have any - did any - was any information
        provided you by any of the insurers for
5       Splash Island or workers' compensation
        insurance as to what the meaning was of
6       construction laborers?

7       A.  I don't believe that they gave me
        anything that defined it.
8
During trial, the Court sustained the objection to reading this
9
deposition testimony on Lee's redirect examination of Ms. Platt:
10
        THE COURT: All right.  I just read on 121,
11      it's entirely consistent with what she said
        today.  And she didn't have an understanding,
12      nor was the term 'construction laborers' ever
        discussed with her, so it is not impeaching.
13      It doesn't add anything.

14      What's the purpose of it?

15      MR. JAMISON: It shows, as to lines 5 though
        19, that the insurers and broker did not give
16      her any definition of these terms,
        'construction laborers.'
17
        THE COURT: They weren't being discussed.  It
18      wasn't an issue, is what she said.  And that
        could have been covered on her direct.  This
19      was not - the insurers providing definitions
        was not the subject of cross.  I think it's
20      also beyond the scope of cross-examination.

21      MR. JAMISON: I believe it is contradictory to
        testimony that was elicited in cross-
22      examination, specifically, with regard to her
        understanding of 'construction laborers'
23      being those who were involved in building the
        park from the ground up, and her
24      understanding that Hugh Awtrey, with his
        experience, knew that.
25
        THE COURT: She has testified clearly.  This
26      is all assumption.  She didn't consider it,

1                she doesn't remember it, it was never
                discussed with her.  She left this to Lisa
2                Ehrlich, and she only did what Ms. Ehrlich
                wanted her to do.  So this - and I don't
3                think this testimony says what you just
                represented it said.
4

                So the objection to that reading is
5                sustained.

6  (Trial Transcript, Feb. 14, 2007, 54:25-56:1).

7     Ms. Platt's deposition testimony at page 122:3-14 was as

8  follows:

9                Q.  Before we break, we had discussed your
                understanding of the term construction
10               laborers.

11               Did you have any discussion with Lisa Ehrlich
                about that term?
12
                A.  I don't recall a specific conversation,
13               but I'm sure in the course of deciphering
                subcontracting that - I mean, I do not recall
14               her ever saying, 'Christy, this is my
                definition of a construction laborer.'
15
                Maybe I just assumed that we had the same
16               definition of that.

17  During trial, the Court sustained the objection to reading this

18  deposition testimony on Lee's redirect examination of Ms. Platt:

19               THE COURT: She doesn't have any recollection.
                She thinks there might have been a
20               discussion, but she doesn't remember any
                discussion about a term, 'construction
21               laborer.'

22               MR. CHARLSTON: There is nothing inconsistent
                with her testimony.
23
                THE COURT: And it's totally consistent with
24               her testimony.  It can't refresh her
                recollection; therefore, there is no purpose
25               to read the deposition.  It's cumulative.
                The objection is sustained.
26

(Trial Transcript, Feb. 14, 2007, 56:3-11).

    Ms. Platt's deposition testimony at pages 126:13-127:1 was
as follows:

              Q.  Now, the last paragraph says, 'Your
              previous coverage with Industrial Indemnity
              was canceled effective August 17, 1998 due to
              the increased exposure of construction
              laborers.'

              Do you recall having a conversation with Mr.
              Awtrey about that statement either before
              this letter or at any time after that letter
              - after this letter?

              A.  A conversation about that statement?

              Q.  Yes, or what was said there as to the
              reason for the cancellation on Industrial
              Indemnity.

              A.  Well, I think that ties into what we
              previously discussed as to me trying to
              clarify things for him for the second policy.

During trial, the Court sustained the objection to reading this
deposition testimony on Lee's redirect examination of Ms. Platt:

              MR. COVINGTON: Beyond the scope, and same
              objections.

              THE COURT: Well, she says she doesn't
              remember anything except that the coverage
              with United States Fidelity & Guaranty
              Company had been issued on the premise that
              there would be no construction laborers
              employed by Lee Investments, LLC, and she
              says that was her understanding.

              So it is beyond the scope.  The objection is
              sustained.  I don't think it adds anything.
              That's cumulative.

(Trial Transcript, Feb. 14, 2007, 56:13-22).

    Lee argues that its credibility was critical in this case,
but the Court "refused to allow Lee to buttress its credibility

69

1   with this key testimony", thereby committing clear error and an

2   abuse of discretion which resulted in a miscarriage of justice.

3        Lee did not argue the ground of buttressing Lee's

4   credibility as the basis for the admission of this deposition

5   testimony.   The testimony was vague and imprecise.   Ms. Platt had

6   no specific recall.   She so testified on direct.   Cross did not

7   change her testimony.   There was no suggestion of impeachment.

8   The testimony was consistent and cumulative.   Even if it were

9   not, the testimony was not of such consequence to be prejudicial.

10       In opposing this ground for a new trial, both USF&G and Aon

11  argue that the Court's rulings set forth above were correct.   Lee

12  replies to the contrary with specific references to Ms. Platt's

13  trial testimony.   Because Lee did not move on the ground that the

14  specific rulings made by the Court were error and did not seek to

15  introduce this evidence on the ground now asserted, these

16  contentions are disregarded.

17       Lee's motion for new trial on this ground is DENIED.

18                              CONCLUSION

19       For the reasons stated above:

20       1.   Lee's motion for new trial is DENIED on all grounds;

21       2.   Counsel for USF&G and Aon shall prepare and lodge a form

22  of order that reflects the specific rulings on each issue

23  addressed by this decision within five (5) days following the

24  date of service of this decision by the Court's Clerk.

25       IT IS SO ORDERED.

26  Dated:   March 14, 2008                    /s/ Oliver W. Wanger

                                70

1                                    UNITED STATES DISTRICT JUDGE

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26